# 23-6724-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

CARL ANDREWS, a/k/a Day, a/k/a Dashawn, a/k/a 91454-053,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Eastern District of New York*

## APPENDIX

LAW OFFICE OF JAMES M. BRANDEN
*Attorney for Defendant-Appellant*
80 Bay Street Landing, Suite 7j
Staten Island, New York 10301
212-286-0173



PHP   (212) 719-0990
appeals@phpny.com

**A - i**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-----------------------------------------x

UNITED STATES OF AMERICA,

            Appellee,          Docket No. 23-6724

      -against-

CARL ANDREWS,

           Defendant-Appellant.

-----------------------------------------x

**<u>APPENDIX</u>**

*Page No.*

Docket Entries. . . . . . . . . . . . . . . . . . . . . A. 1-20

Indictment. . . . . . . . . . . . . . . . . . . . . . A. 21-29

Sentencing

    Defendant's Submission (without exhibits). . . . . A. 30-70

    Government's Submission (without exhibits) . . . . A. 71-111

    Sentencing Transcript (excerpted). . . . . . . . A. 112-182

Judgment. . . . . . . . . . . . . . . . . . . . . . . A. 183-89

Amended Judgment. . . . . . . . . . . . . . . . . . . A. 190-96

Notice of Appeal. . . . . . . . . . . . . . . . . . . A. 197

APPEAL,MAG

# U.S. District Court
## Eastern District of New York (Central Islip)
### CRIMINAL DOCKET FOR CASE #: 2:20-cr-00546-GRB-SIL-1

Case title: USA v. Andrews

Date Filed: 12/02/2020

Date Terminated: 06/22/2023

---

Assigned to: Judge Gary R. Brown
Referred to: Magistrate Judge Steven I.
Locke

**Defendant (1)**

**Carl Andrews**
*TERMINATED: 06/22/2023*
*also known as*
Day
*TERMINATED: 06/22/2023*
*also known as*
DaShawn
*TERMINATED: 06/22/2023*

represented by **Anthony M. LaPinta**
Anthony M. La Pinta
200 Vanderbilt Motor Parkway
Suite C-17
Hauppauge, NY 11788
631-231-1199
Email: lapintaesq@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Kevin James Keating**
Kevin J. Keating
666 Old Country Rd.
Suite 900
Garden City, NY 11530
516-222-1099
Email: kevin@kevinkeatinglaw.com
*TERMINATED: 11/19/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Robert P. LaRusso**
The LaRusso Law Firm, PLLC
666 Old Country Road
Suite 501
Garden City, NY 11530
516-248-3520
Email: robert@rlarussolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Designation: CJA Appointment*

**Susan Gail Kellman**
Susan G. Kellman
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
Fax: 718-783-8226
Email: sgk@kellmanesq.com
*TERMINATED: 05/05/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Ezra Spilke**
Law Offices of Ezra Spilke, PLLC
1825 Foster Avenue
Suite 1k
Brooklyn, NY 11230-1834
718-783-3682
Email: ezra@spilkelaw.com
*TERMINATED: 05/05/2021*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1594(c)CONSPIRACY TO COMMIT SEX TRAFFICKING OF CHILDREN BY FORCE, FRAUD, OR COERCION; 18:981, 982 and 1594(d); 21:853; 28:2461 CRIMINAL FORFEITURE ALLEGATION (1) | Dismissed on the motion of the United States |
| 18:1591(a), 1591(b)(1), 1594(a) and 2SEX TRAFFICKING OF CHILDREN OR BY FORCE, FRAUD OR COERCION; 18:981, 982 and 1594(d); 21:853; 28:2461 CRIMINAL FORFEITURE ALLEGATION (2) | Dismissed on the motion of the United States |
| 18:371 CONSPIRACY TO VIOLATE THE TRAVEL ACT; 18:981, 982 and 1594(d); 21:853; 28:2461 CRIMINAL FORFEITURE ALLEGATION (3) | Dismissed on the motion of the United States |
| 18:1952(a)(3) and 2 TRAVEL ACT; 18:981, 982 and 1594(d); 21:853; 28:2461 CRIMINAL FORFEITURE ALLEGATION | Dismissed on the motion of the United States |

(4)

21:846 CONSPIRACY TO DISTRIBUTE NARCOTICS; 18:981, 982 and 1594(d); 21:853; 28:2461 CRIMINAL FORFEITURE ALLEGATION
(5)

JUDGMENT: One-hundred fifteen (115) months imprisonment; Four (4) years supervised release with special conditions; Special Assessment: $100.00; The fine is waived.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                           **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                 **Disposition**

None

---

**Plaintiff**

**USA**                              represented by   **Daniel H. Wolf**
                                                      United State Attorneys Office
                                                      One St. Andrews
                                                      New York, NY 10007
                                                      212-637-2337
                                                      Email: daniel.wolf@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Government Attorney*

                                                      **Elizabeth Anne Espinosa**
                                                      DOJ-USAO
                                                      1 St. Andrew's Plaza
                                                      New York, NY 10007
                                                      212-637-2216
                                                      Email: elizabeth.espinosa@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Rushmi Bhaskaran**
                                                      U.S. Attorney's Office
                                                      Southern District of New York
                                                      One Saint Andrew's Plaza
                                                      New York, NY 10007
                                                      212-637-2439

Email: Rushmi.Bhaskaran@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Benjamin Woodside Schrier**
Southern District of New York
Greenoaks Capital Partners LLC
535 Pacific Avenue
4th Floor
San Francisco, CA 94133
914-260-2476
Email: benjamin.schrier@greenoaks.com
*ATTORNEY TO BE NOTICED*

**Karl Metzner**
DOJ-USAO
One St. Andrew's Plaza
New York, NY 10007-2632
212-637-2476
Email: karl.metzner@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/02/2020 | 1 | INDICTMENT as to Carl Andrews (1) count(s) 1, 2, 3, 4, 5. (Attachments: # 1 Criminal Information Sheet) (McMahon, Carol) (Entered: 12/02/2020) |
| 12/07/2020 | 7 | Minute Entry for proceedings held on 12/7/2020 before Magistrate Judge Anne Y. Shields: Criminal Cause for Arraignment as to Carl Andrews. Counsel for Defendant: Susan Kellman & Ezra Spilke, retained. AUSA: Daniel H. Wolf. Pretrial report prepared by: Donna Mackey. FTR: 12:11-12:18. Case called. Defendant arraigned on Counts 1, 2, 3, 4, 5 of the Indictment. Defendants initial appearance. Defendant waives public reading and pleads NOT GUILTY to Counts 1, 2, 3, 4, 5 of the 5 Count Indictment. Speedy Trial Order Information: Code Type: X-. Start: 12/7/2020 - Stop: 1/19/2021. Permanent Order of Detention entered for defendant. Status conference set for 1/13/2021 at 12PM before Judge Brown. Defendant continues in custody. (Tirado, Chelsea) (Entered: 12/10/2020) |
| 12/07/2020 | 8 | ORDER OF DETENTION as to Carl Andrews. Ordered by Magistrate Judge Anne Y. Shields on 12/7/2020. (Tirado, Chelsea) (Entered: 12/10/2020) |
| 12/09/2020 | 4 | NOTICE OF ATTORNEY APPEARANCE: Ezra Spilke appearing for Carl Andrews (Spilke, Ezra) (Entered: 12/09/2020) |
| 12/09/2020 | 5 | NOTICE OF ATTORNEY APPEARANCE: Susan Gail Kellman appearing for Carl Andrews (Kellman, Susan) (Entered: 12/09/2020) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)        https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 12/10/2020 | 6 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Carl Andrews. Ordered by Magistrate Judge Anne Y. Shields on 12/10/2020. (Tirado, Chelsea) (Entered: 12/10/2020) |
| 12/11/2020 | | ORDER as to Carl Andrews : Upon application of the defendant the court grants the request to re-appoint Susan Kellman, a member of the EDNY CJA panel, as counsel for defendant. As to the request for additional counsel to be appointed the court will require further justification. Ordered by Judge Gary R. Brown on 12/11/2020. (McMorrow, Karen) (Entered: 12/11/2020) |
| 12/11/2020 | 9 | CJA 20 Appointment as to Carl Andrews - Susan Kellman appointed. Nunc pro tunc date - 12/4/2020. Ordered by Judge Gary R. Brown on 12/11/2020. (Tirado, Chelsea) (Entered: 12/11/2020) |
| 12/14/2020 | | ORDER as to Carl Andrews : Based upon the review of the material submitted by Ms. Kellman, the Court will authorize the approval of a second CJA attorney, to wit: Mr. Spilke, to assist in the defense of the defendant. This, in and of itself, is an unusual if not extraordinary request. However, the request to hire a third defense attorney to represent the defendant even at a discounted rate is not warranted based upon the information presented. Therefore, the application to approve Mr. Spilke is GRANTED, while the request to approve Ms. Cisneros is DENIED. Said request is without prejudice to a request to retain the services of a paralegal, if such is sought by defendant.. Ordered by Judge Gary R. Brown on 12/14/2020. (McMorrow, Karen) (Entered: 12/14/2020) |
| 12/14/2020 | 11 | CJA20 Appointment as to Carl Andrews - Attorney Ezra Spilke appointed - Nunc pro tunc date: 12/4/2020. Ordered by Judge Gary R. Brown on 12/14/2020. (Tirado, Chelsea) (Entered: 12/14/2020) |
| 01/14/2021 | 20 | Minute Entry for proceedings held on 1/14/2021 before Judge Gary R. Brown: Criminal Cause for Status Conference as to Carl Andrews. Counsel for Defendant: Susan Kellman and Ezra Spilke, CJA Appointment. AUSA: Rushmi Bhaskaran and Daniel Wolf. Court Reporter: Dominick Tursi. Telephone conference. Case called. Counsel for all sides present. Defendant is informed of his rights. Set jury selection for 5/17/2021 at 9:30AM before Judge Brown, trial to begin immediately after. CARES Act finding placed on the record. Laptop order to be submitted by defense counsel. Motion to dismiss discussed, briefing schedule set. Any bail application is referred to the magistrate judge. Defendant continued in custody. (Tirado, Chelsea) (Entered: 02/18/2021) |
| 01/21/2021 | 12 | Letter *Regarding Pro Se Letter* as to Carl Andrews (Attachments: # 1 Exhibit Andrews' Letter to the Court) (Kellman, Susan) (Entered: 01/21/2021) |
| 01/21/2021 | 13 | Letter *Regarding Jointly Proposed Order to Provide Carl Andrews with Laptop Access at the MCC* as to Carl Andrews (Attachments: # 1 Text of Proposed Order) (Bhaskaran, Rushmi) (Entered: 01/21/2021) |
| 01/22/2021 | 14 | ORDER as to Carl Andrews re 13 Letter - IT IS HEREBY ORDERED that 1. Mr. Andrews may have access to an "air-gapped" laptop computer (the "Laptop") that is disabled from accessing the internet, local area networks, or other electronic devices; 2. Upon receipt of an acceptable laptop computer from counsel for Mr. Andrews, the Government shall (a) ensure that the Laptop is appropriately "air-gapped" and |

| | | |
|---|---|---|
| | | compatible with the MCC's security requirements; (b) load the Laptop, or if necessary, a hard drive, with the non-sensitive and non-confidential discovery in this case; and (c) deliver the Laptop to the proper authorities at the MCC within 72 hours of completing the tasks described in 2(a) and 2(b); 3. The Laptop shall be password protected and maintained in a location acceptable to Bureau of Prisons personnel; 4. Bureau of Prisons personnel will provide Mr. Andrews with access to the Laptop on a daily basis for at least 3 hours per day in his cell; 5. This Order remains in effect until the trial in this matter is completed and a copy of this Order shall be made available to any unit where Mr. Andrews is housed; 6. Mr. Andrews may use the Laptop for the sole purpose of reviewing discovery and legal materials that relate to his criminal case. He shall not share the Laptop or the materials loaded onto the Laptop with other inmates or with any attorney not appointed to this case without an order of this Court. He will not access or attempt to access the internet or any form of wireless communication. He will forfeit his right under this Order o use the Laptop, and he may expose himself to criminal prosecution for possessing or distributing a "prohibited object" as that term is defined in 18 U.S.C. § 1791(d) in the future, should he violate any of these understandings. 7. Within 48 hours of the MCC's receipt of the Laptop from the Government, Mr. Andrews shall receive access to the Laptop. Mr. Andrews shall not have possession of any charging apparatus or cord that connects to the laptop. SO Ordered by Judge Gary R. Brown on 1/22/2021. (Tirado, Chelsea) (Entered: 01/22/2021) |
| 01/22/2021 | | ORDER as to Carl Andrews re 12 Letter : The Court has received and reviewed the letter written by defendant dated December 9. No action will be taken on the matters raised pending the conclusion of the briefing to permit review upon a complete record. Counsel are directed to address, as part of the current briefing schedule, the Speedy Trial issues implicated in defendants submission, and are to represent, in writing, whether the defendant still intends to waive a jury trial and whether the Government objects to that waiver.. Ordered by Judge Gary R. Brown on 1/22/2021. (McMorrow, Karen) (Entered: 01/22/2021) |
| 02/03/2021 | 15 | Letter to defendant Carl Andrews from the Pro Se Department returning letter without docketing or consideration. (Tirado, Chelsea) (Entered: 02/04/2021) |
| 02/16/2021 | 16 | MOTION to Dismiss on Speedy Trial *Grounds* by Carl Andrews. (Spilke, Ezra) (Entered: 02/16/2021) |
| 02/16/2021 | 17 | AFFIDAVIT in Support re 16 MOTION to Dismiss on Speedy Trial *Grounds* . *Declaration of Defendant Carl Andrews* (Spilke, Ezra) (Entered: 02/16/2021) |
| 02/16/2021 | 18 | AFFIDAVIT in Support re 16 MOTION to Dismiss on Speedy Trial *Grounds* . *Declaration of Ezra Spilke, Esq.* (Attachments: # 1 Exhibit A: Southern District docket sheet and combined SDNY indictments, # 2 Exhibit B: Government Exhibit 115 Summary chart of text message exchanges between Victim-1 and potential client, # 3 Exhibit C: Government Exhibit 116 Summary chart of text message exchanges between Victim-1 and potential client, # 4 Exhibit D: Government Exhibit 117 Summary chart of text message exchanges between Victim-1 and potential client, # 5 Exhibit E: Government Exhibit 203 A and B Backpage advertisements, # 6 Exhibit F: Transcript of status conferences cited in the memorandum of law, # 7 Exhibit G: Trial Transcript, # 8 Exhibit H: Medical note from the Bureau of Prisons dated September 18, 2020) (Spilke, Ezra) (Entered: 02/16/2021) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)      https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 02/16/2021 | 19 | MEMORANDUM in Support re 16 MOTION to Dismiss on Speedy Trial *Grounds* (Spilke, Ezra) (Entered: 02/16/2021) |
| 03/08/2021 | 22 | Letter *update re: scheduling conflict* as to Carl Andrews (Spilke, Ezra) (Entered: 03/08/2021) |
| 03/14/2021 | 23 | First MOTION to Compel *DISCLOSURE OF BRADY/GIGLIO MATERIAL* by Carl Andrews. (Kellman, Susan) (Entered: 03/14/2021) |
| 03/18/2021 | 24 | MEMORANDUM in Opposition re 16 MOTION to Dismiss on Speedy Trial *Grounds* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Bhaskaran, Rushmi) (Entered: 03/18/2021) |
| 03/18/2021 | 25 | Letter MOTION for Discovery *re: juror data* by Carl Andrews. (Spilke, Ezra) (Entered: 03/18/2021) |
| 03/25/2021 | 26 | REPLY TO RESPONSE to Motion re 16 MOTION to Dismiss on Speedy Trial *Grounds* (Spilke, Ezra) (Entered: 03/25/2021) |
| 03/26/2021 | | ORDER granting 25 Motion for Discovery as to Carl Andrews (1). By 4/9/2021, the Government is directed to provide defendant with data reflecting the county of residence, zip code, and to the extent available, the race and age of the individuals listed in the Master Jury Wheel from which the Grand Jury that indicted defendants was selected. Ordered by Judge Gary R. Brown on 3/26/2021. (McMorrow, Karen) (Entered: 03/26/2021) |
| 04/01/2021 | 27 | Letter *enclosing Grand Jury data pursuant to the Court's March 26, 2021 Order* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/01/2021) |
| 04/09/2021 | | ELECTRONIC ORDER TO SHOW CAUSE as to Carl Andrews Show Cause Hearing set for 4/14/2021 at 10:00 AM before Magistrate Judge Steven I. Locke. The Suffolk County Police Department and United States are hereby Ordered to Show Cause on Wednesday, April 14, 2021 at 10:00 am, by video conference (information below) why either or both should not be subject to further orders of the court, up to and including sanctions, for failing to respond to the March 4, 2021 So Ordered subpoena to the Suffolk County Police Department. Counsel for the United States is directed to serve a copy of this order upon the Suffolk County Police Department immediately. WebEx Info: Phone: (571)353-2300, then enter 371904125# **https://join.uc.uscourts.gov /invited.sf?secret=Qc4C2JKzGGuh8xoligEafw&id=371904125** .So Ordered by Magistrate Judge Steven I. Locke on 4/9/2021. (Gandiosi, Kristin) (Entered: 04/09/2021) |
| 04/11/2021 | 29 | MOTION to Quash *Subpoena to the SCPD and Opposition to the Defendant's Motion to Compel Discovery* by USA as to Carl Andrews. (Bhaskaran, Rushmi) (Entered: 04/11/2021) |
| 04/11/2021 | 30 | Letter *Requesting Adjournment of the April 14, 2021 Show-Cause Proceeding Pending the Resolution of the Government's Motion to Quash and the Defendant's Motion to Compel* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/11/2021) |
| 04/12/2021 | 31 | Letter *Requesting a Status Conference to Discuss Trial Scheduling and Other Logistics* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/12/2021) |
| 04/12/2021 | 32 | Letter *Joining In Government's Request for a Status Conference* as to Carl Andrews (Kellman, Susan) (Entered: 04/12/2021) |

      7/28/2023, 5:01 PM

| 04/13/2021 | 33 | RESPONSE in Opposition re 29 MOTION to Quash *Subpoena to the SCPD and Opposition to the Defendant's Motion to Compel Discovery* (Spilke, Ezra) (Entered: 04/13/2021) |
| 04/14/2021 |  | ORDER as to Carl Andrews re Order to Show Cause. Today's 4/14/2021 video conference will be held before the undersigned. The same conference access information applies. Ordered by Judge Gary R. Brown on 4/14/2021. (McMorrow, Karen) (Entered: 04/14/2021) |
| 04/14/2021 | 34 | Minute Entry for proceedings held before Judge Gary R. Brown: Video Status Conference as to Carl Andrews held on 4/14/2021. Case called. Counsel for all sides present. Defendant is informed of his rights. Set jury selection for 5/17/2021 at 9:30 a.m. before Mag. Judge Locke, trial to begin as soon as a courtroom becomes available. CARES Act finding placed on the record. Argument heard. Rulings placed on the record regarding DE 23 , and 29 . Motions terminated. Defendant's motion re: Rule 412 is due one week from tomorrow, the government will have 3 days to respond. Defendant continued in custody. (Court Reporter Owen Wicker.) (Florio, Lisa) (Entered: 04/14/2021) |
| 04/15/2021 | 35 | MEMORANDUM in Support re 16 MOTION to Dismiss on Speedy Trial *Grounds Post-argument letter* (Spilke, Ezra) (Entered: 04/15/2021) |
| 04/15/2021 | 36 | ORDER OF REFERRAL to Magistrate Judge Steven I. Locke as to Carl Andrews - The above-referenced criminal case is hereby referred to Magistrate Judge Steven I. Locke for the following purposes: With consent of the parties as indicated below, to select a jury of 12 jurors, with 4 alternates. SO Ordered by Judge Gary R. Brown on 4/15/2021. (Tirado, Chelsea) (Entered: 04/16/2021) |
| 04/16/2021 | 37 | MEMORANDUM in Opposition re 16 MOTION to Dismiss on Speedy Trial *Grounds* (Bhaskaran, Rushmi) (Entered: 04/16/2021) |
| 04/21/2021 |  | ORDER as to Carl Andrews. In connection with the Court's review of the pending motion to dismiss on Speedy Trial grounds, counsel are directed to file a letter on or before close of business 4/23/2021 with response to the following inquiry: What significance, if any, should be attributed to the Government's refusal to consent to a non-jury trial following defendant's application for such a resolution in October 2020? Should that event affect the Speedy Trial analysis?Ordered by Judge Gary R. Brown on 4/21/2021. (Brown, Gary) (Entered: 04/21/2021) |
| 04/22/2021 | 38 | Letter MOTION in Limine *pursuant to FRE 412* by Carl Andrews. (Spilke, Ezra) (Entered: 04/22/2021) |
| 04/23/2021 | 39 | MEMORANDUM AND ORDER as to Carl Andrews - Based on the foregoing, Count 5 of the EDNY indictment, along with the corresponding portion of the Criminal Forfeiture count, will be severed from the remaining charges. Trial is to begin on Count 5 and related forfeiture provisions on 5/17/2021. If appropriate, the remaining charges will be set for trial following resolution of the pending Speedy Trial Clause motion. SO Ordered by Judge Gary R. Brown on 4/23/2021. (Tirado, Chelsea) (Entered: 04/23/2021) |
| 04/23/2021 |  | ORDER finding as moot 38 Motion in Limine as to Carl Andrews (1). It appearing to the Court that the application has been rendered moot as to the May 17, 2021 trial by the Courts Memorandum and Order dated 4/23/2021, the motion is deemed WITHDRAWN without prejudice to renewal. Ordered by Judge Gary R. Brown on |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)　　　　https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| | | 4/23/2021. (McMorrow, Karen) (Entered: 04/23/2021) |
| 04/23/2021 | 40 | REPLY TO RESPONSE to Motion re 16 MOTION to Dismiss on Speedy Trial *Grounds Per Judge Brown's Recent Order* (Kellman, Susan) (Entered: 04/23/2021) |
| 04/23/2021 | 41 | Letter *in response to the Court's April 21, 2021 Order Requesting Additional Briefing on the Defendant's Motion to Dismiss the Indictment* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/23/2021) |
| 04/30/2021 | | SCHEDULING ORDER as to Carl Andrews. On or before May 7, 2021 the parties will file with the Court in anticipation of jury selection: (1) Proposed Voir Dire; (2) A proposed witness list; and (3) A list of all counsel and anyone else planning to be out counsels table during the trial.Ordered by Magistrate Judge Steven I. Locke on 4/30/2021. (Bartell, Max) (Entered: 04/30/2021) |
| 04/30/2021 | 42 | Letter *Regarding Potential Conflicts* as to Carl Andrews (Kellman, Susan) (Entered: 04/30/2021) |
| 05/02/2021 | 43 | Letter *to Judge Brown Regarding Improper Conduct by a Private Investigator* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 05/02/2021) |
| 05/03/2021 | 44 | NOTICE OF ATTORNEY APPEARANCE Benjamin Woodside Schrier appearing for USA. (Schrier, Benjamin) (Entered: 05/03/2021) |
| 05/03/2021 | | SCHEDULING ORDER as to Carl Andrews. In light of the sealed submission by defense counsel dated April 30, 2021, by which counsel seeks to be relieved due to a purportedly unwaivable conflict, as well as the Governments submission dated May 2, 2021, requesting additional relief based upon purported witness tampering, this matter is set for an *in person* conference before the Court on Wednesday, May 5 at 1:00 p.m. The Government shall ensure that defendant is brought to the Courthouse that day. The Court hereby appoints Kevin Keating, Esq., as standby counsel pending the resolution of the pending motion to withdraw. Present counsel advises that they are no longer in contact with the defendant, as such, Mr. Keating is authorized to contact and/or meet with the defendant to discuss pending matters,. Current defense counsel shall provide (1) Mr. Andrews with a copy of its sealed submission, along with a copy of the Governments submission, as soon as practicable, and (2) cooperate with Mr. Keating to assist him in preparing for this matter as well as prepare for any potential substitution. Counsel for the Government shall advise by written submission by May 4 at noon as to its position, if any, regarding the withdrawal of counsel. In that same submission, counsel shall provide the authority relied upon for the relief sought in its May 2 submission, and whether it believes an evidentiary hearing is required before such relief can be considered. ( Status Conference set for 5/5/2021 at 01:00 PM in Courtroom 940 before Judge Gary R. Brown.) Added attorney Kevin James Keating for Carl Andrews.. Ordered by Judge Gary R. Brown on 5/3/2021. (McMorrow, Karen) (Entered: 05/03/2021) |
| 05/03/2021 | 45 | Letter MOTION *Requesting Limited Courtroom Closure for the Testimony of an Undercover Officer* as to Carl Andrews (Attachments: # 1 Proposed Order Exhibit A) (Bhaskaran, Rushmi) Modified docket from letter to motion on 7/8/2021 (Tirado, Chelsea). (Entered: 05/03/2021) |
| 05/04/2021 | 46 | Letter *in response to the Court's May 3, 2021 Order* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 05/04/2021) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 05/04/2021 | | ORDER as to Carl Andrews: The Court has received a letter from an individual named Manuel Gomez with BLACK OPS PRIVATE INVESTIGATORS INC. (who is, presumably, the individual identified as PI-1 in the Governments submission of May 2, 2021), which appears highly relevant to tomorrows proceeding. To provide all parties notice of the material contained therein in the most expeditious means possible, while generally submissions should only be made by counsel, the Clerk is directed to file the letter after redacting the name of Victim-1. Ordered by Judge Gary R. Brown on 5/4/2021. (McMorrow, Karen) (Entered: 05/04/2021) |
| 05/04/2021 | 47 | Letter as to Carl Andrews from P.I. Manuel Gomez (Tirado, Chelsea) (Entered: 05/04/2021) |
| 05/04/2021 | 48 | REDACTION by Carl Andrews to 47 1 - Sealed Document CR, Letter (Tirado, Chelsea) (Entered: 05/04/2021) |
| 05/05/2021 | | ORDER as to Carl Andrews : An in-person conference is scheduled for 5/5/2021 at 1:00p.m.. Public remote access will be made available call 888-363-4734 using Access code 4132441. Ordered by Judge Gary R. Brown on 5/5/2021. (McMorrow, Karen) (Entered: 05/05/2021) |
| 05/05/2021 | 49 | Minute Entry for proceedings held on 5/5/2021 before Judge Gary R. Brown: Criminal Cause for Status Conference as to Carl Andrews. Counsel for Defendant: Susan Kellman and Ezra Spilke, CJA Appointment. AUSA: Rushmi Bhaskaran and Benjamin Schrier. Court Reporter: Paul Lombardi. Motion Hearing - Non Evidentiary. Case called. Counsel for all sides present. Defendant is informed of his rights. Set jury selection for 7/6/2021 at 9:30AM before Magistrate Judge Locke, trial to begin immediately after selection. Motion to exclude time through 7/6/2021. Motion granted, order entered on record. Conference held regarding DE 42 and DE 43 . The motion to withdraw as counsel is granted. Kevin Keating is appointed as counsel in the case. Counsel Kellman and Spilke are relieved as counsel. Incoming counsel cannot prepare in time for the 5/17/2021. Trial date is adjourned. Defendant continued in custody. (Tirado, Chelsea) (Entered: 05/06/2021) |
| 05/05/2021 | | Terminate Deadlines and Hearings as to Carl Andrews: 5/17/2021 Trial Continued, see 49 Minute Entry. (Tirado, Chelsea) (Entered: 05/06/2021) |
| 05/07/2021 | | ELECTRONIC ORDER as to Carl Andrews: On or before June 28, 2021 the parties will file with the Court in anticipation of jury selection: (1) Proposed Voir Dire; (2) A proposed witness list; and (3) A list of all counsel and anyone else planning to be out counsels table during the trial. Ordered by Magistrate Judge Steven I. Locke on 5/7/2021. (Gandiosi, Kristin) (Entered: 05/07/2021) |
| 05/13/2021 | 50 | Letter *in Response to Motion for a Partial Courtroom Closure* as to Carl Andrews (Keating, Kevin) (Entered: 05/13/2021) |
| 05/18/2021 | 51 | CJA20 Appointment - Kevin Keating added as attorney for Carl Andrews - Nunc Pro Tunc Date 5/3/2021. Ordered by Judge Gary R. Brown on 5/18/2021. (Tirado, Chelsea) (Entered: 05/18/2021) |
| 06/07/2021 | 52 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Carl Andrews Court Reporter/Transcriber Paul Lombardi. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)      https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| | | located under "Other Filings - Other Documents". Redaction Request due 6/28/2021. Redacted Transcript Deadline set for 7/8/2021. Release of Transcript Restriction set for 9/6/2021. (Lombardi, Paul) (Entered: 06/07/2021) |
| 06/22/2021 | | ELECTRONIC ORDER as to Carl Andrews: On or before June 28, 2021 the parties will file with the Court in anticipation of jury selection: (1) Proposed Voir Dire; (2) A proposed witness list; and (3) A list of all counsel and anyone else planning to be at counsels table during the trial.So Ordered by Magistrate Judge Steven I. Locke on 6/22/2021. (Bartell, Max) (Entered: 06/22/2021) |
| 06/28/2021 | 54 | WITNESS LIST by USA as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 06/28/2021) |
| 06/28/2021 | 55 | Proposed Voir Dire by USA as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 06/28/2021) |
| 06/29/2021 | | ORDER as to Carl Andrews: The parties are reminded of the undersigned's individual rules directing the parties to submit requests to charge, motions in limine and proposed verdict sheets with a courtesy copy to chambers in hard copy and electronic media in Word format at least one week before trial. Ordered by Judge Gary R. Brown on 6/29/2021. (McMorrow, Karen) (Entered: 06/29/2021) |
| 06/29/2021 | 56 | MOTION in Limine *Seeking to Preclude Expert Testimony* by Carl Andrews. (Keating, Kevin) (Entered: 06/29/2021) |
| 06/29/2021 | 57 | MOTION in Limine by USA as to Carl Andrews. (Schrier, Benjamin) (Entered: 06/29/2021) |
| 06/29/2021 | 58 | MEMORANDUM in Opposition re 56 MOTION in Limine *Seeking to Preclude Expert Testimony* (Schrier, Benjamin) (Entered: 06/29/2021) |
| 06/29/2021 | 59 | Proposed Jury Instructions/Verdict Form by USA as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 06/29/2021) |
| 06/30/2021 | 60 | RESPONSE in Opposition re 57 MOTION in Limine (Keating, Kevin) (Entered: 06/30/2021) |
| 06/30/2021 | 61 | Letter *to Judge Brown Requesting a Pretrial Conference on July 6, 2021* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 06/30/2021) |
| 06/30/2021 | | ELECTRONIC ORDER as to Carl Andrews. All parties should report to Courtroom 820 before Magistrate Judge Steven I. Locke on 7/6/2021 at 9:30 AM prior to the Jury Selection. Ordered by Magistrate Judge Steven I. Locke on 6/30/2021. (Gandiosi, Kristin) (Entered: 06/30/2021) |
| 07/01/2021 | 62 | Letter *regarding Proposed Vior Dior Questions* as to Carl Andrews (Keating, Kevin) (Entered: 07/01/2021) |
| 07/02/2021 | 63 | NOTICE OF ATTORNEY APPEARANCE Karl Metzner appearing for USA. (Metzner, Karl) (Entered: 07/02/2021) |
| 07/06/2021 | 64 | ORDER OF REFERRAL as to Carl Andrews - The above-referenced criminal case is herbey referred to Magistrate Judge Steven I. Locke for the following purposes: With consent of the parties as indicated below, to select a jury of 12 jurors and 2 alternate jurors. SO Ordered by Judge Gary R. Brown on 7/6/2021. (Tirado, Chelsea) (Entered: 07/06/2021) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| 07/06/2021 | 65 | Minute Entry for proceedings held on 7/6/2021 before Magistrate Judge Steven I. Locke: Criminal Cause for Jury Selection as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA. AUSA: Rushmi Bhaskaran, Benjamin Schrier, Karl Metzner. Court Reporter: Mary Ann Steiger, Paul Lombardi, Fred Guerino. Case called. Counsel for all sides present. Jury selection held. Prospective jurors sworn. Voir dire held. Jury Selection continued to 7/7/2021 at 9:30AM. Defendant remains in custody. (Tirado, Chelsea) (Entered: 07/07/2021) |
|---|---|---|
| 07/07/2021 | 66 | Letter as to Carl Andrews from the Pro Se Department returning document without docketing or consideration. (Tirado, Chelsea) (Entered: 07/07/2021) |
| 07/07/2021 | 67 | Minute Entry for proceedings held on before Magistrate Judge Steven I. Locke: Criminal Cause for Jury Selection as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA. AUSA: Rushmi Bhaskaran, Benjamin Schrier, Karl Metzner. Court Reporter: Mary Ann Steiger. Case called. Counsel for all sides present. Jury selection held. Defendant remains in custody. Oral motion for a new panel has been granted. Jury selection re-scheduled for 8/9/2021 at 10AM. (Tirado, Chelsea) (Entered: 07/07/2021) |
| 07/07/2021 | | ORDER granting in part and denying in part 57 Motion in Limine as to Carl Andrews (1). As to the in limine motion designated as number 3 in the Government's papers, which has been withdrawn as to the sentence imposed on Faustin, said motion is granted in limited part, to wit: defense counsel shall not inquire of Victim-1 (as well as Faustin, if appropriate), about the mandatory minimum sentences potentially faced for past criminal conduct. United States v. Reid, 300 F. App'x 50, 52 (2d Cir. 2008). At the same time, counsel may inquire into the potential maximum sentences faced, United States v. Rosa, 11 F.3d 315, 336 (2d Cir. 1993), so the motion is denied to that extent. Ordered by Judge Gary R. Brown on 7/7/2021. (Brown, Gary) (Entered: 07/07/2021) |
| 07/07/2021 | 68 | ORDER granting 45 Motion to Compel as to Carl Andrews - Accordingly, for the foregoing reasons, the Government's motion is GRANTED. SO Ordered by Judge Gary R. Brown on 7/7/2021. (Tirado, Chelsea) (Entered: 07/08/2021) |
| 07/07/2021 | 69 | Minute Entry for proceedings held on 7/7/2021 before Judge Gary R. Brown: Criminal Cause for Status Conference as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA Appointment. AUSA: Rushmi Bhaskaran, Benjamin Schrier, Karl Metzner. Court Reporter: Paul Lombardi. Motion Hearing - Non Evidentiary. Case called. Counsel for all sides present. Set jury selection for 8/9/2021 at 9:30AM before Mag. Judge Locke, trial to begin immediately after selection. Motion to exclude time through 8/9/2021. Argument heard, motion is denied. Conference held in person. Conference held regarding DE 45 , 56 , and 57 . Jury selection was aborted. The next available date to summons a jury pool is 8/9/2021. The Court also offers defendant the option of a bench trial. Application for a bench trial is made by defendant and opposed by the government. Argument heard. Motion for bench trial is denied. Motions 56 and 57 argued, rulings placed on the record. Motion 45 is argued, motion granted. Defendant continued in custody. (Tirado, Chelsea) (Entered: 07/08/2021) |
| 07/08/2021 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Carl Andrews held on 7/7/2021, before Judge GRB. Court Reporter/Transcriber Paul Lombardi. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other |

| | | |
|---|---|---|
| | | Documents". Redaction Request due 7/29/2021. Redacted Transcript Deadline set for 8/9/2021. Release of Transcript Restriction set for 10/6/2021. (Lombardi, Paul) (Entered: 07/08/2021) |
| 07/21/2021 | 71 | Letter *Regarding Trial Schedule* as to Carl Andrews (Schrier, Benjamin) (Entered: 07/21/2021) |
| 07/22/2021 | | ORDER as to Carl Andrews granting 71 Letter. Ordered by Judge Gary R. Brown on 7/22/2021. (McMorrow, Karen) (Entered: 07/22/2021) |
| 08/05/2021 | 72 | Letter from the Pro Se Department as to Carl Andrews returning letter without docketing or consideration. (Tirado, Chelsea) (Entered: 08/05/2021) |
| 08/06/2021 | 73 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Anne Espinosa appearing for USA. (Espinosa, Elizabeth) (Entered: 08/06/2021) |
| 08/09/2021 | 74 | Minute Entry for proceedings held on 8/9/2021 before Judge Gary R. Brown: Criminal Cause for Status Conference as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA Appointment. AUSA: Rushmi Bhaskaran, Elizabeth Espinosa, Benjamin Schrier. Court Reporter: Paul Lombardi. Case called. Counsel for all sides present. Conference held prior to the jury selection regarding defendant's motions and attorney representation. Parties proceed with jury selection. Defendant continued in custody. (Tirado, Chelsea) (Entered: 08/10/2021) |
| 08/09/2021 | 75 | Minute Entry for proceedings held on 8/9/2021 before Magistrate Steven I. Locke: Criminal Cause for Jury Selection as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA. AUSA: Elizabeth Espinosa, Rushmi Bhaskaran, Karl Metzner, Daniel Wolf. Court Reporter: Paul Lombardi, Mary Anne Steiger and Marie Foley. Case called. Counsel for all sides present. Prospective Jurors sworn. Jury selection held. Voir dire held, jury selected and satisfactory to all sides. Jury Trial to commence on 8/10/2021 at 9:30AM in front of District Judge Brown. Defendant remains in custody. (Tirado, Chelsea) (Entered: 08/10/2021) |
| 08/10/2021 | 76 | Minute Entry for proceedings held on 8/10/2021 before Judge Gary R. Brown: Criminal Cause for Jury Trial as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA Appointment. AUSA: Rushmi Bhaskaran, Elizabeth Espinosa, Karl Metzner. Court Repoter: Mary Ann Steiger and Marie Foley. Case called. Counsel for all sides present. Jury sworn. Jury trial begins, opening statements heard by all sides. Witness(es) sworn, testimony heard. Exhibits entered into evidence. Trial to resume on 8/11/2021 at 10AM. Defendant continued in custody. (Tirado, Chelsea) (Entered: 08/11/2021) |
| 08/10/2021 | 81 | Order of Sustenance as to Carl Andrews. Ordered by Judge Gary R. Brown on 8/10/2021. (Tirado, Chelsea) (Entered: 08/17/2021) |
| 08/11/2021 | 77 | Minute Entry for proceedings held on 8/11/2021 before Judge Gary R. Brown: Criminal Cause for Jury Trial as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA Appointment. AUSA: Rushmi Bhaskaran, Elizabeth Espinosa, Karl Metzner. Court Reporter: Mary Ann Steiger and Paul Lombardi. Case called. Counsel for all sides present. Witness(es) sworn, testimony heard. Exhibits entered into evidence. Trial to resume on 8/12/2021 at 9:30AM. Government rests. Defendant rests. Summations heard. Charge conference held. Defendant continues in custody. (Tirado, Chelsea) (Entered: 08/13/2021) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| 08/12/2021 | 78 | Minute Entry for proceedings held on 8/12/2021 before Judge Gary R. Brown: Criminal Cause for Jury Trial as to Carl Andrews. Counsel for Defendant: Kevin Keating, CJA Appointment. AUSA: Rushmi Bhaskaran, Elizabeth Espinosa, Karl Metzner. Court Reporter: Mary Ann Steiger and Paul Lombardi. Case called. Counsel for all sides present. Jury charged and begin deliberations. Verdict entered. GUILTY Verdict on Count 5 of the Indictment. Jurors polled and excused with the thanks of the Court. Sentence scheduled for 11/2/2021 at 10AM. Defendant continued in custody. (Tirado, Chelsea) (Entered: 08/13/2021) |
|---|---|---|
| 08/12/2021 | 79 | EXHIBIT LIST as to Carl Andrews (Tirado, Chelsea) (Entered: 08/13/2021) |
| 08/12/2021 | 80 | JURY VERDICT as to Carl Andrews (1) Guilty on Count 5. (Tirado, Chelsea) (Entered: 08/13/2021) |
| 08/15/2021 | | ORDER as to Carl Andrews. In light of the jury verdict of 8/12/21, counsel are to meet and confer to discuss the issues that need to be resolved in connection with sentencing and set a pre-sentencing briefing schedule. While the parties may brief any issues they deem appropriate, counsel should provide their positions on the following issues: 1. Whether the activity underlying the pending sex offense counts, which were the subject of the SDNY mistrial, may be considered by the Court either as relevant conduct or pursuant to the USSG 5K2.21 policy statement; 2. Whether such consideration would avert the need for another trial in this matter; 3. Whether the Government will be seeking an obstruction enhancement based upon the defendant's role in hiring the so-called "investigator" and 4. Whether an evidentiary hearing will be required on any of these or any other issues. After conferring, counsel is requested to file a letter setting forth a joint briefing schedule on or before Friday, August 27. Ordered by Judge Gary R. Brown on 8/15/2021. (Brown, Gary) (Entered: 08/15/2021) |
| 08/24/2021 | 82 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Carl Andrews Court Reporter/Transcriber Paul Lombardi. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/14/2021. Redacted Transcript Deadline set for 9/24/2021. Release of Transcript Restriction set for 11/22/2021. (Attachments: # 1 Jury Sel) (Lombardi, Paul) (Entered: 08/24/2021) |
| 08/26/2021 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Carl Andrews Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/16/2021. Redacted Transcript Deadline set for 9/27/2021. Release of Transcript Restriction set for 11/24/2021. (Attachments: # 1 Trial, # 2 Trial) (Lombardi, Paul) (Entered: 08/26/2021) |
| 08/27/2021 | 84 | Letter *Regarding Sentencing* as to Carl Andrews (Schrier, Benjamin) (Entered: 08/27/2021) |
| 08/31/2021 | | ORDER SETTING BRIEFING SCHEDULE and EXCLUDING SPEEDY TRIAL TIME as to Carl Andrews. For the reasons explained in the Government's submission, DE 84, the Court hereby adopts the joint briefing schedule in connection with sentencing in this matter. Furthermore, the Court hereby excludes Speedy Trial time as to the pending counts from the date of this order through and including the date of |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| | | sentencing on the count of conviction, presently scheduled for November 2, 2021, over the objection of defense counsel. The Court finds this exclusion appropriate because, among other things, the complex sentencing issues which need to be briefed and resolved require the full attention of counsel and, depending on the resolution thereof, may well avoid the need for a second trial in this matter. Thus, this exclusion would serve the public interest as well as the interests of the defendant. <br><br> Ordered by Judge Gary R. Brown on 8/31/2021. (Brown, Gary) (Entered: 08/31/2021) |
| 09/16/2021 | 85 | Mail Returned - Copy of 66 Letter (with returned documents) mailed to pro se Defendant, Carl Andrews, RETURNED TO SENDER: Unable to Identify Addressee. (Coleman, Laurie) (Entered: 09/16/2021) |
| 09/16/2021 | 86 | Letter from Pro Se Office to Carl Andrews dated 9/16/2021 Re: Enclosed document is being returned without docketing or consideration for the following reason(s) set forth herein. (Valle, Christine) (Entered: 09/16/2021) |
| 10/18/2021 | 88 | Letter *Regarding Sentencing* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 10/18/2021) |
| 10/19/2021 | | ORDER TO CONTINUE - Ends of Justice as to Carl Andrews. The government's letter 88 motion is granted. Time excluded from 10/19/2021 until 1/28/2022. Sentencing set for 1/28/2022 at 10:00 AM in Courtroom 940 before Judge Gary R. Brown. Sentence submission schedule is amended as detailed in the letter. Ordered by Judge Gary R. Brown on 10/19/2021. (McMorrow, Karen) (Entered: 10/19/2021) |
| 10/27/2021 | 89 | Letter *to Hon. Gary R. Brown* as to Carl Andrews (Keating, Kevin) (Entered: 10/27/2021) |
| 11/19/2021 | 90 | CJA 20 as to Carl Andrews: Appointment of Attorney Anthony M. LaPinta for Carl Andrews., Added attorney Anthony M. LaPinta for Carl Andrews. Attorney Kevin James Keating terminated in case as to Carl Andrews. Ordered by Judge Gary R. Brown on 11/19/2021. (Tirado, Chelsea) (Entered: 11/22/2021) |
| 12/03/2021 | 91 | Minute Entry for proceedings held on 12/3/2021 before Judge Gary R. Brown: Criminal Cause for Status Conference as to Carl Andrews. Counsel for Defendant: Anthony LaPinta, CJA Appointment. AUSA: Rushmi Bhaskaran. Court Reporter: Paul Lombardi. Case called. Counsel for all sides present. Motion to exclude time through 4/8/2022. Sentence rescheduled for 4/8/2022 at 11AM. Motion to withdraw as counsel is granted. Kevin Keating relieved as counsel. Anthony LaPinta appointed. Defendant continued in custody. (Tirado, Chelsea) (Entered: 12/07/2021) |
| 03/30/2022 | 92 | Letter *Regarding AUSA Withdrawal* as to Carl Andrews (Schrier, Benjamin) (Entered: 03/30/2022) |
| 04/07/2022 | | NOTICE OF HEARING as to Carl Andrews Sentencing set for 6/8/2022 11:00 AM in Courtroom 940 before Judge Gary R. Brown. (McMorrow, Karen) (Entered: 04/07/2022) |
| 04/07/2022 | 94 | Letter *Requesting Exclusion of Time Under the Speedy Trial Act* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/07/2022) |
| 04/08/2022 | 95 | Letter *Opposing Exclusion of Time Under the Speedy Trial Act* as to Carl Andrews (LaPinta, Anthony) (Entered: 04/08/2022) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)    https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 04/13/2022 | | ORDER TO CONTINUE - Ends of Justice as to Carl Andrews Time excluded from 4/8/2022 until 6/8/2022. In light of the procedural complexities of this matter, speedy trial time is excluded as to the open charges from 4/8/2022 until 6/8/2022. Ordered by Judge Gary R. Brown on 4/13/2022. (McMorrow, Karen) (Entered: 04/13/2022) |
| 06/01/2022 | | NOTICE OF HEARING as to Carl Andrews Sentencing set for 7/8/2022 at 11:00 AM in Courtroom 940 before Judge Gary R. Brown. (McMorrow, Karen) (Entered: 06/01/2022) |
| 06/06/2022 | 98 | Letter *regarding exclusion of time under the Speedy Trial Act* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 06/06/2022) |
| 06/15/2022 | | ORDER TO CONTINUE - Ends of Justice as to Carl Andrews. DE 98 is granted. Speedy Trial Time is excluded from 6/8/2022 until 7/8/2022.. Ordered by Judge Gary R. Brown on 6/15/2022. (McMorrow, Karen) (Entered: 06/15/2022) |
| 06/27/2022 | 99 | Letter MOTION for Extension of Time to File *Defendant's Sentencing Memorandum* by Carl Andrews. (LaPinta, Anthony) (Entered: 06/27/2022) |
| 07/08/2022 | 100 | Letter *Requesting an Exclusion of Time Under the Speedy Trial Act* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 07/08/2022) |
| 07/12/2022 | | ORDERgranting 99 Motion for Extension of Time to File as to Carl Andrews (1); Sentencing set for 8/23/2022 at 01:30 PM in Courtroom 940 before Judge Gary R. Brown. ORDER TO CONTINUE - Ends of Justice as to Carl Andrews Time excluded from 7/8/2022 until 8/23/2022. Time is excluded to and including 8/23/2022, for the reasons set forth in the court's August 31, 2021 order, including the fact that the resolution of the sentencing could well resolve the pending charges. Signed by Judge Gary R. Brown on 7/12/2022. (McMorrow, Karen) (Entered: 07/12/2022) |
| 08/10/2022 | 101 | Letter MOTION to Continue Sentencing *and Request for Permission for Defendant to Address the Court* by Carl Andrews. (LaPinta, Anthony) (Entered: 08/10/2022) |
| 08/26/2022 | 102 | Letter MOTION for Speedy Trial *Requesting the Exclusion of Time Under the Speedy Trial Act* as to Carl Andrews (Bhaskaran, Rushmi) Modified original letter into a motion on 8/29/2022 (Florio, Lisa). (Entered: 08/26/2022) |
| 08/30/2022 | | ORDER granting 102 Motion for Speedy Trial as to Carl Andrews (1). Given the reasons stated in government counsel's letter, the Court finds that the time from 8/23/2022 until 9/6/2022 is excluded under the Speedy Trial Act because the ends of justice served by granting this continuance outweigh the best interests of the public and the defendant in a speedy trial.18 U.S.C. § 316l{h)(7)(A). Sentence conference set for 9/6/2022 at 1:30 p.m.Ordered by Judge Gary R. Brown on 8/30/2022. (McMorrow, Karen) Modified on 9/8/2022 (McMorrow, Karen). (Entered: 08/30/2022) |
| 09/06/2022 | 104 | Minute Entry for proceedings held before Judge Gary R. Brown: Status Conference as to Carl Andrews held on 9/6/2022: Counsel for all sides present. Motion to exclude time through 9/23/2022. Motion granted. OTHER: Defendant heard. Motion to be relieved as counsel heard, granted. Anthony LaPinta relieved. New counsel will be appointed. Status on sentence is set for 9/23/2022 at 2:00 p.m. Defendant continued: in custody. SEE ATTACHED FOR FURTHER DETAILS. (Court Reporter Fred Guerino.) (Cubano, Jazmin) (Main Document 104 replaced on 2/27/2023) (GO). Modified on 2/27/2023- to correct hearing date from 9/9/2022 to 9/6/2022 (GO). (Entered: 09/09/2022) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 09/08/2022 | 103 | CJA 20 as to Carl Andrews: Appointment of Attorney Robert P. LaRusso for Carl Andrews. Ordered by Judge Gary R. Brown on 9/8/2022. (Cubano, Jazmin) (Entered: 09/09/2022) |
| 09/09/2022 | | Terminate Deadlines and Hearings as to Carl Andrews: Status set for 09/23/2022 (Cubano, Jazmin) (Entered: 09/09/2022) |
| 09/23/2022 | 105 | Minute Entry for proceedings held before Judge Gary R. Brown: Status Conference as to Carl Andrews held on 9/23/2022. Counsel for all sides present. Motion to Exclude time through 11/18/2022; granted. OTHER: Defendant heard. Status on sentence is set for 11/18/2022 at 12:00 p.m. Defendant continued in custody. SEE ATTACHED. (Court Reporter Lisa Schmid.) (Cubano, Jazmin) (Entered: 09/28/2022) |
| 11/18/2022 | 106 | Minute Entry for proceedings held before Judge Gary R. Brown: Status Conference as to Carl Andrews held on 11/18/2022. Counsel for all sides present. Motion to exclude time through 1/10/2023. Motion granted. OTHER: Defendant heard. Status on sentence is set for 1/10/2023 at 11:30 a.m. Defendant continued: in custody. SEE ATTACHED. (Court Reporter Fred Guerino.) (JC) (Entered: 11/22/2022) |
| 01/10/2023 | 107 | Minute Entry for proceedings held before Judge Gary R. Brown:Status Conference as to Carl Andrews held on 1/10/2023. Counsel for all sides present. Motion to exclude time through 4/28/2023. Motion granted. OTHER: Motion schedule set papers due 60 day, response 30 day, reply 1 week. Sentence/oral argument set for 4/28/2023 at 1:30 p.m. CARES Act finding placed on the record. Deft. continued in custody. See attached for further details. (Court Reporter Marie Foley.) (JC) (Entered: 01/11/2023) |
| 01/17/2023 | 108 | Letter MOTION to Compel *requesting CJA funds for the ordering of SDNY transcripts* as to Carl Andrews (Attachments: # 1 Proposed Order) (LaRusso, Robert) Modified on 1/18/2023 to edit to a motion (JC). (Entered: 01/17/2023) |
| 01/17/2023 | 109 | Notice of Related Case, 23-cv-102-GRB (DC) (Entered: 01/17/2023) |
| 01/18/2023 | | ORDER granting 108 Motion to Compel as to Carl Andrews (1). Counsel is authorized to use CJA funds to obtain transcripts of proceedings in the SDNY criminal docket 19-cr131 limited to proceedings between 10/2/2020 and 12/7/2020.Ordered by Judge Gary R. Brown on 1/18/2023. (KM) (Entered: 01/18/2023) |
| 04/19/2023 | 111 | MOTION to Continue Sentencing by Carl Andrews. (LaRusso, Robert) (Entered: 04/19/2023) |
| 04/20/2023 | 112 | Letter *Requesting Exclusion of Time and May 26, 2023 Deadline to File Sentencing Submission* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 04/20/2023) |
| 04/21/2023 | | ORDER granting 111 Motion to Continue Sentencing as to Carl Andrews (1). Ordered by Judge Gary R. Brown on 4/21/2023. (KM) (Entered: 04/21/2023) |
| 04/21/2023 | | ORDER TO CONTINUE - Ends of Justice as to Carl Andrews Time excluded from 4/21/2023 until 5/26/2023.. Ordered by Judge Gary R. Brown on 4/21/2023. (KM) (Entered: 04/21/2023) |
| 04/26/2023 | 113 | Letter MOTION to Compel *requesting permission for telephone conferences with defendant* as to Carl Andrews (LaRusso, Robert) Modified on 4/27/2023 to edit to a motion (JC). (Entered: 04/26/2023) |
| 04/27/2023 | 114 | ORDER granting 113 Motion to Compel as to Carl Andrews (1). So Ordered by Judge Gary R. Brown on 4/27/2023. (JC) (Entered: 04/27/2023) |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| 05/01/2023 | 115 | MOTION to Continue *requesting additional time to complete post-trial motions* by Carl Andrews. (LaRusso, Robert) (Entered: 05/01/2023) |
| 05/02/2023 | | ORDER granting 115 Motion to Continue as to Carl Andrews (1).Ordered by Judge Gary R. Brown on 5/2/2023. (KM) (Entered: 05/02/2023) |
| 05/02/2023 | 116 | SENTENCING MEMORANDUM by Carl Andrews (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13) (LaRusso, Robert) (Entered: 05/02/2023) |
| 05/03/2023 | 117 | NOTICE *of Motion* as to Carl Andrews (LaRusso, Robert) (Entered: 05/03/2023) |
| 05/04/2023 | 118 | MOTION for New Trial *Dismissal and New Trial Motions* by Carl Andrews. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (LaRusso, Robert) (Entered: 05/04/2023) |
| 05/26/2023 | 119 | SENTENCING MEMORANDUM by USA as to Carl Andrews (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit F, # 6 Exhibit Exhibit G, # 7 Exhibit Exhibit H, # 8 Exhibit Exhibit I) (Bhaskaran, Rushmi) (Entered: 05/26/2023) |
| 05/26/2023 | 120 | MEMORANDUM in Opposition re 118 MOTION for New Trial *Dismissal and New Trial Motions* (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Bhaskaran, Rushmi) (Entered: 05/26/2023) |
| 05/30/2023 | 121 | MOTION for New Trial *Supplement to Post Trial Motions* by Carl Andrews. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (LaRusso, Robert) (Entered: 05/30/2023) |
| 05/31/2023 | 122 | MOTION to Continue Sentencing by Carl Andrews. (LaRusso, Robert) (Entered: 05/31/2023) |
| 05/31/2023 | 123 | Letter *Requesting STA Exclusion* as to Carl Andrews (Bhaskaran, Rushmi) (Entered: 05/31/2023) |
| 06/02/2023 | | ORDER granting 122 Motion to Continue Sentencing and the extension of time for replies as to Carl Andrews (1). Sentencing set for 6/22/2023 11:30 AM in Courtroom 940 before Judge Gary R. Brown.<br><br>Given the reasons stated in defense and the government counsel's letters, the Court finds that the time until 6/22/2023 is excluded under the Speedy Trial Act because the ends of justice served by granting this continuance outweigh the best interests of the public and the defendant in a speedy trial.18 U.S.C. § 316l{h}(7)(A). Ordered by Judge Gary R. Brown on 6/2/2023. (KM) (Entered: 06/02/2023) |
| 06/09/2023 | 124 | Letter *Reply to Government Sentence Memorandum* as to Carl Andrews (LaRusso, Robert) (Entered: 06/09/2023) |
| 06/13/2023 | 125 | MEMORANDUM AND ORDER re: Defendant's Post-Trial Motions and in Anticipation of Sentencing; denying 118 Motion for New Trial as to Carl Andrews (1); denying 121 Motion for New Trial as to Carl Andrews (1): Based on the foregoing, Andrews motions to dismiss the indictment and/or for a new trial as to the narcotics charges are DENIED. The Court has not, as yet, ruled on the pending motion to dismiss the sex trafficking charges on Speedy Trial grounds. Sentencing as to the verdict regarding the narcotics count is set to take place shortly. As suggested by this |

Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.2)      https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?180473947918032-L_1_0-1

| | | |
|---|---|---|
| | | Courts Order of August 15, 2021, the Court is considering whether the conduct underlying the pending sex trafficking charges constitute relevant conduct or may warrant an upward departure consistent with the policy statement contained in U.S.S.G. § 5K2.21 of the Sentencing Guidelines or other pertinent provisions. Thus, defendant is hereby placed on notice that the Court is considering the possibility of an upward departure or variance, and the parties should be prepared to advance any arguments and/or proceed with any necessary evidentiary hearings. Immediately following the sentencing, the Government should be prepared (and fully authorized) to state its position regarding the need for further pursuit of the sex trafficking charges and both sides should be ready to argue the pending motion to dismiss on Speedy Trial grounds. SEE ATTACHED ORDER FOR FURTHER DETAILS. So Ordered by Judge Gary R. Brown on 6/13/2023. (JC) (Entered: 06/14/2023) |
| 06/21/2023 | 127 | SENTENCING MEMORANDUM SUPPLEMENT by Carl Andrews (LaRusso, Robert) (Entered: 06/21/2023) |
| 06/22/2023 | 129 | Minute Entry for proceedings held before Judge Gary R. Brown: Fatico/Sentencing held on 6/22/2023 for Carl Andrews (1). Victims and/or witnesses not present. Hearing requested and held. Defendant sworn and testified. Statements heard from defendant, defense counsel and government. The defendant is sentenced to: 115 months. To be followed by 4 years Of supervised release. Special conditions of supervised release are as follows: as listed in the PSR. The fine is waived based on the defendants inability to pay. Special assessment in imposed in the sum of: $ 100.00. The Govt. moves to dismiss the open counts. Motion Granted. The defendant is advised of his right to appeal. SEE ATTACHED FOR FURTHER DETAILS. (Court Reporter Lisa Schmid.) (JC) (Entered: 06/27/2023) |
| 06/22/2023 | 130 | JUDGMENT as to Carl Andrews (1): The deft. plead guilty. The pending counts are dismissed on the motion of the United States. The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: ONE HUNDRED FIFTEEN (115) MONTHS. The court makes the following recommendations to the Bureau of Prisons: A designation to a facility near the New York metropolitan area. Upon release from imprisonment, you will be of supervised release for a term of: THREE (4) YEARS. Special Conditions of Supervision: SEE ATTACHED FOR FURTHER DETAILS. $100.00 special assessment. Ordered by Judge Gary R. Brown on 06/22/2023. (GO) Modified on 7/7/2023- due to statistical errors behind the scenes the judgment was deleted and re-docketed. (GO). (Entered: 07/07/2023) |
| 06/30/2023 | 132 | NOTICE OF APPEAL as to 130 Judgment by Carl Andrews (LaRusso, Robert) Modified on 7/5/2023 (CL). (Entered: 06/30/2023) |
| 07/05/2023 | | Electronic Index to Record on Appeal as to Carl Andrews sent to US Court of Appeals 132 Notice of Appeal; Judgment - Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (CL) (Entered: 07/05/2023) |
| 07/05/2023 | 133 | AMENDED JUDGMENT as to Carl Andrews (1). The deft. was found guilty on Count 4 of a five-count Indictment. Pending counts are dismissed on the motion of the United States. The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: ONE HUNDRED FIFTEEN (115) MONTHS. The court makes the following recommendations to the Bureau of Prisons: A designation to a facility near the New York metropolitan area. Upon release from imprisonment, you will be on supervised release for a term of: FOUR (4) YEARS. |

| | | Special Conditions of Supervision: SEE ATTACHED ORDER FOR FURTHER DETAILS. $100.00 special assessment. Ordered by Judge Gary R. Brown on 7/5/2023. (JC) (Entered: 07/07/2023) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/28/2023 17:00:37 | | | |
| **PACER Login:** | jamesmbranden | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cr-00546-GRB-SIL |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

RB:DHW
F. #2018R00484

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

CARL ANDREWS,
      also known as "Day" and
      "DaShawn,"

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**I N D I C T M E N T**

CR No. **20   546**
(T. 18, U.S.C., §§ 371, 981, 982,
1591(a), 1591(b)(1), 1592(a)(3),
1594(a), 1594(c), 1594(d) and 2; T. 21,
U.S.C., §§ 846 and 853; and T. 28,
U.S.C., § 2461)

**BROWN, J.**

**LOCKE, M. J.**

THE GRAND JURY CHARGES:

COUNT ONE
(Conspiracy to Commit Sex Trafficking
by Force, Fraud, or Coercion)

       1.     From in or about March 2018, up to and including in or about May

2018, in the Eastern District of New York and elsewhere, the defendant CARL ANDREWS,

also known as "Day" and "DaShawn," together with others known and unknown, did

willfully and knowingly combine, conspire, confederate, and agree together and with each

other to commit sex trafficking, in violation of Title 18, United States Code, Sections

1591(a)(1), (a)(2) and (b).

       2.     It was a part and an object of the conspiracy that the defendant CARL

ANDREWS, also known as "Day" and "DaShawn," and others known and unknown,

knowingly, in and affecting interstate and foreign commerce, would and did recruit, entice,

harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit by any means

one and more persons, and did benefit, financially and by receiving things of value, from

participation in a venture that engaged in any such act, knowing and in reckless disregard of

the fact that means of force, threats of force, fraud, and coercion, as described in Title 18,

United States Code, Section 1591(e)(2), and a combination of such means would be used to

cause such persons to engage in one and more commercial sex acts.

(Title 18, United States Code, Section 1594(c))

COUNT TWO
(Sex Trafficking by Force, Fraud, or Coercion)

3.     From in or about March 2018, up to and including May 2018, in the

Eastern District of New York and elsewhere, the defendant CARL ANDREWS, also known

as "Day" and "DaShawn," willfully and knowingly, in and affecting interstate and foreign

commerce, did recruit, entice, harbor, transport, provide, obtain, advertise, maintain,

patronize, and solicit by any means one or more persons, and did benefit, financially and by

receiving things of value, from participation in a venture that engaged in any such act,

knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and

coercion, as described in Title 18, United States Code, Section 1591(e)(2), and a combination

of such means would be used to cause such persons to engage in one or more commercial sex

acts, and attempted to do so, to wit, ANDREWS recruited, harbored, transported, provided,

obtained, advertised, and maintained a female person, Victim-1, an individual whose identity

is known to the Grand Jury, knowing and in reckless disregard of the fact that force, threats

of force, fraud, coercion, and a combination of such means, were used to cause Victim-1 to

3

engage in at least one commercial sex act, the proceeds of which were transferred at least in

part to ANDREWS.

(Title 18, United States Code, Sections 1591(a), 1591(b)(1), 1594(a), and 2)

COUNT THREE
(Conspiracy to Violate the Travel Act)

4.     From in or about March 2018, up to and including in or about May

2018, the defendant CARL ANDREWS, also known as "Day" and "DaShawn," together

with others known and unknown, did willfully and knowingly combine, conspire,

confederate, and agree together and with each other to commit an offense against the United

States, to wit, a violation of the Travel Act, in violation of Title 18, United States Code,

Section 1952(a).

5.     It was a part and an object of the conspiracy that the defendant CARL

ANDREWS, also known as "Day" and "DaShawn," and others known and unknown,

knowingly would and did travel in interstate and foreign commerce and would and did use

the mail and a facility in interstate and foreign commerce, with the intent to promote,

manage, establish, carry on, and facilitate the promotion, management, establishment, and

carrying on of an unlawful activity, to wit, prostitution offenses in violation of the laws of the

State in which they were committed and of the United States, and thereafter would and did

perform and attempt to perform acts to promote, manage, establish and carry on, and to

facilitate the promotion, management, and carrying on of such unlawful activity.

4

## OVERT ACT

6.    In furtherance of said conspiracy and to effect its illegal object, the

following overt act, among others, was committed in the Eastern District of New York and

elsewhere:

(a)    from in or about March 2018 up to and including in or about

May 2018, the defendant CARL ANDREWS, also known as "Day" and "DaShawn,"

purchased and published advertisements on the Internet offering commercial sex acts to

purchasers of commercial sex acts in the Eastern District of New York and elsewhere.

(Title 18, United States Code, Section 371)

## COUNT FOUR
(Travel Act)

7.    From in or about March 2018, up to and including in or about May

2018, the defendant CARL ANDREWS, also known as "Day" and "DaShawn," knowingly

did travel in interstate and foreign commerce and did use the mail and a facility in interstate

and foreign commerce, with the intent to promote, manage, establish, carry on, and facilitate

the promotion, management, establishment, and carrying on of an unlawful activity, to wit,

prostitution offenses in violation of the laws of the State in which they were committed and

of the United States, and thereafter performed and attempted to perform acts to promote,

manage, establish and carry on, and to facilitate the promotion, management, establishment,

and carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3) and 2)

5

## COUNT FIVE
### (Narcotics Conspiracy)

8.     From at least in or about 2017, up to and including on or about

February 27, 2019, in the Eastern District of New York and elsewhere, the defendant CARL

ANDREWS, also known as "Day" and "DaShawn," and others known and unknown,

intentionally and knowingly did combine, conspire, confederate, and agree together and with

each other to violate the narcotics laws of the United States.

9.     It was a part and an object of the conspiracy that the defendant CARL

ANDREWS, also known as "Day" and "DaShawn," and others known and unknown, would

and did distribute and possess with intent to distribute a controlled substance, in violation of

Title 21, United States Code, Section 841(a)(1).

10.     The controlled substance that the defendant CARL ANDREWS, also

known as "Day" and "DaShawn," conspired to distribute and possess with intent to distribute

was 28 grams and more of mixtures and substances containing a detectable amount of

cocaine base, in violation of Title 21, United States Code, Section 841(b)(1)(B).

(Title 21, United States Code, Section 846)

## CRIMINAL FORFEITURE ALLEGATION

11.     As a result of committing the offenses alleged in Counts One and Two

of this Indictment, the defendant CARL ANDREWS, also known as "Day" and "DaShawn,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594(d),

any property, real and personal, that was involved in, used, or intended to be used to commit

or to facilitate the commission of the offenses alleged in Counts One and Two, and any

property, real and personal, constituting or derived from, any proceeds obtained, directly or

6

indirectly, as a result of the offenses alleged in Counts One and Two, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

12.     As a result of committing the offenses alleged in Count Three and Four of this Indictment, the defendant CARL ANDREWS, also known as "Day" and "DaShawn," shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offenses; and any and all property, real or personal, that was used or intended to be used to commit or facilitate the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

13.     As a result of committing the offense alleged in Count Five of this Indictment, the defendant CARL ANDREWS, also known as "Day" and "DaShawn," shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense, and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

7

14.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third person;

        (c)     has been placed beyond the jurisdiction of the Court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 2253(b), 21 U.S.C. § 853(p) and

28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value

of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982 and 1594(d); Title 21, United

States Code, Section 853; and Title 28, United States Code, Section 2461)

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: #2018R00484
FORM DBD-34
JUN. 85

No.

### UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

CARL ANDREWS,

Defendant.

### INDICTMENT

(T. 18, U.S.C., §§ 371, 981, 982, 1591(a), 1591(b)(1), 1592(a)(3),
1594(a), 1594(c), 1594(d) and 2; T. 21, U.S.C., §§ 846 and 853; and T.
28, U.S.C., § 2461)

*A true bill.*

_____

Foreperson

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____

_____   *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_____

*[AUSA NAME], Assistant U.S. Attorney 718/631Insert Extension*

# THE LARUSSO LAW FIRM



ROBERT P. LARUSSO, ESQ.
robert@rlarussolaw.com

May 2, 2023

**Filed ECF and Under Seal**

The Honorable Gary R. Brown
U.S. District Court Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:   United States v. Carl Andrews
             <u>Criminal Docket No. 20-CR-546(GRB)</u>

Dear Judge Brown:

    Please accept this sentencing letter on behalf of my client Carl Andrews ("Andrews")

respectfully requesting a sentence of 60 months, the mandatory minimum for the count of

conviction, as a fair and just punishment based upon a consideration of all the 3553(a) factors

and the reasons set forth in this memorandum.  However, Based on the Attorney General's

direction to all federal prosecutors to advocate for the application of the powder cocaine, rather

than the crack cocaine, guidelines and to decline "to charge the quantity necessary to trigger a

mandatory minimum sentence" provided a defendant satisfies all the criteria for such action,

discussed *infra*. in Points 1 and 6 of our Objections to the Guidelines, we are, herein, requesting

the Government to support our application to sentence the defendant under the powder cocaine

guidelines and without consideration of the mandatory minimum sentence, thus allowing the

Court to sentence the defendant utilizing the powder cocaine guidelines, resulting in a guideline

range of 31 to 41 months, and without a mandatory minimum. (See, pages 1-2 of December 16, 2022 DOJ Memorandum for All Federal Prosecutors attached as **Exhibit 1**).

**A. Objections to the Pre-Sentence Report ("PSR") and Guideline Calculations**.

    1. **The Powder Cocaine Guidelines should be used rather than the Crack Cocaine Guidelines as reported in PSR ¶¶26 and 29.**

PSR ¶¶26 and 29 used the crack cocaine guidelines to determine Mr. Andrews' base offense level of 28 for 196 grams resulting in a prison range of 121-151 months, assuming for our argument that the defendant remains in Criminal History Category III. (See, also, PSR ¶106). However, because pending legislation before Congress, supported by the U.S. Department of Justice ("DOJ"), will eliminate the disparity between crack and powder cocaine, we submit that the correct base offense level for 196 grams of powder cocaine should be used resulting in a base offense level of 16, and adding two points for using a residence to distribute drugs, the Total Offense Level becomes 18 with a prison range of 33-41 months in Criminal History Category III. In the alternative, if the Court insists upon applying the crack cocaine guidelines, we submit that a departure from the recommended guideline range should be granted from 131-141 to 33-41, resulting in a sentence of 60 months because of the statutory minimum sentence for the count of conviction is five years.

The legislation was proposed to eliminate unjustified sentence disparity between drug offenses involving crack and powder cocaine and to remove the unwarranted racial disparities in the application of the crack cocaine guidelines. The DOJ has recently supported the proposed federal legislation to eliminate the "crack-to-cocaine sentence disparity" and has issued instructions to all federal prosecutors, as directed in a December 16, 2022 Memorandum, which reads, in pertinent part,

The Justice Department supports elimination of the crack-to-powder sentencing disparity and has testified before Congress in support of the EQUAL Act, S. 79, which would remove that disparity. As the Department has explained: "First, the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine. Second, as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing. Third, the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities, as there are other tools more appropriately tailored to that end." Justice Department Statement, Senate Judiciary Committee 6 (June 22, 2021).[1]

(See, page 4 of December 16, 2022 DOJ Memorandum for All Federal Prosecutors attached as

**Exhibit 1**).

Recognizing that unfair sentences and unwarranted racial disparities result from applying

the crack cocaine guidelines, the DOJ has issued directions to federal prosecutors to take

immediate "steps to promote the equivalent treatment of crack and powder cocaine offenses,"

and instructed all federal prosecutors, at sentencing, to "advocate for a sentence consistent with

the guidelines for powder cocaine rather than crack cocaine," and "where a court concludes that

the crack cocaine guidelines apply, prosecutors should generally support a variance to the

guideline range that would apply to the comparable quantity of powder cocaine." (See, page 5 of

**Exhibit 1**).

Based upon the above, we submit that the correct guideline calculation should be a base

offense level of 16 for 196 grams of powder cocaine, with an enhancement of two points for

maintaining a premise for the purpose of distributing drugs, resulting in a Total Offense Level of

18 and a prison range of 33-41 in Criminal History Category III. However, if the Court

---

[1] The DOJ Memorandum footnoted the following reference at the end of the above-quoted paragraph:

See, Testimony of Acting ONDCP Director, Senate Judiciary Committee, June 22, 2021: U.S. Sentencing Commission Report 1995 (recommending sentencing guidelines amendment that would have equalized the guidelines penalties for powder and crack cocaine based solely on drug quantities.

concludes that the crack cocaine guidelines are applicable, we submit that a variance from the guidelines is appropriate and warranted in this case. See, *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)(". . . it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case.")(See also, *United States v. Samas*, 2021 U.S. Dist. LEXIS **4-5 (D.C. Ct. 2021)(Citing *Kimbrough*, the Court held that ". . . whenever the law has given me discretion to do so, it has been my practice to depart or vary downwards from crack cocaine cases to the same sentencing guideline range that would apply if the substance at issue were powder cocaine.").

### 2.  **PSR ¶¶ 26 and 31 - Drug Quantity**.

As reported in the PSR, "[t]he government has advised that Andrews distributed a conservative estimate of at least 196 but less than 280 grams of crack cocaine" resulting in a base offense level of 28." (PSR ¶26). However, a review of the trial testimony of the government witnesses raises substantial doubt about the total quantity of crack cocaine attributable to the defendant.

The only reliable evidence of the crack quantity for guideline purposes was presented during the testimony of a chemist Matthew Dinizio who analyzed the 4 bags of crack cocaine sold to the confidential informant on three occasions, July 16, 2018, July 19, 2018, and August 1, 2018, each containing approximately .7 of a gram, totaling approximately 2.8 grams of crack cocaine. The evidence relied upon to prove the remainder of 196 grams comes from the unreliable testimony of the Female Witness,[2] who admitted to suffering hallucinations, and a Co-

---

[2]The alleged victim's name is being withheld, instead we will use "Female Witness" to identify the individual who the Government claimed was coerced and manipulated into prostitution for the defendant's financial benefit and who testified in both the S.D.N.Y. trial for sex trafficking and the E.D.N.Y. trial for drug trafficking.

4

conspirator, which, we submit, failed to factually support a finding that Mr. Andrews is responsible for distributing more than 196 grams of crack cocaine.

The Female Witness testified that her relationship with the defendant lasted over three months from early March of 2018, to around "late" May of 2018. However, the trial testimony disclosed that there were periods of time when drugs were not being provided by Mr. Andrews, who recalled that Greener had "disappeared" for about one or two weeks during the initial part of their relationship. Also, according to the Female Witness, she had been "receiv[ing]" crack cocaine "from Andrews" on a "very irregular" basis (see, E.D.N.Y. Tr. at 323) , had stopped seeing the defendant by mid-April 2018,[3] in fact, during the Sex Trafficking trial, she testified that "there were chunks of time" when the defendant deprived her of crack cocaine (see, S.D.N.Y. Tr. at 467), and that she found an additional source for crack cocaine (see, E.D.N.Y. Tr. at 282-83; see also, E.D.N.Y. Tr. at 324(. . .[she] got drugs from one guy maybe twenty times); see also, S.D.N.Y. Tr. at 411("[T]here came a point in time [she] started purchasing crack from another dealer out of the proceeds of [her] prostitution . . . [and] also acquired crack from clients in return for services"), and had, by the middle of May 2018,"returned to a second drug dealer and relapsed into the use of heroin," using the money that [she was] acquiring from . . . short sessions" and "hiding" these facts from Mr. Andrews. (See, S.D.N.Y. Tr. at 464).

According to her testimony, which as mentioned is unreliable, the Female Witness recalled receiving drugs from the defendant on "50 to 70" occasions, with most of the transactions involving the exchange of ½ grams to 1 gram, totaling between 25 grams to 50

---

[3] During the 2021 drug trial, the Female Witness denied having testified under oath in the Sex Trafficking Trial that "[she hadn't] even seen Mr. Andrews before [she] walked into this proceeding here today since mid-April 2018." See, E.D.N.Y. Tr. at 322. The Female Witness' ability to accurately recall events was severely compromised when she testified on direct that she also sold drugs for Mr. Andrews on 20-30 occasions, then was unable on cross-examination to remember telling the Government during a debriefing on August 16, 2018 that it was 10-20 times, and eventually agreed, after being confronted by agent's notes from a pre-trial meeting on July 5, 2021, that she recalled only five occasions "selling drugs for Mr. Andrews." (See, E.D.N.Y. Tr. at 277-79 and 325-26).

grams at the low-end of her estimations. (See, E.D.N.Y. Tr. at 272 and 321; see also, S.D.N.Y. Tr. at 410). Though the Female Witness testified that "either" Mr. Andrews or his Co-conspirator would bring the drugs (see, E.D.N.Y. Tr. at 273), the Co-conspirator revealed that she only "personally gave drugs to [the Female Witness] . . . **several times**," and observed the defendant "give [the Female Witness] drugs . . . **several times**." (See, E.D.N.Y. Tr. at 162)(Emphasis added).

The Female Witness also testified that she sold drugs for the defendant, recalling the quantity being an "eight-ball" totaling 3.5 grams, but, on the number of occasions this happened, her testimony was unreliable and untrustworthy, because she testified at the Drug Trafficking trial that it was "20 to 30 times" (see, E.D.N.Y. Tr. at 278), but changed her testimony when confronted with prior statements to be unable to remember telling the Government during a debriefing on August 16, 2018 that it was 10-20 times, but eventually agreed, after being confronted by agent's notes from a pre-trial meeting on July 5, 2021, that she recalled only five occasions "selling drugs for Mr. Andrews." (See, E.D.N.Y. Tr. at 277-79 and 325-26).

Even conceding the possibility that the Female Witness sold "eight-balls" on five occasions for the defendant, that would result in a quantity of crack cocaine sold by the Female Witness to 17.5 grams, which, if added to the drugs provided to her for personal use, on approximately 50 occasions, which we seriously doubt, the total quantity would be 67.5 grams, not the 196 grams claimed by the Government.

The Government will also undoubtedly point to the testimony of the Co-conspirator who testified to selling crack cocaine and cocaine with the defendant from the end of 2017 for "about a year" until January 2019 (see, E.D.N.Y. Tr. at 147 and 163), and observing or participating in drug transactions which occurred "very often" until "June of 2018" (see, E.D.N.Y. Tr. at 171),

"about twice a day" with the quantities usually ranging from .4 grams to .6 grams of either crack cocaine or cocaine,  90% of which involved crack cocaine. (See, E.D.N.Y. Tr. at 151-154). Taking into consideration the sales of powder cocaine rather than crack cocaine, the periods of time when drugs were unavailable, and, more importantly, the speculative and unreliable testimony concerning the defendant's drug activities, we submit that the Court cannot rely upon the testimony of the Female Witness and the Co-Conspirator to support the 196 grams used in the PSR to determine drug quantity for purposes of the guidelines.

   3. **PSR ¶¶ 55 and 56 Incorrectly Counted Two Misdemeanor Convictions in the Criminal History Score Resulting in a Criminal History Category of I Rather than Category III as Reported in the PSR.**

The PSR incorrectly calculated the defendant's Criminal History to be in Category III because the Probation Department included two two-point misdemeanors that should not have been counted. (See, PSR ¶¶55. 56, 59 and 60.

The PSR reported that the defendant's Criminal History Category was III for three misdemeanor offenses totaling five criminal history points. (See, PSR ¶¶ 55, 56 and 57). Two of the misdemeanor offenses were each countable for two points because the defendant received a prison sentence "of at least sixty days" that was imposed "within ten years of the defendant's commencement of the instant offense," pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2). However, a close examination will show these latter two convictions are not countable because the sentences were imposed more than ten years before the instant offense.

In the first offense, reported in PSR §55, which comprised two misdemeanors for crimes based on the same incident, Mr. Andrews was released from prison in 2007, and, according to my review of the trial testimony, there was "no" drug activity attributed to the defendant during 2017, even though the Indictment alleges the offense occurred "[f]rom at least in or about 2017,

up to and including on or about February 27, 2019." In the second two-point misdemeanor conviction, Mr. Andrews denies receiving 120 days for driving while intoxicated as noted in PSR ¶56, and, therefore, the two points associated with this conviction should be removed. Without counting the above-described two two-point misdemeanors, the defendant falls within Criminal History Category I.

> **4. The Government's Request for an Obstruction of Justice enhancement under U.S.S.G § 3C1.1 is inapplicable because the conduct underlying the enhancement did not relate to the instant count of conviction.**

In its August 27, 2021 letter, the Government claimed that a sentencing guideline enhancement for obstruction is warranted for the defendant's submission of a false affidavit in support of a suppression motion in the S.D.N.Y. prosecution for sex trafficking. Such an enhancement is inappropriate in the instant case for several reasons: (1) the affidavit was submitted in connection with the S.D.N.Y. prosecution for sex trafficking, and not related to the E.D.N.Y. prosecution for drug trafficking, therefore, the alleged obstruction is not related to the "investigation, prosecution, or sentencing **of the instant offense of conviction**" as required by U.S.S.G. §3C1.1; and (2) the decision to apply the enhancement rests with the judicial officer that conducted the suppression hearing, which, in this case was the Honorable Paul A. Engelmayer, whom the government conceded "stopped short of explicitly stating that it was an intentional falsehood," a necessary finding to apply the obstruction enhancement. (See, page 3 of Government Letter filed as Document 84, in the instant case, attached as **Exhibit 2**).

An obstruction of justice enhancement pursuant to U.S.S.G §3C1.1 requires that a defendant "willfully obstruct[ ] or impede[ ]. . . or attempt[ ] to obstruct[ ] or impede[ ], the due administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**." See, U.S.S.G. §3C1.1 (Emphasis added) Mr. Andrews may have

been responsible for obstructing or attempting to obstruct the sex trafficking offenses in the S.D.N.Y. Indictment, but clearly not in the instant prosecution for drug trafficking.

A recent Second Circuit case, *United States v. Lewis*, ruled that "[c]ourts must balance the need to disincentivize obstruction of justice through perjury with the risk of subjecting a defendant to punishment for submitting an affidavit that raises a colorable suppression issue on which they do not ultimately prevail." *United States v. Lewis*, 2023 U.S. App. LEXIS 6689 *27-28 (2d Cir. 2023)(Citing, *United States v. Pena*, 752 F.3d 101, 106 n.1 (2d Cir. 2014)( quoting U.S.S.G. § 3C1.1. Commentary Note. 2, the Court noted that the obstruction enhancement "is not intended to punish a defendant for the exercise of a constitutional right" and "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.").

As applicable to the instant case, "if a defendant submits a conclusory affidavit in support of a motion to suppress, the fact that the district court does not find the testimony credible does 'not necessarily mean he gave knowingly false testimony in his affidavit.'" *United States v. Lewis*, 2023 U.S. App. LEXIS 6689 *27(Citing, *United States v.Agudelo*, 414 F.3d 345, 349 (2d. Cir. 2005). Here, even if the government can prove the statements in the supporting affidavit were false, we submit that the finding of "intentional" falsehood rests with the court reviewing the testimony, that was presented at the suppression hearing, to make such a determination, and not another judge, in a different prosecution, for different crimes.

Under the circumstances of our case, "any time a defendant, like [Mr. Andrews], submits an affidavit that is sufficient to justify a suppression hearing, he would automatically be subject to an enhancement for obstruction of justice if the suppression motion is denied," and "would also raise the troubling prospect that future defendants might either be deterred from pressing arguably meritorious Fourth Amendment or unfairly punished when they do." *United States v.*

*Agudelo*, 414 F.3d at 350(Commentary Note 2 of § 3C1.1 "highlight[s]" these possibilities, stating that "this provision is not intended to punish a defendant for the exercise of a constitutional right," and cautions that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice).

We submit that the Government cannot sustain its burden of proving "intentional falsehood" without a determination by the presiding judge that the defendant "intentionally" submitted a false affidavit to obstruct the administration of justice, and any decision rendered without such a finding would be tantamount to punishing the defendant "for exercising a constitutional right" to suppress evidence seized unlawfully.

> 5. **Based upon the proposed legislative change in the drug guidelines removing the disparity between crack cocaine and powder cocaine, accepting the PSR amount of 196 grams, and conceding the 2-point enhancement for maintaining a premise for the purpose of distributing drugs, the guideline calculations result in a total offense level of 18 and a prison range of 33 to 41 months**.

Based on our previous arguments regarding the proposed legislative changes to the crack cocaine guidelines, removing the disparity between crack and powder cocaine, we submit that the accurate guideline calculations, conceding the PSR drug quantity of 196 grams and accepting the enhancement for maintaining a premises for drug distribution, are:

| | | |
|---|---|---|
| PSR ¶31. | Base Offense Level | 16 |
| PSR ¶32. | Specific Offense Characteristic - maintaining a premise for drug distribution | 2 |
| PSR ¶39. | Total Offense Level | 18 |

The guideline imprisonment range, accepting the PSR determination that Mr. Andrew's falls within Criminal History Category III, is 33-41 months. Considering the government's proposed enhancement for obstruction of justice is inappropriate, as explained in our previous

argument, we request that the Court accept the accurate reporting in PSR ¶35 that there was no adjustment for obstruction of justice.

Also, as explained in the following sections, the facts presented in support of the untried sex trafficking and Travel Act charges in the E.D.N.Y Indictment, Counts 1 through 4, are neither relevant conduct nor a basis for an upward departure pursuant to U.S.S.G. § 5K2.21, and, because the evidence presented during the mistrial in the S.D.N.Y., on the sex trafficking charges, failed to establish coercion, the Court should not consider PSR  ¶¶15-25 in determining an appropriate sentence for the defendant.[4]

> **6. Based on the DOJ Guidelines directing federal prosecutors to refrain from charging mandatory minimums, we request that the Court sentence the defendant without consideration of a mandatory minimum punishment.**

The defendant should be sentenced without consideration of the mandatory minimum sentence because, under the recent guidelines from the Attorney General to "all" federal prosecutors, prosecutors are directed to "decline to charge the quantity necessary to trigger a mandatory minimum sentence" where a defendant "satisfies all the following criteria":

1. The defendant's relevant conduct does not involve: the use of violence, the direction to another to use violence, the credible threat of violence, the possession of a weapon, the trafficking of drugs to or with minors, or death or serious bodily injury of any person;
2. The defendant does not have a significant managerial role in the trafficking of significant quantities of drugs;
3. The defendant does not have significant ties to a large-scale criminal organization or cartel, or to a violent gang: and,
4. The defendant does not have a significant history of criminal activity that involved the use or threat of violence, personal involvement on multiple occasions in the distribution of significant quantities of illegal drugs, or possession of illegal firearms.

---

[4] We recognize the possibility that the Court may, instead, determine that the facts support a basis to conclude that Mr. Andrews violated the Travel Act offenses charged in Counts 3-4 for "advancing and profiting" from prostitution, but such an offense is a misdemeanor under New York State law and carried a maximum punishment of one year in prison, accordingly, the extent of any consideration of the untried Travel Act counts in an appropriate sentence for drug trafficking should be limited to the maximum term of imprisonment for the state crime.

(See, pages 1-2 of the Attorney General's Memorandum to All Federal Prosecutors, dated December 16, 2022, attached as **Exhibit 1**).

It is clear from an examination of the defendant's background and the facts of the instant offense, Mr. Andrews is "not" violent, does "not" have a managerial role in trafficking of significant quantities of drugs, does "not" have ties to large-scale criminal organization, cartel, or violent street gangs, and does "not" have significant history of criminal activity involving use and threaten use of violence, personal involvement on multiple occasions in distributing significant quantities, or possession of illegal weapons.

Mr. Andrews satisfies all four criteria, and, under the present charging directions, he would never have been indicted for the mandatory minimum offense.

Furthermore, in the same Memorandum, the Attorney General advised federal prosecutors that the Justice Department is "support[ing] the elimination of the crack-to-powder sentencing disparity," and directed them "[a]t sentencing . . . to advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine," and, "[w]here a count concludes that the crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity for powder cocaine."

Based on the above and consistent with the Attorney General's directions, we are requesting the government to support our application to sentence the defendant without consideration of the mandatory minimum, and, also recommend "a variance to the guidelines range that would apply to comparable quantity of powder cocaine," which would be Level 16, resulting in a range of 33 to 41 months, with the adjustment for maintaining a premises for the

purpose of distributing drugs, and a Criminal History Score of five, placing the defendant in

Criminal History Category III.

> 7. **The allegations underlying the pending sex trafficking counts in the E.D.N.Y.**
> **Indictment are not relevant conduct warranting an enhancement, and, in the**
> **alternative, if such activity is considered relevant conduct, or the basis for an**
> **upward departure pursuant to U.S.S.G. § 5K2.21 or pertinent to the Court's**
> **right to consider all evidence relevant to the defendant's history or character,**
> **such evidence of sex trafficking relied on by the government is insufficient to**
> **prove that the defendant engaged in such conduct.**

The Pre-Sentence Report ("PSR") correctly pointed out that the defendant's alleged sex

trafficking of the Female Witness "could not be factored into the applicable guideline range," as

relevant conduct, but incorrectly argued that such conduct "may be grounds for an upward

departure per USSG § 5K2.21," because the facts fail to support such a claim. (See, PSR ¶119).

Regarding the application of § 5K2.21, we agree with the government that

> Based on the plain meaning of the first criterion of Section 5K 2.21, it seems that, in
> order for a court to depart upward based on dismissed or not pursued conduct, the
> relevant charge must have been dismissed or not pursued before sentencing. There does
> not appear to be any published case from within or outside the Second Circuit that
> addresses this issue.
>
> It is likely that the Government will not pursue the pending charges against the defendant
> and will move to dismiss them at the end of the defendant's sentencing hearing. But the
> Government does not intend to make a final determination regarding its course of action
> until after the resolution of any post-trial litigation and the Court's imposition of
> sentence. Thus, at the time of sentencing, it is unlikely that the Government will have
> already dismissed or not pursued the pending charges, which makes Section 5K2.21
> potentially inapplicable.

(See, page 2 of Government August 27, 2021 Letter filed as Document 84 attached as **Exhibit**

**2**).

We also agree with the Government that, in determining a reasonable and proper

sentence, the Court has wide discretion guided by the advisory sentencing guideline range, the

other factors set forth in Title 18, United States Code §3553(a), and, additionally, 18 U.S.C.

§3661 which states that no limitations shall be placed on the amount of information concerning the character, background and conduct of the person convicted. As pointed out by the Second Circuit,

> . . . Distinct from considerations of guilt are considerations of the sentence to be imposed, over which a sentencing court has wide discretion . . . Considerations of the sentence to be imposed can include the defendant's background, character, and conduct, 18. U.S.C. § 3661, as well as conduct clearly beyond the conduct forming the basis of the charged offense.

See, *United States v. Bosganf*, 467 Fed. Appx. 27 at *29 (2d Cir. 2012).

The Government is seeking to use the evidence of sex trafficking to sentence the defendant beyond the present guidelines. However, we submit, a review of the trial testimony of the Female Witness in the S.D.N.Y. prosecution, which resulted in a mistrial because of the COVID pandemic, will substantiate our position that Mr. Andrews was never involved in sex trafficking based upon the government's tortured theory that the Female Witness was coerced, forced, and manipulated into prostitution.

The evidence indisputably established that the Female Witness approached and sought out the defendant and reached a mutual agreement for Mr. Andrews to provide drugs and to pay for transportation, housing, and other expenses, in return, the Female Witness would pay for the drugs and services from her prostitution activities. The government has improperly converted these facts into a sex trafficking operation, as charged in Counts One and Two of the E.D.N.Y. Indictment, which alleged that the defendant coerced, forced, and manipulated the Female Witness to engage in prostitution by threatening to withhold drugs from her. (See, page 2 of Government Letter in Opposition to Bail Application filed as Document 408 without attachment in SDNY Criminal Docket No. 19-131 attached as **Exhibit 3**)("The evidence adduced at trial firmly established the extent of the defendant's manipulation, coercion, and threats to [the

Female Witness], including how he deprived her of the drugs to which she was addicted when

she did not meet the defendant's financial "goal . . .").

The government has alleged that Mr. Andrews was "violent" with the Female Witness on

two occasions. However, on both occasions, he was "drunk" and the Female Witness was unable

to recall if the incidents had any connection to the Female Witness' prostitution:

> The first time, he had come into the room. And he was drunk, and I was upset, and we
> were arguing. And he just, like, cupped my face. That was really it I don't really
> remember much of it
> . . .
> And then the other time, we were arguing about something, and I don't know. I said
> something that pissed him off, and he just like put his hand around my neck quick, and
> then he let go. Like I could breathe, but physically, those were the only two times that,
> you know.

(See, S.D.N.Y. Trial Tr. at 150-51).

The Female Witness could not recall the nature of argument and testified that these two

incidents were the only times Mr. Andrews "put hands" on her, and, on each occasion, she was

not "physically" harmed. (See, S.D.N.Y. Trial Tr. at 489-91). Significantly, there was no

indication that these isolated incidents were either intended as threats or connected to the Female

Witness' prostitution. In fact, the Female Witness certainly did not interpret them that way, and,

according to her response, she felt "mad" and "disrespected" by those two incidents. (See,

S.D.N.Y. Trial Tr. at 151).  In *United States v. Bell*, 761 F.3d 900 (8th Circuit 2014), the force

element was proven because the defendant physically assaulted the victims for disobeying him,

thus causing the women to continue the prostitution activities for the defendant, and thereby

showing a direct correlation between the force and the sex trafficking offense, which is lacking

in our case.

A review of the Female Witness' testimony will prove to the Court's satisfaction

and by the preponderance of the evidence, that Mr. Andrews never coerced, forced, threatened,

or manipulated the Female Witness into prostitution by withholding drugs as charged in Counts

One and Two of the E.D.N.Y. Indictment.  The evidence, presented at the trails in the S.D.N.Y

and E.D.N.Y. showed that Mr. Andrews and the Female Witness entered a business arrangement

where the defendant would provide drugs and services when the Female Witness paid for them

and did not when she could not afford it. Mr. Andrews never forced, coerced, or manipulated the

Female Witness into prostitution.

 The pertinent portions of the Female Witness' testimony from the trial in the S.D.N.Y. on

the Sex Trafficking charges and the E.D.N.Y. trial on the drug offense are presented in support

of our position:

1. The Female Witness had been addicted to drugs, including heroin and crack cocaine for more than a decade. (S.D.N.Y. Tr. at 80-87).

2. Late February 2018, the Female Witness entered a drug treatment program after being "detoxed" at a hospital on Long Island because of her severe addiction to heroin and for the occasional use of crack cocaine. (S.D.N.Y. Tr. at 103 and 252).

3. A few days later, she left the program before completing her treatment because she "didn't want to be there." (S.D.N.Y. Tr. at 104).

4. Before being introduced to Mr. Andrews, the Female Witness resumed her drug use, told a third party that she had no money to buy crack, and she "was prepared to work as a prostitute in order to acquire money to pay for crack" cocaine. (SDNY Tr. at 316-18). The Witness testified that while searching for a "pimp," she was introduced to Mr. Andrews. (S.D.N.Y. Tr. at 109-10).

5. The Female Witness acted as a prostitute on two occasions before she ever met Mr. Andrews.

6. The Female Witness **voluntarily** entered a business arrangement with Mr. Andrews. After being introduced for the first to the Female Witness by a third party, over the telephone, the Female Witness and Mr. Andrews reached an arrangement that she "would pay him money out of the proceeds [she] earned as a prostitute to pay for the crack [she] wanted to get from him." (S.D.N.Y. Tr. at 322-23). At the outset of their relationship, and without equivocation, the Female Witness testified that the defendant advised her that she would have to purchase whatever crack she wanted and that she believed that the amount of crack Mr. Andrews supplied her did not equal her earnings. (See, S.D.N.Y. Tr. at 469).

At trial, the Female Witness also confirmed the arrangement with Mr. Andrews when she testified, "I was given crack when I made money." (S.D.N.Y. Tr. at 468; see also Tr. at 459("He wasn't providing anything if I didn't make money.")). From the outset, Mr. Andrews advised her that she would have to pay him for crack out of the proceeds of her prostitution.

7. The Female Witness also testified that during their relationship which went from early March 2018, to "end of May beginning of June 2018," she used crack almost every day, that Mr. Andrew's "dealt" crack to her "50 to 70" times during that period, and she "arrange[d] for him to deliver the crack "[t]hrough the phone" after she would tell the defendant "I would just say I had the money," then, either the defendant or his associate "would bring me the crack." (E.D.N.Y. Tr. at 272-73).

8. According to the Female Witness, her arrangement with Mr. Andrews required him to pay for expenses, including transportation, hotel rooms, food, advertising, and her cell phone, and that Mr. Andrews would keep 60% from her earnings from prostitution. (S.D.N.Y. Tr. at 114-15; see also, S.D.N.Y. Tr. at 390-91). During their first telephone conversation, Mr. Andrews rejected the Female Witness' proposal "if [she could] get the crack on top of [her] 40 percent," instead, "[she] would have to pay him money out of the proceeds [she] earned as a prostitute to pay for the crack [she] wanted to get from him." (S.D.N.Y. Tr. at 322-23). The government's theory that Mr. Andrews manipulated and coerced the Female Witness into engaging in prostitution by withholding drugs "when she did not meet the defendant's financial goals" is belied by the trial testimony which clearly disclosed a straight-forward money-for-crack relationship. (S.D.N.Y. Tr. at 468)(The Female Witness testified that she "was given crack when [she] made money."). The trial record provided substantial proof that the providing of crack was dependent only on the Female Witness' ability to pay for the drugs.

9. Except for the two unrelated and isolated incidents previously discussed, there is "no" evidence that Mr. Andrews verbally, physically, or otherwise coerced or forced the Female Witness to engage in prostitution during their relationship. The Female Witness testified that Mr. Andrew "never became violent or physical with [her]" and he never "hit or struck [her]." (S.D.N.Y. Tr. 488). The Female Witness' repeated testimony that, from her perspective, everything she did was "a problem" does not amount to coercion. (S.D.N.Y. Tr. at 148)("It was just always a problem. I know I keep saying that, but it was. Like I couldn't – most of the time, I just felt like I couldn't do anything right."); see also, S.D.N.Y. Tr. at 146, 152, 218).[5]

---

[5] Coercion for purposes of the Sex Trafficking Counts of the Indictment is defined as "(A) threats of serious harm to or physical restraint against a person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." See, 18 U.S.C. § 1591(e)(2). Serious harm means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances to perform or to continue to perform commercial sexual activity in order to avoid

10. The trial record failed to present any evidence that Mr. Andrews either isolated the Female Witness from her family and friends or prevented her from communicating by cell phone with them and others, including law enforcement. Mr. Andrews never imposed restrictive rules on her conduct. In fact, the Witness was "free" to enter and leave the hotels without reporting her movements to the defendant. (S.D.N.Y. Tr. at 400).

11.  The Female Witness also testified that she never saw Mr. Andrews "with a weapon," and "[t]here was no kind of sexual relationship with [her]" and "he never attempted to do so." (S.D.N.Y. Tr. at 492).

12. Moreover, the Female Witness testified that her mother "was living in Suffolk County," that she "spoke to her fairly regularly," that her mother and "family has been nothing but supportive," but when "I am on drugs, I am not allowed near them." (S.D.N.Y. Tr. at 400-02). During these conversations, her mother, on occasion, "would beg[ ] [her] to go back to Seafield . . . would cry on the phone and ask [her] to please come home and go into drug treatment so we can help you help yourself." (S.D.N.Y. Tr. at 402). The Female Witness was never prevented from terminating the relationship with Mr. Andrews, and, in fact, she was free to leave any time and return home.

13. Mr. Andrews did not cause the Female Witness to sever ties with her loved ones, in fact, the Witness maintained a close relationship with her mother, who lived nearby, during this time. The Witness acknowledged that she could have returned to her mother's home at any time but indicated that her drug addiction prevented her from doing so, and not Mr. Andrews.  (See, S.D.N.Y. Tr. at 470).

14. After her arrest on April 7, 2018, for providing a false name, because of an open warrant for driving while intoxicated, and being in possession of "three crack pipes," the Female Witness "[wasn't] ready yet to fight her addiction," and "elected not to speak with law enforcement" about her prostitution and drug activities. (S.D.N.Y. Tr. at 439, 446-47).

15. The Female Witness also admitted that "there came a point in time [she] started purchasing crack from another dealer out of the proceeds of [her] prostitution," and "also acquired crack from clients in return for [her] services." (S.D.N.Y. Tr. at 411).

16. The Female Witness testified that, in addition to the Backpage app used in connection with her arrangement with Mr. Andrews, "[she] posted" advertisements for sexual services on "other" commercial sex sites, and "did sessions with clients without telling Mr. Andrews." (SDNY Tr. at 456-57, 461 and 464). In fact, the Witness acknowledged "text[ing] a client" on April 12, 2018, and "telling him [sic] that [she] did not have a pimp," and "worked on her own." (S.D.N.Y. Tr at 457).

---

incurring that harm." See, 18 U.S.C. § 1591(e)(5). Nothing in the Witness' testimony approached the legal definition of coercion or "serious harm."

17. The Female Witness also testified that by "the middle of May 2018, [she] had returned to [a] second drug dealer and had relapsed into the use of heroin," was "using the proceeds" of her prostitution "in order to purchase that heroin," and was hiding "the fact . . . from Mr. Andrews." (S.D.N.Y. Tr. at 464).

18. At a certain point, the relationship between the Female Witness and Mr. Andrews ended. The Female Witness testified that "[she hadn't] even seen Mr. Andrews . . . since mid-April 2018" and "that [she wasn't] even speaking to Mr. Andrews by the end of May 2018." (S.D.N.Y. Tr. at 469). "[B]etween May 17th and May 29th, 2018," the Witness sent "a series of [text] messages . . . asking Mr. Andrews to help [her], and he was refusing to do so." (S.D.N.Y. Tr. at 470). In one of the text messages, the Female Witness actually "wrote to Mr. Andrews that because [she] wasn't making any money, that he wasn't answering [her]." (S.D.N.Y. Tr. at 463). And, as she testified, "[Mr. Andrews] wasn't providing anything if [she] didn't make money." (S.D.N.Y. Tr. at 459). Thus, when she did not have money, Mr. Andrews stopped supplying her with drugs.

Based on the factual review of the Female Witness' trial testimony, she was never coerced, forced, threatened, or manipulated into sex trafficking. Her testimony does not support the Government's imaginative theory that Mr. Andrews manipulated the Female Witness' addiction and coerced and forced her into prostitution by withholding crack cocaine "when she did not meet the defendant's financial goals." Mr. Andrew's business relationship with the Female Witness was straightforward, Mr. Andrews would provide crack and services when the Witness paid for them and did not when she could not afford it.

The Female Witness sought a drug-dealer to supply her with crack and a person to provide transportation, motel accommodations, food, and funds for advertising and a cell phone for communication. Mr. Andrews never employed violence or threats of violence to force the Witness to commit prostitution. He never had sex with her, voluntary or otherwise. He did not seize her cell phone, identification, or credit cards. He did not surveil her. He did not brand her. He did not prohibit her from working independently or with pimps. Indeed, she saw regular customers that did not come through internet advertising.

19

The government's tortured theory that "[t]he evidence adduced at trial firmly established the extent of the defendant's manipulation, coercion, and threats to [the Female Witness], including how he deprived her of the drugs to which she was addicted when she did not meet the defendant's financial goal" is belied by a thorough examination of the trial record.

> ### 8.  Withholding Drugs from an Addict is Insufficient by itself to prove the Element of Coercion Requiring Dismissal of the Sex Trafficking offense Charged in Counts One and Two.

Case law recognizes that withholding drugs from an addict is insufficient to establish coercion and insufficient to sustain the charges of sex trafficking, absent evidence that the defendant engaged in an "intimidating pattern of behavior" that caused the victim to believe "that she could not refuse to work as a prostitute for him without incurring harm, and, therefore, she had no viable alternative to engaging in commercial sex activity with [the defendant's] customers." See, *United States v. Purcell*, 967 F.3d 159, 193-94 (2d Cir. 2020).

In *United States v. Purcell*, involving a similar prosecution for sex trafficking, where the "evidence at trial gave no indication that [the defendant] used force against the [victim], used force or discussed the use of force against other individuals in her presence, or expressly threatened her with force or harm while she was in [defendant's] company," the Court nonetheless determined, from the record, that the defendant's "behavior **inspired fear** in [the victim], and that she remained in his company, followed his instructions, and engaged in commercial sex with a customer based on that fear," *Id.* at 193. (Emphasis added). In reaching its decision, the Court found that "the defendant's conduct, viewed cumulatively, suggest[ed] a pattern of behavior designed to intimidate and exert control over the [victim]," and concluded that "[t]he logical objective of [the defendant's] intimidating pattern of behavior was to cause [victim] to believe that she could not refuse to work as a prostitute for him without incurring

harm, and therefore that she had no visible alternative to engaging in commercial sex activity

with [the defendant's] customers." *Id.* at 193-94. A review of the Court's factual findings will

demonstrate the differences from our case, and support our position that Mr. Andrews never

forced or coerced the Female Witness into sex trafficking:

> [The defendant] insisted that the [victim] sever her ties with her prior or outside life; he
> called her former pimp to announce that the [victim] now worked for him, instructed the
> [victim] to change her telephone number, and took possession of her cell phone except
> when she was answering calls from potential customers. [The defendant] led [the victim]
> to feel that she was subject to his constant oversight and surveillance by instructing her to
> leave the door ajar when she used the bathroom, sleeping beside her bed, and suggesting
> that she could not attend a court appearance or funeral without him. And he signaled that
> she was subject to his control, with little to no autonomy, by taking possession of all her
> cash and earnings, and by leading her to understand that she was expected to abide by his
> restrictive "rules," including a prohibition on speaking to or making eye contact with
> other men and the expectation that she would obtain a 'Casino' neck tattoo.

(See, *Id.*, at 193.

In the instant case, Mr. Andrews never used forced or threated the use of force, against

the victim for refusing to engage in prostitution, never caused the victim to fear "any harm,

whether physical or nonphysical, including psychological," never exercised any control over her

actions, including, never demanding that she "sever her ties with her prior or outside life," never

"instructed [her] to change her phone number" or "[take] possession of her cell phone," never

prevented her from leaving or maintaining her relationship with her parents and friends, and, in

sum, never forced, threatened force, or coerced the victim into engaging in commercial sex acts.

In sum, there never existed "a pattern of behavior [by the defendant] designed to intimidate and

exert control over the [victim]" causing her to engage in prostitution. See, *Id.* at 193-94.

Though the Court in *Pursell* noted that the defendant "took possession of all of [the

victim's] cash and earnings," our case involved the collection of the money to pay for the drugs

and services provided by Mr. Andrews to the Female Witness during the period of their business

relationship. The Female Witness offered the proceeds of **her prostitution activities**, from **her customers**, to pay for drugs to be provided by the defendant. Mr. Andrews never threatened to withhold drugs unless she engaged in prostitution. In fact, the Female Witness testified that on occasion she would withhold from the defendant proceeds from her prostitution activities and that she believed that the amount of crack Mr. Andrews supplied her did not equal her earnings. (See, S.D.N.Y. Tr. at 469).

As previously noted, the Government argues that "[t]he evidence adduced at trial firmly established the extent of the defendant's manipulation, coercion, and threats to [the Female Witness], including how he deprived her of the drugs to which she was addicted when she did not meet the defendant's financial "goal . . ." (See, page 2 of Government Letter in Opposition to Bail Application filed as Document 408 in SDNY Criminal Docket No. 19-131 attached as **Exhibit 3**).

The essence of the Government's position is that Mr. Andrews is guilty of sex trafficking because the "harm" he committed was non-physical by withholding drugs from an addict in desperate need of it. However, withholding drugs alone is insufficient to establish the element of coercion.

In *United States v. Mack*, 808 F.3d 1074, 1081 (6th Cir. 2015), "[t]he evidence adduced at trial showed that defendant coerced the victims into prostituting themselves by initially supplying them with drugs under the pretense that they were free. When he suddenly cut them off and demanded payment, he **exploited their addiction**, which his previous supply of free drugs had cultivated." (Emphasis added). Such exploitation never occurred in the present case.

In *United States v. Fields*, 625 F. Appx 949, 952 (11th Cir. 2015), the Court found that a defendant coerced victims to engage in commercial sex acts by "withholding pills from them and

thereby causing them to experience withdrawal sickness if they did not engage in prostitution" and "[t]he withdrawal sickness was so severe that it caused the victims to want to die. [He also] **isolated the victims to preclude them from obtaining drugs elsewhere and to render them dependent on him and subservient to his demands.**" (Emphasis added) In our case, the Female Witness was never "isolated," never prevented from "obtaining drugs elsewhere," in fact, she had a second source for crack cocaine and a heroin dealer to provide her with "dope," a slang term for heroin. The defendant had unrestricted access to her cell phone, was in regular contact with her mother who, at the time, lived nearby, was free to leave anytime, and the only thing that stood in the way from returning home was her refusal to stop using drugs. Based on all the facts, the Female Witness was neither dependent on the defendant nor "subservient to his demands," and certainly not coerced into prostitution. (See also, *United States v. Carson*, 870 F.3d 584, 588-92 (7th Cir. 2017)(the defendant "trafficked a seventeen-year-old girl in part by isolating her from her mother and not allowing her access to a phone.").

Such evidence of exploiting the addiction, isolating the victim, and making her subservient to the defendant's control, as recounted in the above cases, is completely lacking in the instant matter precluding the consideration of the Sex Trafficking charges in the sentence of Mr. Andrews from trafficking drugs.

Considering the strength of our argument regarding the lack of evidence to prove the Sex Trafficking charges in Counts 1 and 2, the government will undoubtedly argue, in the alternative, that the Court can still consider the Travel Act violations charged in Counts 3 and 4 of the ED.N.Y. Indictment, alleging the defendant promoted prostitution in violation of New York State Law, in fashioning an appropriate sentence for the drug conviction. However, Mr. Andrews was a street-level drug dealer. He sold drugs to the Female Witness who choose the method of payment

by engaging in prostitution to pay for them. If the Court is persuaded to enhance the defendant's

sentence for such offenses, we ask that the Court consider, based upon the credible facts, that Mr.

Andrews may have aided and abetted in the promotion of prostitution, in violation of Penal Law

Section 230.20, Promoting Prostitution in the Fourth Degree, an A-Misdemeanor, for

"advance[ing] and profit[ing] from prostitution." The higher degrees of the offenses for

promoting prostitution are inapplicable to the defendant. For example, promoting Prostitution in

the Third Degree, a D-Felony, requires the defendant to be engaged in a business "involving

prostitution activities by two or more persons in prostitution," facts absent from our case.

The maximum punishment the defendant would have faced in the state courts for the A-

Misdemeanor would have been a year in custody.

### 9.   A Sentence Below the Recommended Guideline Range to Time Served is Appropriate after Careful Evaluation of 3553(a) Factors.

#### A.  Legal Authority.

As the Court is aware, *United States v. Booker*, 543 U.S. 220 (2005) restored district courts'

ability to fashion a sentence tailored to the individual circumstances of the case by requiring courts

to consider all the factors set forth in Title 18, U.S.C Section 3553(a). Indeed, under Title 18 U.S.C.

§ 3553(a) courts are required to sentence below the range if such a sentence would be sufficient to

achieve the purpose of punishment.

Following up on their decision in *Booker*, the Supreme Court in *Gall v. United States*, 552

U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85(2007), effectively reaffirmed the

district court's broad sentencing discretion by permitting them to impose a sentence after

considering "all" the §3553(a) factors, with the Guidelines being only one such consideration.

*United States v. Jones*, 531 F.3d 163, 174-75 (2d Cir. 2008); *United States v. Booker*, 543 U.S. at

245-46; *United States v. Crosby*, 397 F.3d 103, 112-14; see also, 18 U.S.C. §3553(a). Any attempt

to give special weight to the Guideline ranges would be contrary to *Booker* which ruled the Guidelines advisory.

The sentencing guidelines are only the "starting-point and the initial benchmark." *Kimbrough v. United States*, 552 U.S. at 108 (citing, *Gall v. United States*, 552 U.S. at 39). The Court "may not presume that the Guideline range is reasonable." *Gall v. United States*, 552 U.S. at 50 (citing, *United States v. Rita*, 551 U.S. 338, 357-58 (2007)); see also, *Nelson v. United States*, 555 U.S. 350, 352 (2009)("The guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); see also, *Dillon v. United States*, 560 U.S. 817, 841 (2010)(A "sentencing court may not presume [the Guidelines] correct or reasonable when it considers an individual sentencing decision."). Nor should the sentencing court presume a non-guideline sentence "unreasonable." *Irizarry v. United States*, 128 S. Ct. 2198, 2201-02 (2008).

Rather, the sentencing court must make an individualized assessment based upon the facts presented after full consideration of all the § 3553(a) factors. *Gall v. United States*, 552 U.S. at 44, 49-50. The Court may, "in the particular case [determine that] a within-Guideline sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough v. United States,* 552 U.S. at 91 (citing, 18 U.S.C. § 3553(a)) "While a sentencing Court is statutorily obligated to give fair consideration to the guideline before imposing sentence, in the end, it must make an individualized assessment of the sentence warranted by Section 3553(a) based on facts presented." *United States v. Jones*, 531 F.3d at 170; see also, *United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008)(A sentencing court "has a wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.").

In exercising discretion, a sentencing judge "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*,

550 F.3d 180, 188 (2d Cir. 2008)(en banc). District judges are "generally free to impose sentences outside the recommended range" and an appellate court "will not substitute our judgment for the district courts on the question of what is sufficient to meet the §3553(a) considerations in any particular case." *United States v. Cavera*, 550 F.3d at 188.

Ultimately, the district court is guided by the requirement to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553(a)(2).

### B. The § 3553(a) factors.

Among the sentencing factors in 18 U.S.C. § 3553, that a court must consider, are (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; and (3) the need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, and (C) to protect the public from further crimes of the defendant.

Based upon the "individualized assessment" of the facts presented herein and after consideration of all the factors detailed in § 3553(a), we respectfully submit that a sentence below the recommended guideline range is an appropriate and reasonable sentence for the defendant.

### 10. Nature of the Offense.

The defendant was convicted after trial for distributing crack cocaine. We acknowledge the jury's verdict, and, under our system of justice, we must accept it.

Though we disagree with the verdict and with the facts presented in the PSR regarding the nature of the instant offense and the alleged Sex Trafficking allegations, as discussed in this sentencing memorandum, Mr. Andrews acknowledges the seriousness of the instant offense and wishes to assure the Court that, by his comments, does not seek to minimize the importance of the sentencing proceeding.

However, as the Co-conspirator testified, the defendant needed money and, unfortunately, turned to drug trafficking. (See, E.D.N.Y Tr. at 147, 149, 151 and 152). The reliable evidence from the chemist certainly demonstrated that the defendant was never a significant drug trafficker, but a street-level dealer of small quantities of drugs, usually around .7 grams, to users of the narcotics. We are not seeking to minimize his conduct or the seriousness of the verdict but are requesting a fair and just sentence for his criminal offense that, based upon the recognized disparity in the sentencing guidelines for crack cocaine, has resulted in a guideline range, at worst, of 33 to 41. Mr. Andrews has already served over four years, 51 months, in pre-sentence incarceration, over two years of which were in harsh and inhumane conditions at the MCC and MDC.

Based on a consideration of all the 3553(a) factors, we submit a time-served sentence is fair and just.[6]

### 11. History and Characteristics of the Defendant.

Mr. Andrews, 49 years old, born to and raised by an abusive mother "who frequently beat [ ] him with extension cords or broom handles" and a father who became a daily crack user when the defendant was approximately 11 years old. At age 13 or 14, Mr. Andrews left his parents' home and lived without a stable environment, often having "nowhere to live and alternat[ing] between living in cars or at a friends' homes" until he began a romantic relationship with Adrienne Walker, his future wife. (PSR ¶72-75). Though the defendant had a very difficult childhood, he maintained contact with his mother over the years.

---

[6] Our position is obviously based on the government's position and the Court's decision regarding the mandatory minimum and the application of the recent changes to the crack cocaine guidelines. If the Court upholds the application of the mandatory minimum, we respectfully submit that a 60-month sentence is sufficient to satisfy the goals of punishment in §3553(a).

The defendant's sister Yvetta Lambert described "their father as a substance abuser during their childhood," who, '[d]uring times of heavy drug use . . . did not contribute to the family, and was largely absent," and a mother who was a "'disciplinarian,' who utilized corporal punishment," but would not "characterize the treatment by her mother as abusive," but admitted that "due to conditions at home, both she and the defendant left the family in their mid-teens." (See, PSR ¶82). Ms. Lambert "believe[d] that her mother was 'so strict' to make up for the absence of the father." *Id.*

Ms. Lambert told the Probation Officer that "in the years prior to his arrest for the instant offense, the defendant appeared to be 'making positive changes' in his life and was doing 'better than before.' She asked that Your Honor consider that the defendant has always been 'charming, respectful, and a good father,' and "asked that Your Honor consider the circumstances of their childhood and how that affected their overall wellbeing." (PSR ¶84).

Mr. Andrews has 16 children, from five relationships, and has maintained amicable co-parenting relationship with the mothers of the children . . . spend[ing] as much time as he could with his children" before his arrest and incarceration on February 27, 2019. (PSR ¶74 to 79).[7] His sister told the Probation Department that "his children 'adore' him, and the defendant has always tried to be the best father he can." (PSR ¶83).

On February 8, 2023, Denise Lewis, mother to three children with Mr. Andrews (see, PSR ¶78), prepared a character letter, at my request for an anticipated bail application for the defendant. However, I decided to focus instead on post-trial motions and this sentencing memorandum, and, with the Court's permission will submit Ms. Lewis' character letter in

---

[7] Mr. Andrews disclosed to the Probation Department that he has three children from a relationship with LaToya Clay, "which spanned approximately five years," but "has had no contact with these children" since 2010," believing that Ms. Clay presently resides in North Carolina." (PSR ¶80).

support of Mr. Andrews describing his devotion to his children, his consideration of others,

helping "family and friends in difficult times in their life. . . [and] provid[ing] food and shelter to

someone in need." Her letter also discloses the charitable and volunteer work Carl has

performed, but, most importantly, the need for presence in the lives of his children. (See, Denise

Lewis February 8, 2020 Letter attached as **Exhibit 4**). After mentioning that she is presently

employed as a Nurse Attendant at South Shore University Hospital and attending school to

become a Licensed Practical Nurse, Ms. Lewis wrote,

> . . . I have known Carl for eighteen years. I have three children with Carl . . . I've
> watched Carl be a phenomenal father, there physically and mentally to all his children . . .
> attentive and patient to all his children's needs. Carl is the father who made sure his
> children came in from school, sat and did their homework before anything else. He made
> sure to attend every parent/teacher conference, school activities and field trips whenever
> possible. Carl was an assistant coach for BYA (Brentwood youth activities) our two sons
> Prince and King attended for 4 years. Carl cuts hair . . . for family and friends kids . . . for
> free every time . . .

> . . . He has always been kind, loving, funny, supportive, thoughtful, honest and
> dependable, there are not enough words to describe to you the person Carl is. He has been
> a shoulder to cry on for many, and has been helpful to family and friends in difficult
> times in their life, always willing to lend a hand, provide food and shelter to someone in
> need. Carl has taught me the meaning of family and also how to cook, he's a really good
> cook. . .

> Carl's absence has been very hard on his children and myself. His children have been lost
> without him, his sons were doing badly in school. Our son Prince was getting suspended,
> doing things he has never done and I know his fathers absence played a part in this
> because Prince has always been a good kid and has never been in trouble prior to this . . .
> My daughter does not understand and thinks Carl is at work. All she does is talk about
> her father. She has a fairytale scenario in her head that when he comes home from work
> he has to walk in the driveway with his arms out so she can run into his arms . . . Both my
> sons cried on their birthdays because they miss their dad so much . . . It is important Carl
> is here to provide a feeling of security, both physical and emotional. The absence of
> Carl's affectionate and supportive ways to his children has greatly affected them of
> feeling that overall sense of well being and self confidence.

(See, Denise Lewis' Letter attached as **Exhibit 4**).

A close friend of 35 years also wrote a character letter attesting to the defendant's

willingness to help and assist others and his dedication to his children, by writing,

> For the past 7 years, I have been the President of the Brentwood Youth Activities, a youth program that services underprivileged kids. Carl enrolled his sons into the program, where they played sports, built friendships, and learned many life skills. Not only has Carl made sure his son's attend every practice and on time, he also volunteered to assist when needed.
>
> Carl has helped support the head coach when requested and has been a chaperone on team trips. Furthermore, Carl's dedication to his son's team has been an extreme help to the organization and a positive example to others who have hesitated to step up. His leadership to his own children as well as other children exemplifies true commitment and dedication.

(See, Elton George August 10, 2022 Letter attached as **Exhibit 5**).

At my client's request, his mother wrote a letter to the Court, which reads,

> . . . I have had the pleasure to see him grow up to be a great, loving and very inspirational person. During his upbringing he served in the community as a volunteer worker along side of me helping the less fortunate. His compassion for others has caused everyone to develop a unique closeness to him, even throughout the family. Carl has a great relationship with all of his family and friends.

(See, Minnie Andrews August 12, 2022 Letter attached as **Exhibit 6**).

### A. Exemplary Conduct while incarcerated for over four years, 51 months, is a significant sign of rehabilitation and reflects positively on the character of the defendant.

Mr. Andrews has been incarcerated for 51 months, first at the MDC after his arrest on

February 27, 2019, then he was transferred to the MCC on March 9, 2020, until July 2, 2021,

when he was placed in a state prison in Yaphank, New York, where he has been and is presently

being detained as a federal prisoner. Throughout the entire 51 months of his incarceration, Mr.

Andrews has had, unimaginably, only one infraction for possession of a contraband cell phone

and was placed in solitary confinement for over a month until a resolution of the matter resulted

in his losing visiting privileges.

Moreover, Mr. Andrews volunteered his time as a "barber" for the inmates, at the MDC and MCC, usually working 5 days a week without any payment. The representation can be confirmed by reviewing the daily register that the defendant was required to log into when he worked cutting hair. More importantly, he applied for and was accepted as a trusted inmate in the suicide prevention program while incarcerated at the MCC. Mr. Andrew's inherent qualities of caring, of being able to communicate and of establishing a positive report with other inmates made him a suitable candidate for the program which permitted pre-trial detainees to work, for $1.00 an hour, monitoring and counseling "at risk" prisoners, which Mr. Andrews did for many months while detained at the MCC, during which time the defendant prevented two suicides and received certificates for his participation in and training for the program. Mr. Andrews received recognition certificates from the Clinical Psychologist and Inmate Companion Coordinator at MCC for his service, two of which are attached for the Court's consideration. The first acknowledged the defendant's contribution to the Suicide Watch Program, noting the "satisfactory" completion of 200 hours of service between October 5, 2020, and December 31, 2020, and the second certificate verified his "satisfactory" completion of Training in Suicide Prevention, attached respectively as **Exhibit 7** and **Exhibit 8**.

In a work performance report, a prison supervisor wrote a commendable evaluation for Mr. Andrews' participation in the suicide watch program covering the period October 15, 2020, to January 15, 2021:

> Mr. Andrews has worked as an inmate companion under my supervision from October 15, 2020 to Present. Throughout his time as an inmate companion, he has been reliable and exhibits an eagerness to help and learn. Mr. Andrews attends his scheduled shifts on time, as well as scheduled trainings. He has maintained open communication with his supervisor and fellow inmate companions, indicating an ability to work together toward collaborative goals. He interacts with staff and his peers in respectful manner, and has been a valuable addition to the inmate companion roster overall. Mr. Andrews has demonstrated a commitment to observing, reporting and appropriately intervening during

a potentially life-threatening situations.  His constant, careful observation has been key to ensuring the safety of the inmates on Suicide Watch.  He demonstrates empathy and positive regard for others.  His patience, understanding, and stress tolerance have enabled him to succeed in dealing with some of the most challenging aspects of mental illness, including inmates who are extremely labile, verbally aggressive, acutely suicidal, or have grossly distorted perceptions of reality.  He is well-related and is able to interact with those in an acute crisis non-defensively, prioritizing the safety and needs of inmates on Suicide Watch.

(See, January 15, 2021 Report attached as **Exhibit 9**).

In addition, when time permitted, Mr. Andrews also attended educational and self-improvement programs offered at the MDC and MCC, on a limited basis, because of the COVID crisis, and received certificates of attendance for 5-6 courses that he attended. However, Mr. Andrews was only able to locate two certificates attesting to his participation in a "Child Development and Sexuality" Workshop presented by Planned Parenthood of New York City and "Chess 2 Sentry Class" offered by the MDC Recreational Department, attached respectively as **Exhibit 10** and **Exhibit 11**.

Mr. Andrews never received a "ticket" for any infraction at the MDC or the Yaphank facility and volunteered to be the dormitory representative in the state prison responsible for the sanitary condition of his unit and for compliance with prison regulations.

An inmate's conduct in prison, including participation in "institutional programs" and an inmate's work performance ratings are compelling evidence of a defendant's sincere efforts at rehabilitation. See, *United States v. DeJesus*, 2022 U.S. Dist. LEXIS 71936 *17 (S.D.N.Y. April 19, 2022)(in a compassionate release case seeking reduction in sentence, the Court acknowledged the importance of a positive work record and educational training while in prison as signs of "sincere rehabilitation"). We submit that Mr. Andrew's outstanding record at the three prison facilities are compelling evidence of his sincere efforts at rehabilitation, warranting substantial consideration at sentencing.

B. **Mr. Andrews criminal record is adequately considered in the guideline calculations and does not reflect a single conviction for a violent felony offense.**

We anticipate that the Government will certainly mention the defendant's lengthy criminal history and argue for a substantial term of imprisonment. However, a closer examination of all the arrests will reveal that the defendant has never been convicted of a violent felony and was placed in Criminal History Category III for three misdemeanor **arrests** that occurred more than ten years ago, with the remainder of the earlier arrests occurring on or before March 25, 2005, more than 18 years ago. And, significantly, the three misdemeanor convictions that placed him in Criminal History Category III were already considered in determining his criminal history score.

We also anticipate that the Government will point to several arrests related to domestic violence incidents against his wife Adrienne Walker-Andrews that resulted in the defendant's arrest on April 22, 1998, for violating an order of protection, and on April 10, 2002, for assault in the third degree, incidents that occurred more than twenty years ago. (See, PSR ¶¶47 and 50). Though certainly never an excuse for violence, the defendant's sister described the relationship with Ms. Walker-Andrews as "toxic, adding that Ms. Walker was physically and emotionally abusive toward the defendant," and she was unfaithful by getting "pregnant during one of the defendant's prior terms of incarceration." (PSR ¶83). Additionally, over-time, the relationship between Ms. Walker-Andrews and the defendant was renewed, and, after his arrest on February 27, 2019, Ms. Walker-Andrew signed an affidavit in support of a bail application "making clear that the conditions that gave rise to her complaints are in the distant past." (See, page 12 of the Bail Application in S.D.N.Y. Criminal Docket No. 19-131(PAE) filed as Document 402 on June 5, 2020). In her supporting affidavit, Ms. Walker-Andrews writes,

In the early years of our marriage, when we were both much **younger**, Carl and I bumped heads a lot over many disagreements.

. . .

Carl and I both played a part in the wrongdoings **we** have done to **each other**. I do not want to give the impression that it was all his fault when we **were** both to blame back in our early **teenage years**.

,

Over time, as we have gotten older, we have each matured and our relationship has significantly improved. We know ourselves, well as, each other better. We have mutual respect for each other. **I let go** of the issues in past, including his relationships with other woman. Carl and I have a long history together that includes having had our ups and downs, but we have a unique love for each other, and our bond is unbreakable.

Old conflicts, and there were plenty, some that even resulted in reports of domestic violence in the **past**, were triggered by things that haven't been an issue in our lives for years. That is not our relationship anymore in our **adult** lives.

**I know** and feel completely, 100% **safe** residing with Carl.

I also need help around the house with our children who range in age from eight to twenty-seven.

. . .

Our children respect their Dad (Carl) and they do listen to him. Even while Carl has been incarcerated, our teenage boys behave more respectful to me after speaking with Carl on the phone.

(See, Ms. Walker-Andrews May 29, 2020 filed in in S.D.N.Y. Criminal Docket No. 19-

131(PAE) as Exhibit A in Document 402 attached as **Exhibit 12**).

## 12. **The Unusually Harsh Conditions of Mr. Andrew's Detention at MCC Warrant Substantial Consideration in Sentencing.**

A departure is warranted by the unusually harsh conditions of Mr. Andrew's confinement

at the MDC and MCC since his arrest on February 27, 2019, particularly, his confinement at the

MCC from March 9, 2020, until his transfer to his present location at a state facility in Yaphank,

New York, in Suffolk County, on July 2, 2021. Here, a departure is warranted to acknowledge the

qualitatively different, substandard conditions to which Mr. Andrews was subjected for an

extended period. See, *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001). The

combination of the pre-trial confinement under the abhorrent conditions at the MCC, including the significantly restrictive conditions caused by the COVID pandemic, make the conditions of Mr. Andrew's confinement qualitatively different for the term of his detention, and even more acutely so since the onset of the pandemic in March 2020.

The Second Circuit holds "that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures*." United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001), *cited by United States v. Rodriguez*, 651 F. App'x 44, 48 (2d Cir. 2016) (recognizing that harsh conditions of imprisonment can provide basis for sentencing departure), *United States v. Robinson*, 799 F.3d 196, 201 (2d Cir. 2015) (pre-sentence confinement conditions may, in appropriate cases, be a permissible basis for downward departures).

In *United States v. Batista*, 2022 U.S. Dist. LEXIS 100688 (S.D.N.Y. June 6, 2022), the Court noted that "the COVID-19 pandemic has 'subjected all inmates to far more restrictive conditions of confinement than normal incarceration.'" (Citing, *United States v. Robles*, 553 F. Supp.3d 172, 182 (S.D.N.Y. 2021)("It has limited inmates' access to visitors such as family, to counsel, and to rehabilitative, therapeutic, and recreational programs. And it has given rise to fears of infection and worse by inmates. In these respects, the pandemic has spawned conditions of confinement far more punishing than what could have been expected at the time of the [defendant's] sentencing.").

In favorably ruling on a compassionate release motion, the Court wrote, pertinent to our inquiry,

> Even as compared to the experiences of her fellow inmates, moreover, Ms. Batista's experience in custody has been unusually challenging. As explained in the Court's 2020 Order, Ms. Batista served the first several months of her custodial term at the Metropolitan Correctional Center ("MCC"), where, after the arrival of COVID-19, she was subject to 24-hour-per-day lockdowns, experienced a lack of medical and psychiatric care, and suffered "every COVID-19 symptom" without the receipt of medical attention. . . This experience was consistent with that of several other inmates at the MCC who

received neither medical care nor any response to their requests for such care for days or weeks during the initial outbreak and lockdown at the MCC. See, *Fernandez-Rodriguez v. Licon-Vitale*, 470 F.Supp.3d 323, 331-40 (S.D.N.Y. 2020)(summarizing the MDC's response to the initial outbreak of COVID-19); see also, *id.* at 350("Rather than having a functioning sick-call system, the MCC admits it entirely failed to review inmates' electronically submitted complaints due to neglect in staffing of the sick-call inbox."). The initial months after COVID-19's arrival in New York City were a frightening time for all New Yorkers and were particularly frightening for those in custody.

(See, *United States v. Batista*, 2022 U.S. Dist. LEXIS 100688 *87-8).

In late February and earlier March of 2020, our country began to experience the unprecedented COVID-19 health pandemic. The horrific impact on the living conditions of the inmates in federal prisons throughout the United States, including the MCC, has been well documented in the news and in court decisions. Though measures were rightfully taken to stop the spread of the disease, life became harder on the inmates due to restrictive lockdowns, limited access to telephone and email services, educational and vocational training, and normal medical treatment. The Honorable Paul A. Engelmayer, U.S. District Court Judge, Southern District of New York, best described the conditions of an inmate's confinement during the COVID crisis:

> . . . As has been widely chronicled, the pandemic, for good and sound public health reasons relating to arresting the spread of the virus within the crowded confines of federal prisons and jails, has required extreme restrictions on prisoners' movements and visits. It has also exposed prisoners to heightened fears of contagion and its consequences . . .
>
> In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing. See Def. Mem. At 1, 6; *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

(See, *United States v. Phillibert*, 2021 U.S. Dist. Lexis 162770 *11 and *12 (S.D.N.Y. August 27, 2021).

Mr. Andrews was incarcerated at the Metropolitan Correctional Center ("MCC") from March 9, 2020, until transferred on July 2, 2021, to the state prison in Yaphank, New York, and, during that 16-month period, was "often" locked into a cell twenty-three hours a day, four days a week for months. He was denied showers, clean clothing, recreational time, and hot food for weeks at a time. In fact, shortly after his arrival at the MCC, Mr. Andrews contracted the virus, and was placed in quarantine in the Special Housing Unit ("SHU"), locked in his cell for 28 days, the first 9 days without a shower, isolated from his family and friends, except for one telephone call that month, and without any meaningful medical attention. Mr. Andrews suffered painful body aches and severe headaches, and, compounding his condition, the defendant suffered from anxiety and depression.

In a handwritten letter, sent to several government officials, Mr. Andrews described the harsh and inhumane conditions at the MCC that suffered during the early period of the pandemic, especially his time in SHU described above:

> …on the 21st of March I was placed in Shu for quarantine because I was exposed on the 16th at Court. While placed in Shu it was a nightmare the building is infested with rodents and roaches the first 9 days in Shu I was denied a shower and change of clothes, soap, toothpaste, towel, wash cloth. I haven't received my psych meds since they brought me to MCC and told psych a number of times. I was aloud one phone call actually two because my lawyer called me one time and the other I called my wife and kids in 18 days. On April 7th I was placed back in population 7-South cell-G-10774 a cell with no sink now mind you still quarantined. How do I wash my hands and keep clean with no sink me and my cellmate complains every day and nothing gets done it seems like hell have to block the door at the bottom to keep the mice from coming in there holes they come thru in the walls the toilet leaks it smells horrible. My skin is infected from all this filth theres flies flying around the cell its disgusting its unhealthy and unsanitary for living. Air vents dirty we're breathing in dirty air. Ive been aloud 1 shower since the 7th todays the 13th mind you no sink in my cell. The whole 25 days I had 3 showers and don't know when my next one will be. I ate cold food for two weeks in the Shu.

(See, pages 2-3 of Mr. Andrews' Handwritten Letter attached as **Exhibit 13**)[8]

During his incarceration at the MCC, the defendant has endured the harsh conditions and restrictive measures imposed to contain the disease, including, at times, limited access to telephones and internet services, periodic lockdowns in his cell preventing exercise and recreation, termination of educational and vocational programs, occasional cold meals for lunch and dinner, and delays and postponements of normal health treatment.

The horrors of a "modified" lockdown, requiring the inmates to be isolated in their cells, sometimes for relatively short periods, other times for 24 hours per day for days at a time occurred, usually without warning and resulted in almost complete isolation, except for a possible cellmate, and being neglected by the prison officials. These lockdowns entombing the inmates were experienced for various reasons, including a period when the Bureau of Prisons ("BOP") announced a nationwide lockdown in response to protests on the streets over police brutality,[9] and, upon his arrival, MCC was on lockdown because a loaded handgun was discovered in an inmate's cell, believed smuggled into the prison by a prison officer. "[I]nmates complained of getting cold sandwiches (one claimed the cold cuts were frozen and inedible on one occasion) during the lockdown. Visitors also said inmates reported their cells or dorms were destroyed during the searches, with urinals broken and bedsheets taken away. Others complained about having to wash their clothes in the shower, in sinks, or even in the toilet."[10]

---

[8] In the handwritten letter, the defendant also described the lack of medical attention at the MDC and an incident where he placed in SHU for over forty days accused of "fighting" until prison officials reviewed the video of the incident and realized Mr. Andrews "didn't do anything." (See, page 1 of **Exhibit 13**).

[9] Courtney Buble, *Federal Bureau of Prisons Goes into National Lockdown Over Protests*, Government Executive (June 1, 2020), https:www.govexec.com/management/2020/06/federal-bureau-prisons-goes-national-lockdown-over-protests/165820/.

[10] See, https://www.ky3.com/2022/03/11/timeline-march-11-2020-what-happened-when-covid-19-was-declared-pandemic-two-years-ago/.

Mr. Andrews suffers from clinical anxiety. The pandemic, as experienced in the MCC, not only created unspeakable anxiety in Andrews, it also denied him outlets he would otherwise have to obtain some relief from that anxiety. There were, for many months, no legal visits. Worse still, access to his family was severely limited. He is a married man with sixteen children, and, for a substantial period had virtually no contact with his family after the onset of the pandemic.[11]

The court in *United States v. Pennick*, No. 10-CR-191-A, 2016 WL 4089192 (W.D.N.Y August 2, 2016), found "the obvious psychological and social impact" of incarceration on the defendant controlling. *Pennick, 2016 WL 4089192 at *8*; see also, *United States v. Pennick*, 713 F. App'x 33, 35-36 (2d Cir. 2017)(finding that the district court did not abuse its discretion "in affording heavy weight to the psychological and social anxiety resulting from fifty-four months of pre-trial detention and twenty-five months of home incarceration"). Many sentencing courts have ruled that time spent incarcerated under the pandemic conditions should equitably be multiplied because of their rigors.[12] Mr. Andrews' detention at the MCC was more oppressive than the same amount of time under ordinary conditions.

Since the COVID crisis, federal judges have considered the harsh impact of the pandemic as a §3553(a) factor and have imposed below guideline sentences and granted downward variances

---

[11] This and several following paragraphs are taken mostly verbatim from the defendant's motion to dismiss filed February 16, 2021, as Document 19 in the captioned case.

[12] See, e.g., *United States v. Christopher Bertsch*, 20-CR-109(JS)(E.D.N.Y. October 24, 2022)(downwardly departing 24 months from a 30 year sentence in a child exploitation case); *United States v. Taveras*, 19-CR-180(KAM)(E.D.N.Y. March 23, 2022)(downwardly departing six months in an attempted murder of a confidential informant); *United States v. Cirino*, No. 19-CR-323 (JSR)(S.D.N.Y. July 21, 2020)(Departing downwardly 83% in Hobbs Act robbery case); *United States v. Garcia*, No. 20-Cr-27 (JKG)(S.D.N.Y. July 17, 2020)(departing downwardly 30% in illegal reentry case and imposing time-served sentence): *United States v. Piper*, No. 18-CR-008(AMD)(E.D.N.Y June 25, 2020)9departing downwardly 75% in child pornography case and imposing time-served sentence); *United States v. Casillas*, No 19-CR-836 (S.D.N.Y. June 2, 2020)(departing downwardly 60% in illegal reentry case and imposing time served sentence); *United States v. Hendryx*, No. 18-CR-478 (ENV)(E.D.N.Y. May 22, 2020)(departing downwardly 25% from bottom of guidelines range in felon-in-possession case); *United States v. Polanco*, No. 20-CR-94 (AJN)(S.D.N.Y May 15, 2020)(departing downwardly 60% in illegal reentry case and imposing time-served sentence); *United States v. Vinas*, No 20-CR-44 (ERK)(E.D.N.Y. April 20, 2020)(departing downward 63% in escape case): *United States v. Aracena de Jesus*, No. 2-CR-19 (PAE)(departing downwardly 77% in illegal reentry case and imposing time served-sentence).

based on the pandemic and harsh conditions endured by inmates at BOP detention facilities. (See, *United States v. Morgan*, 19 Cr. 209 (S.D.N.Y. May 5, 2020) (the Court cut the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemned the conditions at MCC and MDC prior to the current crisis); see also, *United States v. Jervis Cirino*, 19 Cr. 323 (S.D.N.Y. July 21. 2020)(Judge Rakoff granted a variance from a guideline range of 57-71 months for a Hobbs Act robbery and imposed 10 months, noting, "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons.").[13]

Based on the harsh and sometimes inhuman conditions the defendant has had to endure during his imprisonment at the MCC, we are respectfully requesting that the Court grant a variance

---

[13] As pointed in a sentence memorandum prepared by the Federal Public Defender's Office, Eastern District of New York, Judges in both the Eastern and Southern Districts of New York have granted leniency to defendants for harsh conditions at the MDC during the pandemic, and have "imposed terms of imprisonment that are substantially less than the bottom of the defendant's advisory ranges," citing the following cases: *United States v. Clark*, No. 20-cr-241 (NGG) (E.D.N.Y. May 7, 2021) (imposing 96 months in armed robbery case where bottom of guidelines range was 114 months); *United States v. Narcissi*, No. 20-cr-449 (RPK) (E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence of 7 months, where guidelines range was 24-30 months); *United States v. Colon*, No. 15-cr-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Shi*, No. 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where guidelines range was 12-18 months); *United States v. Piper*, No. 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had served approximately 24 months and bottom of guidelines range was 63 months). See also, e.g., *United States v. Searles*, No. 19-cr-381 (GBD) (S.D.N.Y. Mar. 25, 2021) (imposing 48-month sentence in Hobbs Act robbery case where bottom of guidelines range was 120 months); *United States v. Soto*, No 19-cr-903 (KMW) (S.D.N.Y. Mar, 19, 2021) (imposing 60-month sentence where bottom of guidelines range was 120 months); *United States v. Marmolejo*, No. 20-cr-1 (JSR) (S.D.N.Y. Feb. 3, 2021) (imposing 18-month sentence where bottom of guidelines range was 87 months); *United States v. Almonte*, No. 19-cr-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of guidelines range was 51 months); *United States v. Garcia*, No. 19-cr-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Camacho*, No. 19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, No. 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines range was 27 months); *United States v. Cirino*, No. 19-cr-323 (JSR) (S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of guidelines range was 57 months); *United States v. Aracena de Jesus*, No. 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines range was 30 months). See, *United States v. Watson*, page 12 of Document 174 in Criminal Docket No. 19-CR-4(WFK).

and downwardly depart, or otherwise compensate with a more lenient sentence from the recommended prison guidelines.

      13. **Conclusion – Recommendation.**

      Considering all the 3553(a) factors, including the nature of the offense and the history and characteristics of the defendant, we submit that a time-served sentence and supervised release are sufficient, but not greater than necessary, to satisfy goals of sentence.

      Mr. Andrews has served 51 months in prison for an offense that results in a guideline range of 33 to 41 months, if the recommended guideline calculations for crack cocaine are replaced with those for powder cocaine. Also, if the government refuses to support our application to withdraw the necessity of imposing the mandatory minimum, we recommend that the mandatory 60 months and a term of supervised release is sufficient, but not greater than necessary, to satisfy the goals of sentencing and, under all the circumstances, is a fair, just, and reasonable punishment for the defendant's crimes.

                Respectfully submitted,

                Robert P. LaRusso
                Attorney for Carl Andrews

cc:    Rushmi Bhaskaran
       Elizabeth Espinosa
       Assistant U.S. Attorneys
       (by ecf and email)

       Lisa A. Langone
       Senior U.S. Probation Officer
       Eastern District of New York
       (by email)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CARL ANDREWS,
   a/k/a "Day,"
   a/k/a "Dayshawn,"

                      Defendant.

20 Cr. 546 (GRB)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Rushmi Bhaskaran
Elizabeth Espinosa
Assistant United States Attorneys
   *Of Counsel*

<u>**PRELIMINARY STATEMENT**</u>

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Carl Andrews scheduled for June 2, 2023.

As the Court is well aware, the procedural history of this case is unusual and complex. But perhaps a result, the factual record reflecting the defendant's offense conduct, his history, and his behavior is especially robust. That record includes a trial on sex trafficking charges in the Southern District of New York—where the Government was less than a day from resting—that was cut short because of the COVID-19 pandemic. The record also includes a second trial in this District in August 2021, after which a jury convicted Andrews of narcotics conspiracy. The evidence at these trials overwhelming established that the defendant was a prolific crack dealer, a pimp, and a sex trafficker who, through fraud, coercion, and threats of violence, caused a vulnerable, drug-addicted victim to perform commercial sex acts she did not want to commit.

In the Presentence Investigation Report (the "PSR") dated June 3, 2022, the United States Probation Office ("Probation") calculates the United States Guidelines Range (the "Guidelines" or "U.S.S.G"), using the crack cocaine Guideline, to be 121 to 151 months' imprisonment and recommends a sentence of 151 months' imprisonment.[1] In light of recent Department of Justice ("DOJ") guidance promoting equivalent treatment of powder and crack cocaine, the Government has calculated the Guidelines range using the powder cocaine Guideline to be 78 to 93 months' imprisonment.

---

[1] The Government has informed Probation of its arguments regarding the applicability of additional enhancements that were not applied in the June 3, 2022 PSR. The Government understands that Probation is preparing its responses to the Government's and the defendant's objections and comments to the PSR.

The Government respectfully submits that the goals of sentencing—in particular, just punishment, promotion for the respect for the law, and adequate deterrence—will be served by a substantially above-Guidelines sentence of imprisonment of approximately 15 years.  Such a sentence is sufficient, but no greater than necessary, to serve the legitimate goals of sentencing in light of the numerous aggravating factors in this case—especially, Andrews's deeply inhumane sex trafficking of Victim-1.

## I.        The Conduct Relevant to Sentencing

On August 9, 2021, the Court presided over the defendant's trial (the "August Trial") on Count Five of the Indictment, which charged the defendant with conspiracy to distribute 28 grams or more of cocaine base.  On August 12, 2021, the jury found the defendant guilty of that charge. The evidence at the August Trial overwhelming established that, from late 2017 until his arrest in February 2019, the defendant was a prolific crack dealer in Suffolk County.  In addition, the evidence proved that he sold substantial amounts of crack cocaine and powder cocaine—at least 200 grams—in just six months of a conspiracy that lasted over a year

The evidence presented at the August Trial, however, captured a mere sliver of his criminal conduct.  As a jury in the Southern District of New York heard during a trial that began on March 9, 2020 (the "March Trial"), the defendant was not just a crack dealer.  He was also pimp and a sex trafficker who, through fraud, coercion, and threats of violence, caused a vulnerable, drug-addicted victim to perform commercial sex acts she did not want to commit.

The following summary of the evidence draws from both the March and August Trials and reflects the totality of the defendant's conduct that is relevant to the Court's sentencing.

### A.  The Narcotics Conspiracy

The defendant met Geraldine Faustin in approximately October 2016.  Transcript of August Trial ("Aug. Tr.") at 145.  A few months later, they began dating.  Aug. Tr. 146.  Their relationship

was "very serious" and they effectively lived together from at least early 2018 until their arrest on February 28, 2019.  Aug. Tr. 146, 152, 171, 174.  The defendant told Faustin's family that he was a barber, but that was a lie.  Aug. Tr. 146-147.  Instead, he made a living by selling crack and cocaine. Tr. 147.

In late 2017, the defendant recruited Faustin to sell and deliver drugs from him.  Aug. Tr. 147.  Faustin—a home health aide making minimum wage with no prior criminal history—had no drug customers of her own; instead, the defendant would direct her to meet with his customers, and the defendant would supply Faustin with crack or cocaine.  Aug. Tr. 143, 153, 208-209.  Faustin gave all the money she collected from selling drugs to Andrews; she received no share of the profits.  Aug. Tr. 149-151; 208-209.

With Faustin, the defendant sold crack and powder cocaine throughout Suffolk County beginning in late 2017. Aug. Tr. 147.  From early 2018 until approximately March 2018, the defendant and Faustin sold crack from Faustin's home on Claire Court in West Babylon (the "Claire Court House").  Faustin testified that, during this time period, Andrews stayed at the Claire Court House five nights per week; made or directed her to make two sales of crack or cocaine each night he was there; and that 90 percent of those sales were crack cocaine.  Aug. Tr. 151-153.  She further testified that the most common value of those sales was $60, which would correspond to .6 grams of narcotics.  Aug. Tr. 154.  As calculated below as a conservative estimate, the defendant and Faustin therefore sold $3,240 worth of crack cocaine—or 32.4 grams—in just six weeks from Claire Court.  Furthermore, the defendant sold about $360 worth of powder cocaine—or 3.6 grams—in the same time period.

**Table 1:  Crack Cocaine Sales from Claire Court, Early 2018 to March 2018**

| Faustin's Testimony | Crack Cocaine Calculation |
|---|---|
| Early 2018 to March 2018 | Approximately 6 weeks |
| Andrews stayed at Claire Court 5 days a week on average | 6 weeks x 5 days/week = 30 days |
| Two sales almost every day Andrews was a Claire Court | 30 days x 2 sales = 60 sales |
| 90 percent of sales were crack cocaine | 60 x .9 = 54 sales of crack cocaine |
| $60 was the most common value of the sale | $60 x 54 sales = $3,240 |
| $60 corresponds to .6 grams of narcotics | $100 corresponds to 1 gram of crack |
| **Estimated Weight from Claire Court, from Early 2018 to March 2018** | $3,240 crack sales / $100 (price per gram) = **32.4 grams of crack cocaine** |

**Table 2:  Powder Cocaine Sales from Claire Court, Early 2018 to March 2018**

| Faustin's Testimony | Powder Cocaine Calculation |
|---|---|
| Early 2018 to March 2018 | Approximately 6 weeks |
| Andrews stayed at Claire Court 5 days a week on average | 6 weeks x 5 days/week = 30 days |
| Two sales almost every day Andrews was a Claire Court | 30 days x 2 sales = 60 sales |
| 90 percent of sales were crack cocaine, so 10 percent were powder cocaine | 60 x .1 = 6 sales of powder cocaine |
| $60 was the most common value of the sale | $60 x 6 sales = $360 |
| $60 corresponds to .6 grams of narcotics | $100 corresponds to 1 gram of powder cocaine |
| **Estimated Weight from Claire Court, from Early 2018 to March 2018** | $360 crack sales / $100 (price per gram) = **3.6 grams of powder cocaine** |

Andrews also maintained a stash house located in Bayshore (the "Bayshore House"), from at least January 2018 until May 2018.[2]  As Faustin testified, during this time period, the Bayshore House was a squatter home—replete with surveillance cameras trained on the front entrance—where Andrews sold drugs on countless occasions.  Aug. Tr. 171-172.  Within the Bayshore House,

---

[2]As the Court is aware, pole camera footage of the Bayshore House was inadvertently not preserved.  The Government agreed not to elicit testimony about drug sales from the Bay Shore House during the time that the pole camera was operational, *i.e.*, from June 2018 to November 2018.

Andrews kept crack in bedroom and kitchen drawers.  In addition, Both Faustin and Victim-1 saw Andrews or an unidentified co-conspirator cook crack cocaine from the Bayshore House.  Aug. Tr. 173.  Victim-1 specifically recalled Andrews and an unidentified co-conspirator cook 50 grams of crack at his home in Bayshore. Aug. Tr. 281, 290.  Photographs recovered from the defendant's iCloud account resemble the crack rocks that both Faustin and Victim-1 witnessed the defendant cooking at the Bayshore House.  *See* GX 104H, 104I.

In approximately March 2018, Faustin told Andrews that she did not feel comfortable selling drugs from the Claire Court House.  Andrews then directed her to make sales from a ShopRite parking lot (the "ShopRite").  Aug. Tr. 155-156. Faustin testified that she made "a lot" of sales on a weekly basis at the ShopRite between March 2018 and May 2018, and that most common value of those sales was approximately $60 (or .6 grams of narcotics).  Aug. Tr. 157.  Some of these sales were made to a confidential informant (the "CI") under the direction of Detective Jay Thomas, who testified at the trial.  As reflected in the recordings between the defendant and the CI (*see* GX 201-A-2, 201B-1, 201C-1, 201D-1), the defendant negotiated the sales; directed the CI where to park at the ShopRite to avoid detection; and surveilled the parking lot to determine whether law enforcement was present.  Over the course of three sales—on July 16, 2018, July 19, 2018, and August 1, 2018—the defendant sold the CI approximately 2.8857 grams of crack cocaine, and 2.0148 grams of powder cocaine:

**Table 3:  Crack Cocaine and Powder Cocaine Sales to the Undercover Officer**

| Date of Sale | Crack Cocaine | Powder Cocaine | Price | Price Per Gram |
|---|---|---|---|---|
| July 16, 2018 | .6946     grams (GX 302B) | .6581   grams   (GX 302B) | $140 (Aug. Tr. 49) | $103.50 |
| July 19, 2018 | .7042 grams (GX 303B) | .6997 grams (GX 303B) | $140 (Aug. Tr. 62) | $99.72 |
| August     1, 2018 | .7645 +.7224 = 1.4869 grams | .6570   grams   (GX 303B) | $200 (Aug. Tr. 69) | $93.28 |
| **Total** | **2.8857    grams of       crack cocaine** | **2.0148    grams    of powder cocaine** | **$480** | **$98.84 (average  price per gram)** |

For the August 1, 2018 sale, Andrews and Faustin arrived in a Black Mercedes (Aug. Tr. 70), which, as described below, was a vehicle that Andrews made Victim-1 put in her name while he trafficked her.

Towards the end of 2018, Andrews had to leave the Bayshore House.  He and Faustin settled into another squatter home, this time in Smithtown (the "Smithtown House").  Aug. Tr. 174, 177.  From there, Andrews continued to distribute narcotics.  Faustin witnessed several such sales and saw how Andrews stored the narcotics in the kitchen.  From the Smithtown House, Andrews dispatched Faustin to sell narcotics to a customer located in Central Islip.  Andrews and Faustin continued to sell narcotics until his arrest on February 27, 2019.  Aug. Tr. 177-178.

**B.   The Sex Trafficking Conduct**

All while continuing to sell drugs, in March 2018, Andrews entered a new venture:  sex trafficking Victim-1, a drug addict who, in early March 2018, had discharged herself from in-patient drug treatment to find drugs, including crack.  Ex. A, Transcript Excerpts from the March 2020 Trial (the "March Tr."), at 104.[3]  As with his crack dealing, Andrews did not act alone.  For

---

[3] The page numbers of the citations to the March Transcript refer to the page number of the transcript itself, on the upper right corner, in courier font.

example, he used and directed Faustin to assist with his efforts, by, among other things, having Faustin drive Victim-1 to dates, collect money from her, and distribute crack to Victim-1.

At the time that Victim-1 met Andrews, she had hit rock bottom.  She was estranged from her family members, had virtually no social support system, was homeless, unemployed, and had no money.  Ex. A, March Tr. 104, 112, 471-72.  Her only possessions were two suitcases of belongings she had brought to the drug treatment center and a nebulizer she was prescribed to use for asthma.  Ex. A., March Tr. 103-104.  She was also dealing with withdrawal from drugs, and experience she described as "torture," "like the world was ending," that made her "depressed" and "suicidal."  Ex. A, March Tr. 83, 88, 96, 100.

After leaving the drug treatment center, Victim-1 met Francisco Franklyn, whom she knew as "Mafia."  Ex. A, March Tr. 108.  Mafia, too, was a crack addict, and his crack dealer was Andrews.  Desperate to get drugs, and with no means to pay for them, Victim-1 told Mafia that she was considering working as a prostitute, and asked Mafia whether he knew of anyone who worked as a pimp.  Ex. A, March Tr. 109.  In Victim-1's mind, a pimp was someone who would "protect" her, help her get from place to place, and provide drugs.  Ex. A, March Tr. 109-10.

The pimp that Mafia knew was Andrews, so Mafia sent Andrews a photograph of Victim-1.  Andrews responded, in substance and in part, that he "want[ed]" Victim-1 to work for him as a prostitute.  March Tr. 112.  In an apparent effort to determine the depths of Victim-1's desperation, Andrews asked Mafia whether Victim-1 was homeless.  Ex. A, March Tr. 112.

Andrews and Victim-1 then spoke on the phone, and Andrews promised to post online advertisements for commercial sex on Victim-1's behalf, keep 60 percent of the proceeds Victim-1 made from commercial sex acts, and provide Victim-1 with the remaining 40 percent of the proceeds.  Ex. A, March Tr. 114.  Knowing that Victim-1 was a crack cocaine user, Andrews

agreed to supply her with it, but stated that drugs were not included in the deal.  Ex. A, March Tr. 115.  Victim-1 agreed to this arrangement.  In her mind, it made sense that Andrews would get a greater share of the proceeds because Andrews would be posting the commercial sex advertisements, paying for hotel rooms, providing her with food, and transporting her.  Ex. A, March Tr. 115.

Andrews's promises to Victim-1, however, were pure fraud.  He paid Victim-1 none of the proceeds she made from working for Andrews.  Ex. A, March Tr. 132-34, 139, 140-41.  Indeed, the very first time Andrews came to Victim-1's room to pick up the money she had made, he violated their agreement and took all of it, claiming that he owed her nothing because he paid for the room and gave her crack.  Ex. A, March Tr. 133.  On another occasion, Andrews told Victim-1 that rather than reneging on his agreement with Victim-1, he was simply safekeeping her share of the proceeds so she would not spend it.  Ex. A, March Tr. 133. Victim-1 testified that Andrews's refusal to pay Victim-1 any of the proceeds from her commercial sex acts violated the agreement they had, and that she would not have performed those sex acts if she had known that Andrews was going to take all of the money.  Ex. A, March Tr. 133, 139.

After defrauding Victim-1, Andrews maintained his grip over through coercion, by manipulating her severe drug addiction.  Andrews supplied Victim-1 with the majority of the crack that she consumed from March to May 2018.  At the August Trial, she estimated that he gave her .5 to 1 gram of crack between 50 to 70 times—approximately 25 to 70 grams—in that time period.  Aug. Tr.  272.

**Table 4:  Andrews's Distribution of Crack Cocaine to Victim-1**

|  | Low-End Calculation | High-End Calculation |
|---|---|---|
|  | .5 grams | 1 gram |
| 50 times | 25 grams | 50 grams |
| 70 times | 35 grams | 70 grams |

Andrews put a condition on whether he would supply Victim-1 with crack.  He would only give it to her when she met financial "goals" set by Andrews.  Ex. A, March Tr.141-43, 146.  The "goal" was typically that Victim-1 engage in sufficient commercial sex acts each day to earn approximately $1,000 a day, and later $2,000, for Andrews.  Ex. A, March Tr. 141-142.  To reach these goals, Victim-1 would have to engage in commercial sex with as many as three to twenty men in a single day.  Ex. A, March Tr. 145.  If—and only if—Victim-1 met these goals, Andrews would supply Victim-1 with crack cocaine.  Ex. A, March Tr.142-43.  In other words, he ensnared Victim-1 in a horrific cycle of reward—in the form of just enough crack cocaine to keep her working—and punishment—where he would deprive her of drugs, a feeling Victim-1 likened to "torture." Ex. A, March Tr.144.  The amount of crack cocaine that Andrews supplied to Victim-1 when she reached Andrews's goals, moreover, was never commensurate to the proceeds Victim-1 made from commercial sex acts.  *See*, *e.g.,* Ex. A, March Tr. 99, 141, 145.

When Victim-1 did not reach her goals, she feared that she would not get any crack cocaine.  Ex. A, March Tr. 143, 168-169.  For Victim-1, that is when the "torture"—the feeling of going through withdrawal and not knowing if and when it would end—would begin.  Ex. A, March Tr.144.  The fear was compounded by the fact that she would have to perform commercial sex acts—work that she found awful—without the numbing effects of crack cocaine.  Ex. A, March Tr.143.  Victim-1 therefore kept working towards the goals set by Andrews—by seeking out and performing commercial sex acts she would not otherwise have committed—so that Andrews, her source of crack cocaine, would give her enough drugs to avoid a debilitating withdrawal.  Ex. A, March Tr.144-45. Put differently, Andrews coerced Victim-1 into performing these additional commercial sex acts through a depraved cycle of reward and punishment.

9

Andrews's acts of coercion were not limited to his manipulation of Victim-1's drug addiction. Victim-1 testified that Andrews berated her and made her feel like she was worthless when she did not achieve his goals. Ex. A, March Tr. 142, 144. Andrews denied Victim-1 food when she was hungry. Ex. A, March Tr.144, 148, 224. Andrews would also wake up Victim-1 (or have Faustin wake her up) when she was sleeping, demanding that Victim-1 continue to solicit and perform commercial sex acts. Ex. A, March Tr. 149. When Victim-1 had no place to sleep, Andrews had her wait outside a gas station through the night until she began seeing commercial sex customers. March Tr. 233-34

In Andrews's toxic stew of coercion, Andrews also mixed in threats of violence. Victim-1 described one episode in which Andrews cupped his hand and pressed it against her face when they had a disagreement, and another episode where Andrews put his hands around her neck. Ex. A, March Tr. 151-152. Victim-1 testified that these events harmed her emotionally and made her scared that Andrews could be violent towards her. Ex. A, March Tr. 151-152. Victim-1 further testified that she could not just "walk away." Ex. A, March Tr.471-472. She was addicted to drugs, and Andrews was the primary source of drugs that she had. Ex. A, March Tr. 471. Given the singular role that Andrews has assumed in her life, Victim-1 also described how she had an "attachment" to Andrews and wanted to "make him happy." Ex. A, Tr. 174, 471-472.

Andrews profited immensely by his trafficking of Victim-1. Indeed, she was making thousands of dollars each week, which he kept in its entirety. He even had Victim-1 sell crack and cocaine to her prostitution clients on his behalf. Andrews told Victim-1 that those sales had to be at least an "eight ball"—or approximately 3.5 grams. Aug. Tr. 278-279. Victim-1 testified that she sold eight balls for Andrews some twenty to thirty times, and that most of these sales were

crack.  *Id*.  As a conservative estimate, this amounts to 38.5 grams to 56 grams of crack cocaine, and 31.5 to 49 grams of powder cocaine, as calculated below.

**Table 5:  Victim-1's Sales of Crack Cocaine and Powder Cocaine on Andrews's Behalf**

| Narcotic | Low End | High End |
|---|---|---|
| Crack Cocaine | 11 sales (~55% of 20 sales) x 3.5 grams = **38.5 grams of crack cocaine** | 16 sales (~53% of 30 sales) x 3.5 grams = **56 grams of crack cocaine** |
| Powder Cocaine | 9 sales (~45% of 20 sales) x 3.5 grams= **31.5 grams of powder cocaine** | 14 sales (~47% of 30 sales) x 3.5 grams = **49 grams of powder cocaine** |

Flush with the cash he made from selling crack and prostituting Victim-1, Andrews bought himself a Black Mercedes S-Class.  Because he did not have a driver's license and had no credit, he made Victim-1 purchase the car, and take a car loan, in her name.  Andrews was delinquent in paying off the loan, which ruined Victim-1's credit history.  March Tr. 188-189

At the end of May 2018, Victim-1 tried to kill herself by injecting herself with a lethal dose of heroin. Ex. A, March Tr. 241-242.  She tried to kill herself because she felt like she "had no way out."  Ex. A, March Tr. 242.  Victim-1 woke up from her attempted overdose because she choked on her own vomit. Ex. A, March Tr. 242.  Because she did not die, she felt like she "needed to make something" of her life.  Ex. A, Tr. 242.  She stopped working for Andrews, sought help from law enforcement, and began her path toward recovery. Ex. A, March Tr. 242-43, 498.

Victim-1's testimony concerning the coercion Andrews used to cause her to engage in commercial sex acts was corroborated by, among other things, text messages between Victim-1 and Andrews. For example, in a series of text messages on May 18 to 19, 2018, Victim-1 described how she no longer had a hotel room and had nowhere to sleep, had nothing to eat, and had been

sitting outside in the cold and rain.  Ex. B, at 3-4.[4]  Victim-1 sent Andrews nearly 40 text messages begging Andrews to come pick her up.  *Id.* at 5-7.  Andrews ignored her.  *Id.*  Only when Victim-1 told Andrews that she found a customer, and after nearly 24 hours of pleading for Andrews's help, did Andrews finally reply to Victim-1, stating "That's my baby that's wat I'm talking about apply yourself babe you can do it."  *Id.* at 7.  Victim-1 responded, "Love you," to which Andrews replied, "Love you more I just want you to get focused."  As Victim-1 testified, she understood Andrews to mean that he wanted Victim-1 to focus on making money for Andrews by engaging in more commercial sex acts.  Ex. A, March Tr. 234.

At the March Trial, Andrews's fraud, coercion, and threats of force, were further explained by the expert testimony of Dr. Chitra Raghavan, a tenured professor of clinical psychology at John Jay College.  Based on her training and experience, including her work with hundreds of survivors of sex trafficking, Dr. Raghavan was qualified to testify at the trial on the topics of sex trafficking, coercive control, and trauma.  Ex. A, March Tr. 512. Dr. Raghavan had never met Victim-1 or Andrews and had not reviewed any of the testimony or documents related to the case.  Ex. A, March Tr. 282-83.

Dr. Raghavan described the concept of coercive control, an "abuse dynamic" comprising several different, often subtle, coercive tactics, which sex traffickers use to coerce a person to engage in commercial sex acts, even without violence.  Ex. A, March Tr. 522.  Several of the tactics that Dr. Raghavan described, including the reward and punishment, micro-regulation, degradation and deprivation, closely mirrored the testimony of Victim-1.

---

[4] The page numbers refer to the exhibit page numbers, at the bottom of the page.

**Table 6:  Coercive Control Methods that Andrews Used on Victim-1**

| Tactic | Raghavan's Testimony | Victim-1's Testimony |
|---|---|---|
| Reward and Punishment | "[T]he abusers typically use a mixture of reward and punishment, which is he punishes in whatever way he punishes this particular woman, and then when she has a back to break, he rewards her. In other words, he gives her something that she needs. . . . We actually call it intermittent reward and punishment. . . . Intermittent because if she can guess when she's being rewarded and when she's being punished, she can actually control. And the whole point of coercive control is for the person to have as little control as possible." Ex. A, March Tr. 534 | Q: "How much crack did he give you?" Victim-1: "It was – it was different at all times. Sometimes it was a 50 piece, sometimes it was a hundred. That's my guess, by the size, but it was – it was all different at all times. It was really whatever he gave me." Ex. A, March Tr. 134. |
| Micro-regulation | "Microregulation. . . refers to the constant daily control of small things in one's most private life, and by that I mean the length of your hair, how you dress, what time you wake up, the color of your nail polish, how many calories a meal can be, how much drugs you can take[.]" Ex. A, March Tr. 524-25. | "He used to nitpick. Like if I didn't have enough makeup on or if my eyebrow was out of place or if my hair wasn't straight. . . .  He liked my hair straight. So I tried to keep it straight." Ex. A, March Tr. 152-153 |
| Degradation | "Degradation. . . . It's essentially humiliating the person by whatever means, calling them names, putting them down, telling them they'll never get a decent job because they're too ugly, too stupid, not educated enough, didn't finish school, have a | Q. "Generally speaking, what happened if you did not reach the goal that Day had set for you?" Victim-1: "He would say things like: You don't want to work. You don't want to win. You know, what are you doing wrong? Why aren't you making more? You know, what are you saying to these |

| Tactic | Raghavan's Testimony | Victim-1's Testimony |
|---|---|---|
| | drug addiction." Ex. A, March Tr. 532. | [guys]? What are you wearing? What did he look like? And then I wouldn't get high. I wouldn't really, you know." Ex. A, March Tr. 142 |
| Deprivation | "Deprivation is when you deprive someone of basic sustenance; so often sleep, waking women up in the middle of the night, or having them work through the night, but not being able to sleep during the day; food, controlling what they eat, how much they eat; and if they have a drug addiction, substances, what they can take, when they can take it, and who they can take it with." Ex. A, March Tr. 532 | "I just remember at the Holiday Inn, and I had gotten really sick when we were there. It was just like a cold. But because I have asthma, it's ten times worse. So I was having trouble breathing, and I was just miserable. And he had—I was on one bed, and he was on another. And we both fell asleep. He woke up, and he was checking my phone. And he's like, you're missing all these dates. Wake up." Ex. A, March Tr. 149. |

Dr. Raghavan also described the concept of traumatic bonding, an "attachment" or emotional connection or bond and sense of loyalty that results from being subjected to "multiple coercive tactics." Ex. A, March Tr. 574. Dr. Raghavan's testimony concerning traumatic bonding explained Victim-1's testimony that she felt a sense of attachment, loyalty, and affection towards Andrews, notwithstanding his acts of deception, coercion, and threats of violence against her.[5] *See* Ex. A, March. Tr. 174, 471.

---

[5] As to the relevance of Dr. Raghavan's testimony, Judge Engelmayer commented to the parties: "I listened very closely to the riveting testimony, frankly, of [Victim-1's] yesterday. And her testimony, if anything, reinforces the probative value of Dr. Raghavan's testimony. There were a number of moments during the testimony in which the witness articulated professions of startling loyalty and love for Mr. Andrews, notwithstanding the circumstances of their relationship that might have led a person in her position to the opposite view of him. It was striking to me. There is, to say the least, a fulsome factual predicate for an expert like Dr. Raghavan to explain this surprising phenomenon. So while the government had proffered that there would be testimony

### C.  Andrews's Obstruction of Justice in the SDNY Proceeding

While this matter was pending in the Southern District of New York, Andrews filed a motion to suppress certain evidence seized from the Smithtown House at the time of his arrest in February 2019.   In September 2019, Andrews submitted an affidavit in connection with a suppression hearing, in which he stated, among other things, that he had a privacy interest in the Smithtown House because he believed that Faustin had signed a lease for it.  *See* Ex. C.  Because there was a lease, Andrews argued that he had standing to challenge the seizure of crack cocaine that was found, in plain view, on the top of a dresser in the bedroom where Andrews was arrested. Andrews also argued in his motion that the crack cocaine was not on top of the dresser, but inside the drawer, and as a result, law enforcement agents violated his constitutional rights by searching the drawer without a warrant.

In denying the suppression motion (*see* Ex. D) in December 2019, Judge Engelmayer held that Andrews statements regarding the lease and the location of crack cocaine were false, although he stopped short of explicitly stating that it was an intentional falsehood.  *See* Ex. D,[6] at 13, ("That is false."); *id.* (describing the defendant's "false . . . statement about the lease"); *id.* at 24 (describing the "false statement by" the defendant); *id.* at 14 ("His statement about the lease arrangement is a bare falsehood . . . ."); *id.* at 15 (describing the "false claim of lessor status"). Furthermore, Judge Engelmayer denied the motion, holding that (1) the crack was seized in plain view; and (2) even if the crack was not seized on a plain view basis, Andrews did not have standing to suppress the evidence at the Smithtown House because he was a squatter.  Ex. D, at 9-13.

---

along these lines, I'm here to say, having listened closely to the direct, that the proffer has been validated and then some."  Ex. A, March Tr. 282-83.

[6] The page numbers refer to the page number of the transcript itself.

At the August Trial, Faustin testified that there was no such lease.  Instead, Faustin explained that Andrews was a squatter, who obtained keys from for the house from a friend who was a real estate agent.  Aug. Tr. 174, 177.  As discussed above, Faustin also testified that Andrews distributed narcotics from the Smithtown House.  The Government, ultimately, determined that it would not introduce the crack cocaine evidence from the Smithtown House at the August trial because it had come to learn that certain photographs of the search—which were consistent with the Government's positions during the suppression hearing—had not been produced to Andrews prior to the December 2019 suppression hearing.

**II.     The Applicable Guidelines Range, Using the Powder Cocaine Guidelines, is 78 to 97 Months' Imprisonment.**

At sentencing, the Government urges the Court to calculate the defendant's Guidelines in reference to the powder cocaine guidelines, in light of DOJ policies promoting the equivalent treatment of crack and powder cocaine offenses.

As described in detail below, the Government submits that the offense involves at least 200 grams of crack cocaine and powder cocaine.  Using the powder cocaine guidelines, that results in a base offense level of 18, pursuant to U.S.S.G. § 2D1.1(c)(11).  Furthermore, the Government submits that the defendant's Guidelines are subject to the following enhancements: (1) a two-level enhancement because the defendant maintained a premises to distribute narcotics (U.S.S.G. § 2D1.1(b)(12)); (2) a two-level enhancement because the defendant was a manager in the narcotics conspiracy (U.S.S.G. § 3B1.1(c)); (3) a two-level enhancement because the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood (U.S.S.G. § 2D1.1(b)(16)(E)); and (4) a two-level enhancement because the defendant engaged in obstructive conduct in the SDNY proceeding, which is material to this proceeding (U.S.S.G. § 3C1.1).  Accordingly, the Government submits that the total offense level is 26.

Because the defendant is in Criminal History Category III, the applicable Guidelines range for the defendant is 78 to 97 months' imprisonment.

> **A.     The Government Proved that the Offense Involved at Least 200 Grams of Crack and Powder Cocaine, which, Under the Powder Cocaine Guidelines, Results in a Base Offense Level of 18.**

At the August Trial, the Government proved, by a preponderance of evidence, that the narcotics conspiracy for which Andrews was convicted involved at least 200 grams of crack and powder cocaine.  Using the powder cocaine guidelines, this results in a base offense level of 18, pursuant to U.S.S.G. § 2D1.1(c)(11).  While the Probation Department continues to adopt the cocaine base Guidelines (which would result in a base offense level of 28), the Probation Department has adopted the weight calculation that the Government proved at trial.  *See* PSR ¶ 31.

The tables below summarize a conservative accounting of the Government's evidence of the amount of crack cocaine and powder cocaine involved in the conspiracy based on the following sales or distributions: (1) the Claire Court sales, from January to March 2018; (2) distribution involving Victim-1, from March to May 2018; (3) a single incident where Victim-1 saw Andrews and an unidentified co-conspirator cook crack; and (4) the three sales to the CI in July and August 2018.  As calculated below, at the low-end, the conspiracy involved—in these limited time periods—185.89 grams of crack and powder cocaine; at the high-end, 270.89 grams; and on average, approximately 228.39 grams.  Furthermore, as the trial testimony established that Andrews sold both crack cocaine and powder cocaine at a rate of approximately $100 per gram, this translates to income ranging from these sales of $18,589 to $27,089.

**Table 7: Crack Cocaine Sales**

| Category | Low End | High-End | Average |
|---|---|---|---|
| Crack distributed to Victim-1 [Table 4] | 25 grams | 75 grams | 50 grams |
| Crack Victim-1 sold on Andrews's Behalf [Table 5] | 38.5 grams | 56 grams | 47.25 |
| Crack rock cooked at the Bayshore House | 50 grams | | |
| Claire Court Crack Sales [Table 1] | 32.4 grams | | |
| CI Sales (Crack) [Table 3] | 2.88 grams | | |
| ***Total Crack Cocaine*** | 148.78 grams | 216.28 grams | 182.53 grams |

**Table 8: Powder Cocaine Sales**

| Category | Low End | High End | Average |
|---|---|---|---|
| Cocaine Victim-1 sold on Andrews's Behalf [Table 5] | 31.5 grams | 49 grams | 40.25 |
| Claire Court Cocaine Sales [Table 2] | 3.6 grams | | |
| CI Sales (Powder Cocaine) [Table 3] | 2.012 grams | | |
| ***Total Cocaine Powder*** | 37.11 grams | 54.61 grams | 45.86 grams |

**Table 9:  Total Crack and Powder Cocaine Sales**

| | Low End | High End | Average |
|---|---|---|---|
| Total Crack Cocaine | 148.78 grams | 216.28 grams | 182.53 grams |
| Total Cocaine Powder | 37.11 grams | 54.61 grams | 45.86 grams |
| ***Total Crack and Powder Cocaine*** | 185.89 grams | 270.89 grams | 228.39 grams |
| ***Income from Sales*** | $18,589 | $27,089 | $22,839 |

What is notable about these tables is what they do *not* include.  They do not include the countless sales that Faustin witnessed at the Bayshore House between January 2018 and May 2018, or the numerous sales she conducted at the ShopRite from March to May 2018, which she was unable to quantify.  They do not include the sales that Faustin delivered to Andrews's other drug customers.  Nor do include any sales from November 2018 to February 2019, such as the sales Faustin witnessed from the Smithtown House.  In other words, these tables contain a fraction of the narcotics that were contemplated by this conspiracy.

"Where the sentencing court determines that the weight of the drugs actually seized from a defendant 'does not reflect the scale of the offense, it 'shall' approximate the actual quantity, based upon a preponderance of the evidence.  *United States v. Garner*, 2 Fed. App'x 115, 117 (2d Cir. 2001).  Here, the Court should accept the Government's higher end (yet still conservative) estimate of 265.89 grams.  Even if the Court began with the lower end estimate of 185.89 grams, it would only need to estimate that the conspiracy involved an additional 15 grams of crack cocaine and powder cocaine.  The preponderance of the evidence easily supports that conclusion.  In a six-week period at Claire Court, the defendant and Faustin sold approximately 32.4 grams of crack and 3.6 grams of powder cocaine, for a total weight at Claire Court of 36 grams.  That amounts to approximately 1.2 grams per day.  At that rate, it would take just 13 additional days for the defendant to sell the additional 15 grams.  Here, the Government's low-end estimate of 185.89 grams does not include any sales from August 2, 2018 to February 27, 2019—*i.e.*, there are *209* days in the conspiracy that are not accounted for in the Government's calculation.

In support of a lower drug weight, Andrews principally argues that the testimony of Victim-1 and Faustin was unreliable.  However, when the jury found that the conspiracy

involved at least 28 grams of crack, it implicitly found *both* witnesses reliable.  It would make little sense for the jury to credit Faustin's testimony, and entirely reject Victim-1's testimony, given how consistent their testimonies were.  Nor does it make any sense that jury rejected Faustin's testimony and not Victim-1's, given how Faustin's testimony was corroborated by Victim-1's testimony, the undercover buys, and the photographs of crack on Andrews's iCloud account.

Andrews's other efforts to attack Victim-1's testimony are similarly unavailing.  For example, Andrews cherry picks testimony to the effect that Andrews distribution to Victim-1 was "irregular" or that there were periods when they did not see each other.  However, while Victim-1 testified that Andrews provided crack to Victim-1 on an "irregular basis"—consistent with his using and withholding crack from Victim-1 to traffic her—the irregular cadence of Andrews's distribution of crack to Victim-1 does not diminish Victim-1's testimony that she received crack from him or Faustin approximately 50 to 70 times in a three-month period. Likewise, while Andrews's then-counsel attempted to impeach Victim-1 on the number of times Victim-1 sold eight-balls for Andrews by using Government notes of a proffer from August 2018 (which reflect the note-taker writing that Victim-1 had said she sold drugs for Andrews ten to twenty times), Victim-1 stood by her testimony that she sold for Andrews approximately twenty to thirty times.  Furthermore, with respect to Victim-1's hallucinations, Victim-1 made clear that she knew the difference between reality and her hallucinations, and that she was not hallucinating during the events she had described to the jury.  Aug. Tr. 338.

Andrews also points to purported inconsistencies between Faustin and Victim-1's testimony, arguing, for example, that while Victim-1 testified that Andrews distributed crack to her 50 to 70 times, Faustin only testified that such distribution occurred "several times."  Sent

Mem. at 5-6; Aug. Tr. 273.  On its face, that testimony is plainly consistent.  Moreover, Victim-1 was the consumer of those drugs, so it is hardly surprising that Victim-1 had a more specific recollection of the number of times she received narcotics from Faustin or Andrews.

> **B.**  **A Two-Point Enhancement Applies Because Andrews Was a Manager in the Conspiracy**

U.S.S.G. §3B1.1(c) provides that, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity," other than as described in §3B1.1(a) or (b), a two-level enhancement applies.  For this enhancement to apply, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. §3B1.1, Application Note 2.  The Second Circuit has held that the enhancement applies when a defendant "exercised some degree of control over others involved in the commission of the offense . . . or played a significant role in the decision to recruit or to supervise lower-level participants" and that a defendant "need only manage or supervise a single other participant to warrant a § 3B1.1(c) enhancement."  *United States v. Garcia*, 413 F.3d 201, 223 (2d Cir. 2005).

Here, the trial testimony amply supports the application of a two-point managerial enhancement.  Shortly after she started to date Andrews, Faustin learned that Andrews was a crack and powder cocaine dealer and recruited her to sell drugs for him.  As the Second Circuit has explained, recruitment of an additional party can "by itself" support an enhancement under § 3B1.1(c). *See Garcia*, 413 F.3d at 223. Andrews's supervision of Faustin is also established by the fact that Andrews had drug customers, would direct Faustin to sell to them or deliver drugs to them, and would take all of the proceeds.  *See* Aug. Tr. 208-209.  Further showing his leadership role in the conspiracy, Andrews told Faustin that she was uncomfortable selling drugs, and that if they were ever caught, "he would take the blame for it."  Aug. Tr. 178.

### C.      A Two-Point "Stash House" Enhancement Applies

U.S.S.G. § 2D1.1(b)(12) provides a two-level enhancement for a defendant who maintains a premises for the purpose of manufacturing or distributing a controlled substance. The trial testimony firmly established that defendant maintained two houses—the Bayshore House and the Smithtown House—that were used for this purpose.  Indeed, the defendant does not contest the applicability of this provision.  *See* Sent. Mem. at 18.

### D.      A Two-Point "Criminal Livelihood Enhancement" Applies

U.S.S.G. § 2D1.1(b)(16)(E) provides for a two-level enhancement for offenses committed as a part of a pattern of criminal conduct engaged in as a livelihood.  Application Note 20 to § 2D1.1 states that "[f]or purposes of subsection (b)(15)(E)" the terms "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning set forth in U.S.S.G. § 4B1.3.  Application Note 1 to U.S.S.G. § 4B1.3, in turn, provides that a "'[p]attern of criminal conduct' means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses."  Application Note 2 of U.S.S.G. § 4B1.3 defines "engaged in as a livelihood" to require that:

> (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period . . . .

In *United States v. Pristell*, the Second Circuit held that six months was sufficient to constitute a "substantial period of time."  *United States v. Pristell*, 941 F.3d 44, 53 (2d Cir. 2019).  With respect to the income threshold, the Second Circuit held that the defendant must

derive an income "in excess of $14,500 in any twelve-month period,"[7] and interpreted income to refer to gross income, not net sales.  *Id.* at 54.

Here, the Court should infer that the defendant earned more than $14,500 in income from his criminal conduct in a twelve-month period.  As discussed in Section II.A, *supra*, the Government estimates at the low-end that the defendant made, in essentially a six-month period (*i.e.*, the Claire Court sales from Early 2018 to March 2018, the distributions involving Victim-1 from March 201 to May 2018, and the sales to the undercover), $18,589.  As with the drug amounts computed above, this figure reflects a fraction of the overall income that the defendant made during the period of the charged conspiracy.  The trial testimony established, and the PSR does not suggest otherwise, that the defendant's primary occupation was that of a drug dealer.  There is no evidence—either at trial or in the defendant's PSR—that he made money from any legitimate source during the charged conspiracy.  While Andrews told Faustin's family that he was a barber, Faustin never saw him work in that capacity, even though they were in a serious relationship and practically lived together for nearly two years.  Aug. 145-147.  Faustin testified that she saw Andrews make money from drug dealing, and that in so doing, he would squat in other people's homes.  Aug. Tr. 147, 171, 174, 177.  As for the PSR, the defendant did not, on counsel's advice, respond to questions on how he financially supported himself since 2013.  PSR ¶ 23.  Accordingly, the two-point enhancement for criminal livelihood is applicable to the defendant's Guideline calculation.

---

[7] In 2017, 2018, and 2019, the federal minimum wage was $7.25.  *See* U.S. Department of Labor, *History of Changes to the Minimum Wage Law*, *available at* https://www.dol.gov/agencies/whd/minimum-wage/history (last accessed May 26, 2023).  Two-thousand times $7.25 is $14,500.

E.       A Two-Point Enhancement Applies for Obstruction of Justice

1.       Relevant Law

Under U.S.S.G. § 3C1.1, "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense," the offense level is increased by two levels. U.S.S.G. § 3C1.1. Conduct covered under this section includes "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1, comment. (n.4(b)).  Furthermore, "obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G § 3C1.1, Application Note 1.

In *United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997), the Second Circuit observed that perjury is one of the ways in which a defendant may earn an obstruction-of-justice enhancement, but that there is "an additional twist" on the ordinary considerations "[w]here . . . the enhancement is applied based upon perjury made not in the instant judicial proceeding."  *Id.* at 329.  The Second Circuit held that, in that situation, application of the enhancement requires that the false testimony must not just have been "material to the related proceeding," but must also have been "material to the instant action." *Id.* (emphasis in original). The Second Circuit concluded its analysis by articulating what amounts to a four-part test for applying an obstruction-of-justice enhancement when the perjury in question occurred in a separate proceeding: "We thus hold that, when false testimony in a related but separate judicial proceeding is raised as the basis for a § 3C1.1 obstruction of justice enhancement, a sentencing court may only apply the enhancement upon making specific findings that [1] the defendant

intentionally gave false testimony [2] which was material to the proceeding in which it was given, [3] that the testimony was made willfully, *i.e.*, with the specific purpose of obstructing justice, and [4] that the testimony was material to the instant offense." *Id.*

The commentary to Section 3C1.1 defines "material" evidence, as it relates to the obstruction enhancement, as "evidence, fact, statement or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6). There must be a finding that "the defendant's statements unambiguously demonstrate an intent to obstruct." *United States v. Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998). The sentencing court "must make a finding of specific intent." *United States v. Giraldo*, 80 F.3d 667,680 (2d Cir. 1996); *United States v. Case*, 180 F.3d at 467. When a sentencing court imposes an obstruction enhancement, "separate findings of fact. . .are encouraged but not required as long as a general finding of obstruction. . .tracks those factual predicates necessary to support a finding of perjury." *United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) (per curiam) (internal quotation marks and citations omitted).

Even when a defendant's testimony is so untruthful that the factual prerequisites to a perjury enhancement are obvious, the district court is not relieved "of the burden of making its own independent findings." *United States v. Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996). The district court's finding "that the defendant consciously acted with the purpose of obstructing justice" must be supported by facts "proven only by a preponderance of the evidence." *United States v. Cutler*, 520 F.3d 136,167 (2d Cir. 2008).

### 2.    Discussion

All of the requirements set forth by the *Zagari* court are present here, and this Court should apply a two-point obstruction enhancement.

*First*, Andrews gave intentionally false testimony at the SDNY Suppression Hearing.  In his affidavit, which he filed in support of a motion to suppress evidence seized from the Smithtown House, Andrews stated that Faustin was the "named lessee for the premises."  Ex C, ¶ 3.  This statement was false:  as Faustin testified, Andrews was a squatter at the Smithtown House.  Furthermore, the falsity of the statement was intentional.  Given that it was Andrews who found the house and paid for it, there can be no innocent mistake that he thought Faustin had a lease.  While Judge Engelmayer stopped short of calling Andrews's statement regarding the lease intentionally false, that is not dispositive of his intent.  With respect to another false statement in Andrews's affidavit (that the crack that was seized from the top of a dresser was not in plain view), Judge Engelmayer noted that Andrews had "an obvious motive to lie on this point, to prevent evidence of that crack cocaine that was found alongside him in a bedroom from being received a trial."  Ex. D, at 9.  Moreover, Judge Engelmayer did not have before him Faustin's August 2021 testimony, that made it plainly clear that Andrews's affidavit was intentionally false.

*Second*, Andrews's false testimony was material to the SDNY proceeding.  Among several issues, the hearing considered whether Andrews had standing to challenge the evidence seized from the Smithtown House, which turned on whether he had a privacy interest in the Smithtown House.  Because trespassers lack such standing, Andrews's testimony that there was a lease, if credited, would have influenced the proceeding insofar as it would have established standing to challenge the search.  *Third*, the intentionally false statement had the specific purpose of obstructing that proceeding.  By falsely asserting that there was a lease, Andrews attempted, through a falsity, to establish standing to challenge and suppress the seized evidence, when he in fact had no such standing.  That is clearly obstructive conduct.

*Fourth*, the false testimony was also material to this action.  The EDNY case is a prosecution for the same—and additional conduct—as the SDNY case.  Andrews's effort to suppress drug evidence in the SDNY case (where there was no narcotics charge) was just as material to the EDNY proceeding, where he was charged with narcotics conspiracy.  Moreover, his statement that he stayed at the Smithtown House pursuant to a lease is also material to sentencing.  The fact that Andrews maintained stash houses out of homes where he was a trespasser is certainly relevant to the Court's consideration of Section3553(a) factors, including the nature and seriousness of the offense.

As Andrews concedes, he "may have been responsible for obstructing or attempting to the obstruct the sex trafficking offenses."  Sent. Mem. 8-9.  Despite this admission, he argues that, because the EDNY case is separate case from the SDNY case, the obstruction enhancement cannot apply, or that only the judge who presided over the obstructive conduct could make a finding as to intentionality and willfulness.  *Id.* at 9.  That position is unsupported by the text of the enhancement and the case law, which make clear that the obstructive conduct can occur before the instant prosecution, or in a separate matter.  *See Zigari*; 111 F.3d at 339; U.S.S.G § 3C1.1, Application Note 1.  Furthermore, this is not the case where Andrews submitted a conclusory affidavit for the purpose of challenging evidence:  instead, he submitted an affidavit with intentional falsehoods for the purpose of thwarting these proceedings.  Under such circumstances, a two-point enhancement should apply.

**F.    Andrews Falls in Criminal History Category III**

The Probation Department correctly determined that Andrews is in Criminal History Category III.

The Probation Department correctly assessed two criminal history points for Andrews's October 3, 2007 conviction for conspiracy and criminal possession of a controlled substance, for which he received a sentence of 365 days.  PSR ¶ 55.  That sentence falls within ten years of the charged conduct.  Faustin testified at the trial that, around the end of 2017, Andrews told her that "he needed money and that he would have to start selling drugs again," specifically, crack and cocaine.  Aug. Tr. 147.  This testimony establishes that Andrews's 2007 conviction was within 10 years of the start of the charged conduct.  Accordingly, the Probation Department correctly assessed two criminal history points for this offense, pursuant to U.S.S.G. §§ 4A1.2(b) and 4A1.2(e)(2).

The Probation Department correctly assessed two criminal history points for Andrews's November 30, 2012 conviction for driving while intoxicated.  PSR ¶ 56.  As the appended incarceration records make clear, Andrews served a sentence of 120 days for that conviction. *See* Ex. E (filed under seal).  Accordingly, pursuant to U.S.S.G. 4A1.1(b), two criminal history points are assessed.

**III.    The Court Should Consider the Sex Trafficking Conduct in Fashioning the Defendant's Sentence**

   **A.  Applicable Law**

At sentencing, a district court's discretion to consider information about the defendant is "largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come."  *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (citation omitted).  Accordingly, in exercising its discretion in sentencing, the Court should consider the facts adduced at the March Trial in sentencing the defendant.

*First*, Section 3661 of Title 18 of the United States Code provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Accordingly, a district court may "consider any and all information that reasonably might bear on the proper sentence for the particular defendant." *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) (citation omitted); *Carmona*, 873 F.2d at 574 ("Any information or circumstance shedding light on the defendant's background, history and behavior may be properly factored into the sentencing determination.").  The law is clear that "unconvicted conduct may be relied upon to adjust a defendant's sentence level as contemplated by the Guidelines based on proof by a preponderance of the evidence." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (citations omitted); *see also United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992) ("disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence").  In making factual findings under the Sentencing Guidelines, the "sentencing court remains entitled to rely on any type of information known to it." *Concepcion*, 983 F.2d at 388; *see also United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998).

    *Second*, with respect to drug offenses, "all acts and omissions. . .that were part of the same course of conduct or common scheme or plan as the offense of conviction" are relevant conduct under U.S.S.G. § 1B1.3(a)(2).  *See also United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991). For two offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. U.S.S.G. § 1B1.3, application note 9(A); *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (proof of a 'common scheme' requires a connection among participants and occasions).  Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are

sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree or ongoing series of offenses.  Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered part of the same course of conduct include the degree of similarity of the offenses, the regularity of the offenses, and the time intervals between the offenses.  When one of the factors is absent, a stronger presence of at least one of the other factors is required. U.S.S.G. § 11.3, application note 9(B); *see United States v. Perdomo*, 927 F.2d 111, 114 (2d Cir. 1991) (proof of same course of conduct does not require a connection between the acts in the form of an overall criminal scheme, but instead focuses on whether the defendant has been engaged in an identifiable behavior pattern of criminal activity).  In the context of a narcotics conviction, relevant conduct is not limited to narcotics sale outside the scope of the charged conspiracy.  Courts have held that other offenses, separate from drug sales, can constitute relevant conduct with respect to the sentencing of a defendant convicted of a narcotics offense.  *See*, *e.g.*, *United States v. Dixon*, 262 Fed. App'x. 300, 301 (2d. Cir. 2008) (homicide properly consider relevant conduct for a defendant who pleaded guilty to narcotics conspiracy).

At minimum, the Court can and should consider the evidence adduced from the March Trial pursuant to Section 3661, and factor that evidence in its analysis of the Section 3553(a) factors.  As the case law discussed above makes clear, this Court has wide discretion to consider the facts adduced from the March Trial in fashioning Andrews's sentence.  For the reasons set forth in Section IV.A, *infra*, Andrews's sex trafficking of Victim-1 should weigh heavily in its consideration of the nature and seriousness of the offense, the need of justice punishment, and deterrence.

Andrews's sex trafficking of Victim-1, which occurred within the period of the charged narcotics conspiracy, also constitutes relevant conduct within the meaning of U.S.S.G. § 1B1.3. Indeed, the record establishes that Andrews's crack dealing and sex trafficking were substantially intertwined on numerous levels.[8] *First*, and most obviously, both the defendant's crack dealing and sex trafficking victimized Victim-1.  Andrews's distribution of crack cocaine not only harmed Victim-1 by feeding her crack addiction; it also was the primary means by which he exercised his dominion over her to cause her to engage in commercial sex acts she did not want to perform.  *Second*, Andrews conspired with the same accomplice—Faustin—to commit both offenses.  In addition to selling crack on Andrews's behalf, Faustin drove Victim-1 to dates for commercial sex act; woke up Victim-1 in the middle of the night so Victim-1 could take calls for sex; and collected the money that Victim-1 made from commercial sex acts.  *Third*, Andrews used crack—the primary narcotic that he sold—as the primary means by which he coerced Victim-1 into committing sex acts she did not want to commit.  And *finally*, Andrews's distribution of crack to Victim-1 arose from his trafficking of her.  Accordingly, Andrews's sex trafficking of Victim-1 shares a common victim, accomplice, and modus operandi with the narcotics conspiracy.

---

[8] Faustin pled guilty to narcotics conspiracy.  In sentencing Faustin on May 12, 2021, Judge Engelmayer considered Faustin's trafficking of Victim-1 as central to her criminal conduct.  *See* Ex. F, May 12, 2021 Transcript of Sentencing of Geraldine Faustin, at 11 (page numbers refer to the page numbers of the transcript).  After her trial testimony in this case, the Government filed a Rule 35 motion for Faustin, and Judge Engelmayer resentenced Faustin to a time-served sentence.

**B.   The Court Should Consider the Sex Trafficking Conduct in Sentencing Andrews**

While Andrews concedes that the Court is free to consider the evidence adduced at the March Trial pursuant to Section 3661, he principally argues that this evidence did not prove that Andrews engaged in sex trafficking.  He is wrong.

As Judge Engelmayer noted after having heard much of the Government's sex trafficking evidence, the Government presented "formidable evidence" concerning Andrews's sex trafficking of Victim-1.  Ex. G, June 15, 2020 Decision Denying Andrews Bail, at 2-3.  That evidence included Victim-1's trial testimony and cross-examination, as well as the "extensive text messages corroborating her account."  *Id.* at 3.  As discussed above, that testimony established that Andrews defrauded Victim-1 to work as a prostitute for Andrews by reneging on his promises to pay her 40 percent of the proceeds from sex trafficking.  Ex. A, March Tr. 132-34, 139, 140-41.  Andrews's conduct was also coercive, as he ensnared Victim-1 in a vicious cycle of reward—in the form of just enough crack to keep her working to meet Andrews's financial goals—and punishment, where he would deprive her of drugs, a feeling Victim-1 described as torture.  Ex. A, March Tr. 83, 88, 96, 100.  Victim-1 therefore kept working towards Andrews's goals—seeking out and performing commercial sex acts that she otherwise would not have done—so that Andrews would give her enough drugs to avoid a debilitating withdrawal.  *See*, *e.g.*, Ex. A, March Tr.144-45.

In his sentencing memorandum, Andrew wrongly relies on the Second Circuit's decision in *United States v. Purcell*, 967 F.3d 159 (2d Cir. 2020), which, among other issues, considered the sufficiency of coercion evidence to support guilt beyond a reasonable doubt in a sex trafficking case.  *Purcell* recognized that a finding of coercion in part depends on the particular circumstances of the victim. 967 F.3d at 192. *Purcell* did not, as Andrews appears to suggest, set

a floor for the kind of coercive conduct that must be present to satisfy Section 1591(a).  Instead, *Purcell* established that Section 1591(a) coercion requires that "the defendant know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution." *Id.* at 193.

Here, Andrews's toxic stew of sex trafficking tactics—fraud, degradation, deprivation, and reward and punishment—was uniquely tailored to coerce Victim-1 based on her particular vulnerabilities.  Indeed, most of the defendant's selection of "pertinent portions" of Victim-1's testimony from the March Trial underscore those vulnerabilities.  *See* Sent. Mem. at 16, points 1 (Victim-1 addicted heroin and crack for more than a decade), 2-3 (Victim-1 had entered a drug detox program but left because she needed drugs), 4 (Victim-1 had no money to pay for drugs and prepared to work as a prostitute to make money), at 7 (Victim-1 a daily crack user).  Andrews makes much about the fact that Victim-1 initially sought out a pimp, that Andrews did not physically strike Victim-1 or have sex with her, and that he did not brand her or physically restrain her.  But nothing in law requires this Court to find that that every commercial sex act Victim-1 performed was the product of coercion, or that Andrews deployed the full complement of sex trafficking tactics that were used in other sex trafficking cases.  Indeed, the cases that Andrews cite in his sentencing submission directly refute many of the arguments that he makes in his submission.  For example, in *United States v. Bell*, 761 F.3d 900 (8th Cir. 2014), the Eight Circuit rejected the notion that a victim's prior voluntarily decision to become a prostitute precludes a finding of sex trafficking, noting that "prostitution histories of these women do not preclude a finding that Bell violated § 1591(a)".  *Bell*, 761 F.3d at 909.  In *United States v. Mack*, 808 F.3d 1074 (6th Cir. 2015), the Sixth Circuit noted that the defendant in that case, like here, exploited a victim's drug addiction by providing heroin to the victim "only after she completed

her 'appointments' with 'Johns.'" *Mack*, 808 F.3d 1074, 1081.  Likewise, *United States v. Fields* stands for the proposition that withholding drugs from a victim can constitute coercion.  *United States v. Fields,* 625 F. App'x. 949, 952 (11th Cir. 2015).  Finally, in *United States v. Carson*, 870 F.3d 584 (7th Cir. 2017), the Eleventh Circuit noted that seemingly voluntarily conduct does not negate a finding of sex trafficking: "Victims of sex trafficking may make decisions that look voluntary at times due to the incredible weight of coercion and force upon them.  And they may make some decisions along the way that are truly voluntary.  Those decisions do not take away from the fact that they have been held hostage, coerced, forced, or threatened to engage in commercial sexual acts." *United States v. Carson*, 870 F.3d 584, 591 (7th Cir. 2017).

Andrews also attempts to discount an instance where he cupped Victim-1's face and put his hands around her neck, justifying this conduct because he was "drunk" and asserting that the behavior was unconnected to Victim-1's commercial sex acts.  Sent. Mem. at 15.  Not only were these acts plainly violent, but Victim-1 also testified that they made her fear Andrews, and as such, contributed to the climate of fear that Andrews created.  Ex. A, March Tr. 151-152.

**IV.      The Court Should Impose a Sentence of 15 Years' Imprisonment.**

In this case, a sentence of 15 years would be sufficient, but not greater than necessary, to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant, as required by 18 U.S.C. § 3553(a).

**A.      The Seriousness of the Offense, The Need for Just Punishment, and General Deterrence**

"Truly abhorrent."  "Sadistic."  "Evil."  "Heinous."  "Deeply immoral."  These words, and more, were how Judge Engelmayer described the sex trafficking of Victim-1 during the May 12, 2021 sentencing proceeding of Faustin.  During that sentencing, he considered the trafficking of

34

Victim-1 as relevant to Faustin's sentence—as the Government urges the Court to do here—and made the following remarks about the seriousness of that conduct, which apply with even greater force to Andrews, who recruited Victim-1 to work for him and masterminded the abuse that she endured:

> I sat through the testimony of Victim-[1] at the Carl Andrews trial.  It was riveting, it was altogether credible, and it was deeply affecting.  I heard her account of how Carl Andrews trafficked her.  (Ex. F, at 57)
>
> [. . .]
>
> Your conduct was disgraceful.  You exploited the vulnerabilities and, in particular, the severe crack addiction of Victim-[1] to induce her to sell her body for sex to make money for Carl Andrews, and the drug that you plied her with or helped ply her with, crack, is unusually addictive and destructive, as exemplified by Victim-[1] herself.  (Ex. F, at 57-58)
>
> [. . .]
>
> You also, in concert with Andrews, shamefully regulated her food intake, and you did nothing to stop Andrews when you would literally deny her food to maintain control over her, much as he was denying her or giving her addictive drugs to cement that control.  She was totally dependent on Carl Andrews and on you.  He and you regulated her sleep.  Her sleep was denied at times to get her to work more. You also helped Victim-[1] pay for the renewal of advertisements for commercial sex acts.  When, at the depths of her despair, Victim-[1] reached out to you for food or to avoid eviction from her hotel, according to the testimony, you and Andrews ignored her to further cement her control.  (Ex. F, at 58)
>
> [. . .]
>
> This conduct is gravely, gravely serious, for obvious reasons. Along with Andrews, you abused a fellow human being.  You exploited her addiction and poverty and emotional fragility to induce her to sell her body for profit.  Now, I have seen plenty of cases for which defendants hurt other people by shooting or stabbing them.  This is different I kind, but let's say this: your conduct toward Victim-[1] was in it's own way a terrible, sadistic assault. (Ex. F, at 58-59)
>
> [. . .]
>
> Had Victim-[1] remained in captivity to Andrews and you, she might well be dead today or still be a sex slave.  Your conduct was deeply immoral, and it lasted for

some time, for a period of months, and the process of controlling and psychologically coercing Victim-[1] to be a sex worker and facilitating her prostitution took time and forethought.  (Ex. F, at 59) [9]

The seriousness of the offense and the need for just punishment are the most significant Section 3553(a) factors that should drive the Court's sentence in this case.  The defendant did not simply supply a dangerous and highly addictive narcotic through Suffolk County for over a year. He used that crack to exploit a vulnerable human and make her, as Judge Engelmayer put it, his "sex slave."  That conduct inflicted on Victim-1 deep, psychological abuse that lasted for several months.  This conduct required planning, and it reflected an utter lack of conscience and concern for the well-being of another human being.   Andrews's psychological abuse made Victim-1

---

[9]     On March 2, 2020 (and prior to the start of the March Trial), Judge Engelmayer sentenced Franklyn Francisco, who pleaded guilty early in the SDNY case to conspiracy to violate the Travel Act, to 24 months imprisonment.  Francisco was originally charged with conspiracy to sex traffic Victim-1, based on his role, in introducing Victim-1 to Andrews. Francisco was involved in the sex trafficking conspiracy for approximately one day.  In sentencing Francisco to 24 months imprisonment, Judge Engelmayer made the following remarks with respect to the conduct involving Victim-1:

> Your offense here was gravely serious. You badly exploited a very vulnerable victim. Victim-[1] was a drug addict, and that was known to you. She was in drug treatment and she essentially escaped or got out of drug treatment simply because she desperately needed her fix of opioids. She went to your house and used narcotics with you and with others. You seized on her vulnerability and steered her to Carl Andrews to become her sex trafficking pimp. . . .

> You exposed another human being to sustained abuse and degradation. You helped further her serious drug habit. You put her in a position in which she could easily have been harmed and subjected to violence. Your conduct was heartless and selfish. And as a drug addict yourself, you knew uniquely well just how vulnerable she was when she approached you.

Ex. H, March 2, 2020 Transcript of the Sentencing of Franklyn Francisco, at 33-34 (page numbers refer to the page number of the transcript)

entirely dependent on Andrews, and Andrews leveraged that dependency to fuel his sick, financial interests.  He deprived of her drugs, food, and shelter so that she would make money for him by selling her body for sex.  This depraved conduct drove Victim-1 to near suicide.  To be sure, while the sex trafficking of Victim-1 lasted for approximately three months, it did not end because Andrews realized he made a grave mistake and sought to help her.  Rather, it ended because Victim-1 nearly killed herself, and when she failed, she reached out to a law enforcement agent and began her path toward recovery.

Andrews insists that his relationship with Victim-1 was at arms-length:  a pimp who supplied drugs to a prostitute, in exchange for money.  *See* Sent Mm. at 19.  That argument cannot withstand scrutiny.  As any seasoned crack dealer like the defendant would know, crack is a highly addictive substance.  Andrews knew that Victim-1 was addicted to crack, was homeless, and had no money—so he controlled her for his financial gain by conditioning his distribution of crack to Victim-1 on her making enough money for him.  This conduct is simply abhorrent and warrants a substantial term of imprisonment.

> **B.**      **The Need for General Deterrence**

A significant sentence of approximately 15 years is also necessary for general deterrence.  Sex trafficking is all too common.  Pimps like Andrews frequently target vulnerable women, including those with drug addictions, and force them to sell their bodies for sex through force, fraud, violence, and coercion.  They engage in this highly destructive criminal behavior on the belief that they will not suffer consequences, particularly because the victims in these cases all too often have struggled with various issues, including drug addictions.  Accordingly, a substantial sentence in this case is warranted to send a message that conduct like this ill be met with significant periods of incarceration.

**C.      The Need for Specific Deterrence and To Protect the Public from the Defendant's Crimes**

In addition to the nature and seriousness of the offense, a substantial, above-Guidelines sentence is warranted in light of the defendant's substantial criminal history.

Andrews has committed serious, violent crimes since he was a teenager.  At age 17, he was arrested, along with two others, for assaulting a victim whom he and his co-defendants had punched and kicked numerous times in the face and body.  PSR ¶ 43.  At age 21, he was arrested after knocking a woman to the ground at a bank and stealing money.  PSR ¶ 44.  At age 23, he interfered with the arrest of another individual, including by kicking, punching and pushing police officers.  PSR ¶ 45.  At age 23, he was arrested for possessing crack cocaine, packaged in a manner consistent with distribution, which was found in his home.  PSR ¶ 46.  At age 27, he was arrested after he violated an order of protection related to his ex-wife, whereby he "pulled her hair and squeezed her breasts."  PSR ¶ 48.  When he was 24, he stole a car.  PSR ¶ 48.  At age 27, he was arrested with another two individuals after assaulting four victims.  At age 28, Andrews was arrested after repeatedly punching his ex-wife.  At age 30, he again impeded another individual's arrest and used physical force against law enforcement officers, and then in another incident, violated an order of protection by putting his hands around his ex-wife neck and threatening her.  PSR ¶ 51-52.  At age 31, he was arrested after he physically assaulted a law enforcement who attempted to arrest him.  Nearly every one of these offenses were plainly violent, none were met with any significant period of incarceration, and as a result, none of them are reflected in his criminal history score.[10]

_____

[10] Even in his sentencing submission, Andrews minimizes the conduct leading to his domestic violence arrests by noting that his relationship with his ex-wife was "toxic."  Sent Mem. 33

In addition to these convictions that caried no criminal history points, Andrews received a one-year sentence in 2007 for conspiracy and criminal possession of a controlled substance.  He also has two convictions related to driving under the influence.  PSR ¶¶ 56-57.

In total, Andrews has been convicted of 17 crimes, not including the instant offense or juvenile offenses.  At age 34, he began to commit the federal offenses with which he was charged.  As Judge Engelmayer noted when he first denied bail for the defendant, "after reaching an age which all would agree that a person is supposed to have migrated into maturity, he continues to have a substantial criminal record;" "there is a recurrent pattern of committing crimes, and not just crimes, diverse crimes." Ex. I, Transcript of March 25, 2019 Bail Hearing, at 24-25.  The defendant has not shown any real indication that he is aging out of his criminal past.  Accordingly, a substantial term of incarceration is appropriate in light of his criminal history.

**<u>CONCLUSION</u>**

Carl Andrews's crimes were heinous.  He sadistically abused another human being, and he should be punished accordingly.  For this reason, the Court should impose a sentence of approximately 15 years' imprisonment.

Dated: May 26, 2023
       New York, New York

                          Respectfully submitted,

                          DAMIAN WILIAMS
                          United States Attorney for the
                          Southern District of New York

By:  **/s/**_____
       Rushmi Bhaskaran
       Elizabeth A. Espinosa
       Assistant United States Attorneys
       (212) 637-2439 / 2216

40

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :    20 CR 546(GRB)
                             :
                             :
-against-                    :    United States Courthouse
                             :    Central Islip, New York
                             :
CARL ANDREWS,                :
                             :
        Defendant.           :    June 22, 2023
                             :    11:30 AM
                             :
                             :
                             :
                             :
                             :
- - - - - - - - - - - - - - - -X

       CRIMINAL CAUSE FOR FATICO HEARING AND SENTENCING
            BEFORE THE HONORABLE GARY BROWN
              UNITED STATES DISTRICT JUDGE


                 A P P E A R A N C E S :


 For the Government:    U. S. ATTORNEY'S OFFICE
                        SOUTHERN DISTRICT OF NEW YORK
                        One Saint Andrew's Plaza
                        New York, New York 10007
                        BY: RUSHMI BHASKARAN, ESQ.
                            ELIZABETH ESPINOSA, ESQ.
                        Assistant United States Attorneys


 For the Defendant:     ROBERT LARUSSO, ESQ.
                        666 Old Country Road
                        Suite 501
                        Garden City, New York 11530

 Also Present:          LISA LANGONE, USPO


       Court Reporter:  Lisa Schmid, CCR, RMR
         Proceedings recorded by computerized stenography.
 Transcript produced by Computer-aided Transcription.

LISA SCHMID, CCR, RMR

SENTENCING

103

1   that.  I think Ms. Faustin was much more involved in the

2   narcotics operation, and gave us all the details and so

3   on.  All right?

4           Anything else on any of the adjustments?

5           MR. LARUSSO:  I just have my checklist here,

6   Judge.

7           THE COURT:  Yes.  Yes.  Please.

8           MR. LARUSSO:  We did Criminal History.  We did

9   all the adjustments.  We did the drug quantity.

10          I think that's where we are.  I'm getting from

11  our discussion that the Court -- well, you have to rule.

12  I'm not the judge.

13          THE COURT:  Yes.  Yes.  Stand by.

14          Do you want to add anything to any of those

15  points?

16          MS. BHASKARAN:  No, Your Honor.

17          THE COURT:  Okay.  All right.  So I'm going to

18  rule on the Guidelines calculations.

19          So the first and I guess most important part of

20  this is the Court will, as urged by both defense and

21  prosecution, give the defendant the benefit of using the

22  powdered cocaine Guidelines rather than the crack cocaine

23  Guidelines.

24          Everyone should recognize that that is a

25  substantial benefit in these circumstances because the

104

1   crack Guidelines remain the law, and while there's

2   speculation that they may be rolled back, they haven't

3   been, but nevertheless, because both parties want me to

4   use that calculation, I will use that calculation.

5           So let's start with the base level.  The base

6   level turns on the amount of drugs involved in the

7   conspiracy.

8           In applying this level, I have carefully

9   considered the argument set forth by defendant and his

10  counsel; however, looking at the determinations made by

11  the government and Probation, and considering the

12  testimony that this Court heard at trial, including the

13  credible testimony of Victim One, and as I have already

14  indicated, the defendant's co-conspirator, Ms. Faustin, I

15  find that the total amount of narcotics proven by a

16  preponderance easily exceeds the 200-gram mark.

17          The reason for this determination includes the

18  following considerations.  The conspiracy included the

19  following sets of activity that all contributed to the

20  amount involved.

21          The distribution of crack to Ms. Greener by

22  Andrews and Faustin for her use and exchange for whatever

23  was being exchanged for there.  I'll get to more on that

24  in a second, but whether it was done for sex work or

25  money, whatever it is, there was substantial -- there were

105

1    amounts of drugs that went to Ms. Greener for her use.

2            It was further distribution of coke and/or crack

3    by Ms. Greener to her customers on Mr. Andrews' behalf.

4    She testified about that.  There was testimony concerning

5    the amount of crack processed at the Bay Shore house, as

6    well as sales of crack from that location, and the

7    regularity with which that was done.

8            The sales of crack directly opposite to the

9    confidential informant in this case which that was, as

10   Mr.  LaRusso says, the smallest almost precise measure

11   because we actually have those drugs, and the sales

12   witnessed by Ms.  Faustin at the Bay Shore house in early

13   2019, as well as additional sales she testified to at the

14   ShopRite in the first half of 2018, which includes the

15   undercover sales here as well as other sales.

16           To the extent that the defendant argues against

17   these reasoned estimates, those arguments are based upon

18   attacks upon the credibility of Faustin and Victim One,

19   both of whom this Court found to be highly credible and

20   whose testimony was corroborated in numerous ways.

21           Counsel for defendant argues perhaps correctly

22   that there was some double-counting in the government's

23   estimate as it may include a 50-gram quantity of crack

24   that was cooked, and that quantity may have been counted

25   separately in connection with some -- at least some of the

SENTENCING

106

1    distribution, if not all.

2          But I find that even excluding that 50-gram

3    batch, a reasoned estimate of the total amount of cocaine

4    involved in the conspiracy still exceeds the 200-gram

5    mark, as the extensive, organized and regular nature of

6    the sales gives rise to a reasonable inference that the

7    level of sales resulted in well over 200 grams in sales.

8          Second -- so that would give us a Level 18.

9          Then there's the maintenance of a premises for

10   narcotics sales, which is the additional two levels that

11   Probation has recommended and the government is

12   advocating.

13         Now, Mr. Andrews took the stand in an effort to

14   avoid the application of this enhancement.  While the

15   Court could credit his testimony concerning the Bay Shore

16   house, as it does seem Mr. Andrews testified that he used

17   this as a home, the inquiry doesn't end there.

18         Here, the trial testimony of Geraldine Faustin,

19   whom this Court observed testify, belies the claims

20   regarding the Bay Shore house.  Ms. Faustin gave detailed

21   credible testimony concerning the use of the Bay Shore

22   house and its extensive facilitation of narcotics sales.

23         She described how drugs were stored in the

24   kitchen drawers.  Cameras were maintained to witness the

25   coming and goings of drug customers and how drug customers

SENTENCING

107

1  knew and would come to the front door of that residence to

2  buy crack and cocaine.

3       Additionally, that house was used to crook crack

4  cocaine, and that's at the transcript at 171 and 174.  Ms.

5  Greener also corroborated that the Bay Shore home was used

6  for narcotics distribution activities, and you can see it

7  at the trial transcript at 279 through 290.

8       As to the Claire Court home which belonged to

9  Ms. Faustin, Mr. Andrews gave testimony denying at least

10  superficially his use of that location to sell drugs.

11      At trial, though, Ms. Faustin credibly testified

12  that Mr. Andrews stayed there five nights per week for a

13  period of months, chiefly so that she and he could make

14  drug sales regularly from that location.  She estimated

15  that Andrews would make two sales per night for each of

16  the five nights per week that he resided there.

17      He stored drugs in a bedroom drawer, prepared

18  the drugs on the scale in anticipation of customers

19  coming, took phone calls at the location, and then had the

20  customers meet him outside the house.  He also gave

21  instructions to Faustin on making sales in that location.

22  And that's at the transcript from 150 to 155.  So I do

23  find that the two levels for maintaining a premises does

24  apply.

25      Criminal livelihood adjustment, another disputed

## SENTENCING

108

1    enhancement.  The amount of narcotics and monies involved

2    in both the narcotics and the sex trafficking activities

3    well exceeds the threshold for the criminal livelihood

4    adjustment.  This determination is buttressed by the

5    absence of any record of legitimate employment by the

6    defendant for the past decade, as well as his acknowledged

7    extraordinary expenditures on gambling activities.

8          So I believe that the threshold is really clear,

9    and as Mr. LaRusso points out, that also turns on the role

10   adjustment, but I do find that the two-level -- not the

11   four-level, but the two-level enhancement for role

12   adjustment is appropriate because the testimony

13   established clearly Andrews' relationship to Faustin and

14   to Greener was such that a two-level managerial

15   enhancement is appropriate, as he was directing their

16   activities in this conspiracy.

17         That brings us to the last and the hardest of

18   these.  That's the obstruction of justice enhancement.

19   While the government argues for an obstruction of justice

20   enhancement based upon the submission of a false affidavit

21   in the Southern District of New York, the Court declines

22   to impose the enhancement on this basis.

23         As the law suggests that the Court should be

24   mindful so as not to dis-incentivize defendants from

25   protecting their rights, and Judge Engelmayer stopped

SENTENCING

109

1    short of declaring that the declaration was false or

2    fraudulent, though he did raise questions about it, and

3    again, because that didn't happen in this courtroom, I'm

4    much less comfortable and I think maybe actually

5    prohibited from imposing an obstruction enhancement on

6    that basis; however Mr. Andrews' testimony today warrants

7    a different outcome.

8            Mr. Andrews was counseled by his attorney not to

9    take the stand.  He was frequently counseled by this Court

10   not to take the stand, but he proceeded anyway, fully wear

11   of the risks.

12           This Court does not or does not impose an

13   enhancement or a penalty for his taking the stand.  He has

14   the right to do that.  It's the right thing to do if he

15   has to defend his rights; however, unfortunately, he

16   testified falsely on several material matters.

17           And by simply -- by way of example, I'll use the

18   one I've already discussed, which is the narcotics

19   activity at Claire Court.  The evidence is overwhelmingly

20   the case that narcotics activity was carried out.  I

21   understand he was there, and he simply denied it under

22   oath.  As such, the two-level enhancement is warranted

23   because of that and other issues.

24           Thus, the Court will use that calculation of the

25   Guidelines which I believe -- and I'll ask everyone to

110

1    check the math -- would make a total offense level of 26,

2    which a Criminal History Category of III yields a

3    recommended advisory sentencing range of -- I want to

4    say -- hold on.

5          Seventy-eight to 97?

6          MS. BHASKARAN:  Yes, Your Honor.

7          THE COURT:  Seventy-eight to 97 months and, of

8    course, as a backstop to all that, there is a five-year

9    mandatory minimum.

10          So with calculation in mind, the recommended

11    Guideline range of 78 to 97 months, I will adopt that

12    calculation along with the balance of the PSR.  In other

13    words, I don't think there's other factual disputes on the

14    PSR.  Am I right about that?

15          MR. LARUSSO:  No, Judge.  I think you've covered

16    them all.

17          THE COURT:  Yes?

18          MS. BHASKARAN:  Not from the government.

19          THE COURT:  Okay.  So incorporating that

20    Guidelines calculation, I'll adopt the balance of the PSR.

21          So -- oh, I didn't ask.  Does the government

22    have any objections to the PSR?  I didn't ask you.

23          MS. BHASKARAN:  Not after the Court has resolved

24    all those issues, no.

25          THE COURT:  Excellent.  Thank you.

1          All right.  Mr. Andrews, are you satisfied with

2     your legal representation up to this point?

3          THE DEFENDANT:  (No response.)

4          THE COURT:  I know you have had problems in the

5     past.  I'm talking just about Mr. LaRusso today.

6          THE DEFENDANT:  Yes.

7          THE COURT:  Okay.  And have you had enough time

8     to talk about sentencing matters with him?

9          THE DEFENDANT:  (No response.)

10         THE COURT:  I'm sorry.  If you answered me, I

11    didn't hear you.  I'm sorry.

12         THE DEFENDANT:  I wouldn't say enough time.

13         THE COURT:  You need more time to talk to him?

14         THE DEFENDANT:  I didn't even know that I was

15    being sentenced 'til Sunday.

16         THE COURT:  Well, okay.  Are there things that

17    you need to talk to him about that we can do by taking a

18    break right now or --

19         THE DEFENDANT:  No.

20         THE COURT:  Okay.  Fair enough.

21         Mr. LaRusso, any reason why sentencing should

22    not proceed?

23         MR. LARUSSO:  I don't see any, Judge.

24         THE COURT:  Okay.  Other than what we've already

25    heard, are there victims, witnesses or anyone else who

SENTENCING

1  needs to be heard from in terms of testimony?

2          MS. BHASKARAN:  No, Your Honor.

3          I would note for the record that the victim has

4  been informed about this proceeding and does not wish to

5  make any additional statements.

6          THE COURT:  Okay.

7          Mr. LaRusso, anybody else you need to call?

8          MR. LARUSSO:  No, Your Honor.

9          THE COURT:  Okay.  Other than what we have

10 already done, does either side need an evidentiary hearing

11 on any other issues?

12         MR. LARUSSO:  Not for purposes of sentencing,

13 no, Your Honor.

14         MS. BHASKARAN:  Not from the government.

15         THE COURT:  Okay.  As we all know, pursuant to

16 U. S. V. Booker, the Sentencing Guidelines are advisory,

17 but must be considered.  I've already ruled on that.  And

18 thus, we have that Guideline range that I set out earlier,

19 which is 78 to --

20         MS. BHASKARAN:  Seventy-eight to 97.

21         THE COURT:  To 97?  All right.  Good.

22         So with that, Mr. LaRusso, would you like to be

23 heard on sentencing?

24         MR. LARUSSO:  I would, Your Honor.

25         This is, as I said, a difficult one because of

1    the overriding allegations of sex trafficking, but I'll

2    try and, you know, do the traditional sentencing until I

3    get to that aspect of it, and talk about the nature of the

4    offense, which is obviously the first and one of the most

5    important considerations for the Court.

6          Mr. Andrews was convicted, Count Five,

7    conspiracy to possess and possess with intent to

8    distribute 28 grams or more.  So that carries a mandatory

9    minimum of 60 months.  I'm upfront all the time, and I'll

10   tell the Court that that's going to be my recommendation

11   at the end, I think under all the circumstances.

12         But you know, when you look at all the evidence,

13   the evidence in the Southern District case and the

14   evidence from the ones presented to you, you know,

15   Mr. Andrews is not a major trafficker of narcotics.  He is

16   a street dealer of crack and powder cocaine during the

17   period charged in the indictment.  And now the Court is

18   found he's responsible for at least over 200 grams.

19   That's not kilos, Judge.  That's one-fifth of a kilo.

20         The drug traffickers that I have represented

21   that have come to this court and have been sentenced dealt

22   in multiple kilos, tons of drugs.  He's a street-level

23   dealer.

24         Now, am I trying to minimize the seriousness of

25   the event?  This is where you have to be very careful,

A - 124

SENTENCING

114

1   Judge, when I make my presentation to you.  No, because

2   this is a serious offense.  It impacts the community where

3   he lives, and therefore, the Court has to take that into

4   consideration, but I also ask the Court to take a look at

5   him in the context of drug trafficking in the cases the

6   Court has sentenced defendants to.

7           The government itself has estimated, Judge, on

8   the low end as opposed to the high end that he made

9   $19,000 from trafficking crack cocaine.  Now, that's not,

10  you know, a small amount of money to sneeze at, but in

11  today's day and age, Judge, that's what he made.  That's

12  what the government's estimate, their low end was,

13  12-month period of time.

14          Again, please, Judge, I'm not minimizing this.

15  This is, you know, I really have to emphasize that because

16  some people think that you're doing that purposely.  I'm

17  not.  I just want to try to place his conduct in the

18  context of other cases that come before the Court for

19  sentencing.

20          I also made an argument to the Court -- and we

21  haven't alluded to it today, but it struck me as very

22  interesting.  In the Attorney General Guidelines that came

23  out December 16th of 2022, I noted this in my sentence

24  memorandum, that if you look at the Guidelines for not --

25  this is Guidelines to federal prosecutors -- do not charge

SENTENCING

115

1　the mandatory minimum under certain criteria, and he lays

2　all those criteria out.

3　　　　You know what?  He meets all of them, every

4　single one of them.  He's not an international trafficker.

5　He doesn't deal with international drug smugglers.  Judge,

6　there's no violence involved in any of his drug

7　trafficking activities.  He meets every single criteria,

8　and if this case was presented today for presentation to

9　the grand jury, Judge, there would be no mandatory

10　minimum.  That's why I put that in there, and that's what

11　struck me as very unusual.

12　　　　I guess it struck me, Judge, because I've read

13　many of those memos, and I've seen changes in Guidelines,

14　charging Guidelines coming out of the Department, but

15　that's the most recent one.  And I thought that was

16　something the Court should consider at the time you impose

17　sentence on Mr. Andrews.

18　　　　Your Honor, I'm hesitant to mention it, but I'm

19　sure the government is going to allude to the fact that

20　Mr. Andrews is alleged to have possessed a weapon.

21　There's no proof of that, Judge.  There is no evidence to

22　support it.  And I'm hoping I don't hear anything in

23　regards to that.

24　　　　It was, I believe, somewhere in the colloquy in

25　court that a witness had said that to the government at

SENTENCING

1    one point.  I couldn't find it.  I looked for it.

2              THE COURT:  Hang on.

3              Is that an issue?

4              MS. BHASKARAN:  No.

5              THE COURT:  Okay.

6              MR. LARUSSO:  Thank you.

7              THE COURT:  I didn't know if it --

8              MR. LARUSSO:  That removes that.

9              THE COURT:  And I will disregard it completely.

10             MR. LARUSSO:  Okay.  And I was also going to

11   say, Judge, if there was any question, Ms. Faustin never

12   testified to any weapon during the three-year period of

13   her relationship.  Mr. Andrews never had one.

14             The next one that is also very difficult because

15   of the numerous arrests and convictions that Mr. Andrews

16   has when you first look at it, my God.  I mean, what this

17   is?  You immediately start thinking of an enhancement.

18   You think of a larger sentence, but you know, most of

19   them, Judge, if you look at it, are very lengthy when he

20   was very, very young.

21             And I know the government is going to allude to

22   it and rightfully so, but Judge, he's never been convicted

23   of a violent felony.  He does have A misdemeanor

24   convictions for assault, but Judge, you know when that

25   occurred?  Thirty-three years ago.  He was 17 years old.

SENTENCING

117

1          We now have to accept the Court's finding that

2     we're in Criminal History Category III because of his

3     criminal record.  You know what those offenses are for

4     that put him in Criminal History Category III?  Possession

5     of a controlled substance, November of 2016; DWI, an A

6     Misdemeanor, March 23rd, 2011; an aggravated unlicensed

7     operator, an E Felony, and driving while intoxicated.

8     Those are the ones that led up to his five points.  All

9     right?

10          Now, look.  I'm not blind.  I saw the

11     allegations in the government's paperwork that there were

12     some issues of domestic violence, and I'm not going to --

13     I'm sure the Court noted that as well, and that involved

14     his wife, Andrienne Walker Andrews that resulted in his

15     arrest I think it was August of 1998, and violating his

16     Order of Protection, April of 2002, for assault in the

17     third degree, and since that occurred, again, 20 years

18     ago.

19          What interested me, Judge, is that Ms. Walker

20     wrote a letter and actually filed an affidavit, May 29th,

21     2020, in support of a bail application.  And the Court --

22     I'm sure the Court read it, and there is no doubt in my

23     mind, but can I just allude to a few portions of that

24     letter, Judge?

25          THE COURT:  Of course.  Of course.

1          MR. LARUSSO:  Just a few portions.  She

2    addresses that because it was important if you're going to

3    make an application for bail, let the judge know

4    everything.

5          And she writes, Carl and I both played a part in

6    the wrongdoings we have done -- wrongdoings we have done

7    to each other.  I do not want to give the impression that

8    it was all his fault when we were both to blame back in

9    our early teenage years.

10          Over time, as we have gotten older, we have each

11    matured, and our relationship has significantly improved.

12    We know ourselves well as each other better.  We have

13    mutual respect for each other.

14          I let go of the issues in the past, including

15    his relationships with other women.  Carl and I have a

16    long history together, and that includes having had our

17    ups and downs, but we have unique love for each other and

18    our bond is unbreakable.

19          Old conflicts -- and there were plenty -- some

20    of that even resulted in reports of domestic violence in

21    the past -- she underlines it -- were triggered by things

22    that haven't been an issue in our lives for years.  That

23    is not our relationship anymore in our adult lives, and

24    she writes, I know and feel completely one hundred percent

25    safe residing with Carl.

1    I thought that letter so was well-written that I

2    needed to, Judge, reemphasize it, though with you, I don't

3    normally have to do that, but I think his family has to

4    know that these incidents have been addressed by his wife,

5    and I think quite adequately.

6    We now come to the part, Judge, that has been

7    taking most of our time today in my eyes, the sex

8    trafficking charges, not convictions that have loomed

9    largely over the proceedings and the sentencing, and been

10   uppermost in my mind.

11   I'll candidly tell you, Your Honor, that, you

12   know, the lesser burden of proof to punish Andrews and

13   deprive him of his right to a trial by jury, which he's

14   been asking for forever where the burden is beyond a

15   reasonable doubt, it seems to me to be unfair and

16   unconstitutional.  I didn't raise it.  The Court can

17   properly so say.

18   But you know, it seems to deprive an individual

19   of his due process rights because he no longer has any

20   protection of beyond a reasonable doubt.  He now has to

21   deal with a preponderance of the evidence, and that's a

22   tricky one to deal with.

23   And I just thought the Court should be aware of

24   how important this was to Mr. Andrews.  He insisted on a

25   trial, not only insisted on a trial, he spent months and

SENTENCING

120

1    years in a horrific prison environment, waiting to be

2    tried and ultimately tried on a case that belonged here in

3    the Eastern District of New York.

4           That's unfair.  And now to have to face an

5    allegation as opposed to a conviction -- and Judge, I know

6    legally -- and I'm not saying the Court cannot do so.  The

7    law, especially the Supreme Court recently has already

8    ruled on this issue.  The Court can basically look at

9    anything that bears upon the history and characteristics

10   of the defendant.

11          And I'm not saying you can't consider it.  I'm

12   just asking the Court to factor in the horrific conditions

13   that he's had to endure for so many years, when if this

14   case was brought here, it would have been done and over,

15   and he could have gone to prison and he could be getting

16   his programs done, and the case would be forwarded if he

17   was convicted.

18          But you know, Judge, he's insisted as he sits

19   here today, he's not guilty of sex trafficking as defined

20   by the law, and that's what he testified to today, and the

21   government's evidence -- I'll point out later -- actually

22   proves he didn't force or coerce as the term is defined,

23   and I will be glad to answer questions when I get to that

24   in a few minutes, Judge, if I may.

25          The other thing that stuck me again as unfair,

SENTENCING

121

1   but not improper.  I guess unfair is the word -- is the

2   government seems to be putting pressure on the Court to

3   sentence him to more than almost twice the Guidelines for

4   the drug trafficking conviction.  They want 180 months for

5   a crime that he went to trial, mistrial, and he's still

6   sitting here looking for his trial in that regard.

7           I just feel that that kind of pressure put on

8   the Court -- and I know the Court won't be involved in

9   letting that influence your judgment, and I put that on

10  the record, Judge, knowing you in the past and have been

11  before you.

12          But it's just not right that a defendant has to

13  bear that kind of burden where the government is saying

14  we're going to wait to decide what to do after sentence,

15  whether to retry it.  What does that mean?  That means

16  they want their 15 years and their pound of flesh.

17          I don't like using words like that, Judge.  I

18  really don't.  I think it's kind of off the mark, but

19  here, I'm just maybe spending a little too much personal

20  interest.  That bothered me.  I think they didn't need

21  that in order to resolve this case properly.

22          I had probably spend hours, and I won't take

23  those hours and burden you with all of them, Judge, but I

24  really spent time evaluating the testimony on this sex

25  trafficking case.  And it is a very unusual theory which

122

1    the courts have accepted, but the courts also say that

2    just withholding drugs from an addict is not sex

3    trafficking. There has to be much more.

4            Judge, the cases in the Second Circuit talk

5    about -- if the Court may remember, it was the *Purcell*

6    case that I was alluding to. They actually talked

7    about -- and I want to get the words right, Judge, because

8    they are specific, and I think to Mr. Andrews in

9    particular.

10           (Pause in proceedings.)

11           And again, I'm just going to try to summarize,

12   Judge, and not read everything because that's

13   inappropriate.

14           What the Court said when dealing with this

15   particular statute -- and by the way, *Purcell* had the same

16   situation. There was a nonviolent, no force-type of sex

17   trafficking charge that was brought in that case, that was

18   brought against Mr. Andrews.

19           And what they said was, that what you look at or

20   what they looked at is to determine whether the defendant

21   engaged in an, quote, intimidating pattern of behavior --

22   an intimidating pattern of behavior that caused the victim

23   to believe -- and I quote -- that she could not refuse to

24   work as a prostitute for him without incurring harm, and

25   therefore, she had no viable alternative to engaging in

SENTENCING

123

1  commercial sex activity with the defendant's customers.

2       I recognize, Judge, the fear addicts go through

3  when they realize they can't find the drugs, and you

4  probably more than I, dealing with many of these cases,

5  know particularly the horrors an addict goes through when

6  they've lost their source of drugs.  And so there is, in

7  the Court's mind, that kind of harm can be manipulated.

8  That kind of harm can be used by others to inflict that

9  kind of pain.

10       But it talks about, Judge, an intimidating

11  pattern of behavior.  It talks about the fact that this

12  person had no viable alternative, and there are so many

13  factors in this case that certainly don't match up to the

14  requirement that the Second Circuit sees in these types of

15  cases.

16       Mr. Andrews testified -- and I think truthfully,

17  uncontradicted -- about his relationship with her.  There

18  was no force.  There was no violence, Judge.  And more

19  importantly, Judge -- and this is the key here and there's

20  another section of that court's opinion where they talk

21  about a pattern of behavior designed to intimidate and

22  exert control over the victim.  The logical objective of

23  the defendant's intimidating pattern of behavior was to

24  cause the victim to believe that she could not refuse to

25  work as a prostitute for her without incurring harm --

SENTENCING

124

1   that never happened in this case.  It never happened.

2           In *Purcell*, it did.  In *Purcell*, the court said,

3   let's take a look at this.  And Judge, what they found --

4   which is not in this case -- they found the defendant

5   insisted that the victim sever her ties with her prior or

6   outside life.  That's the first thing they said was

7   existing there.  He didn't do that.  She was not isolated.

8   She met with her mother.  She talked with her mother.

9   They met together for lunches.  She could have walked

10  away.  She had freedom of movement.  That, to me, it tells

11  all in terms of -- wait a minute.  What was this

12  relationship?

13          Judge, the other thing that I won't put on the

14  record because of Rule 412, but that letter I sent to you

15  is right on point here, Judge.  I can generally -- I hope

16  I can generally describe it because the Court knows it.

17  Before --

18          THE COURT:  And after.

19          MR. LARUSSO:  -- during and after, she was

20  engaged in prostitution, and again, I shouldn't specify,

21  but I just ask the Court to please look at that to try to

22  understand.  Did he intimidate her?  Did he exploit her,

23  her addiction?  Did he control her movements?  That's the

24  point I was trying to make, Judge.  And to me, when you're

25  involved in such a serious case like this with an addict

125

1  who is in need of drugs, you need to look at the full

2  picture, and that's the full picture.

3          The government has no evidence.  Yeah, they had

4  evidence that maybe he withheld food, those text messages.

5  Yeah, they may have a conversation where he talked about

6  drugs with her.  But that doesn't negate the fact that she

7  herself testified that she engaged in activities

8  unbeknownst to Mr. Andrews during this period that he was

9  charged with.  If he's a pimp and he's controlling her and

10 he's exerting this influence, how was she able to go out

11 and do it because she had the freedom of movement and the

12 freedom of choice?

13         I'm very -- how do I describe it, Judge, without

14 taking too personal an interest here?  That is nothing

15 here to leads one to conclude that this particular

16 witness -- maybe the one in *Purcell* was.  All right?  And

17 I'll read just a few more just to conclude my remarks

18 here -- would apply to the statute, but not here.

19         They talk about, the judge said, he called her

20 former pimp to announce that the victim now worked for

21 him.  That's never happened here.  Instructed the victim

22 to change her telephone number.  He let her keep her phone

23 number.  He took possession -- and did not take possession

24 of her cellphone except when she was answering calls from

25 potential customers.  She had it at all times.

SENTENCING

1          She talked to each one of the customers.  He

2     didn't know who they were.  He didn't even know how much

3     she charged -- well, he might know what she was supposed

4     to charge, but he doesn't know for a fact, Judge, and I'm

5     telling you, there is a pimp -- and I've actually been

6     involved in cases.  Those street pimps, Judge, they know

7     exactly how many customers, they know exactly how much

8     money, and that person better give that money.  That's not

9     this case.  That's not this case.

10          Judge, you have read it.  I mean, it's there.

11    There are so many aspects to this particular case that cry

12    out for not finding in anyway that she was forced or

13    coerced as defined.

14          I mentioned on cross and on the direct with

15    Mr. Andrews that, you know, your traditional having sex

16    with a prostitute to further exert your control, that

17    never even happened.  They never even discussed it.  She

18    was never even asked to do it.  This was just a straight

19    relationship.  You want drugs?  Give me money and you got

20    it.  All right?  Maybe it took on some rough forms, Judge,

21    but it didn't take on the forms of a sex trafficking case.

22          I'll leave that, Judge.  I think at this point,

23    I have kind of summarized what I wanted the Court to know

24    from our position, and get to the part that you don't

25    really have an opportunity to present during prosecution.

SENTENCING

127

1          You know, most of it's about what the defendant

2     wrong and who are the witnesses, and you know, you've got

3     to get ready for all of that.  This is about the

4     defendant, the histories and characteristics.  That's why

5     it's probably part of the considerations the Court has to

6     take into account.

7          You know, Judge, he's 49 years old.  He was born

8     and raised, as the Court knows, by an abusive mother,

9     whose father became a daily crack user when he was young.

10    You know, 13 and 14, he had a sister that left the house

11    because of the situation at home.  I mean, I can't even

12    think of my kids 13 and 14 doing something like that.

13    It's just very hard.

14          And look, Judge, just so you know, he's never

15    used that as an excuse for anything.  I'm telling the

16    Court what I found in the Probation report.

17          His sister confirmed much of the information

18    that Mr. Andrews imparted to the Probation officer.  His

19    sister kind of set the stage for me when I was looking at

20    this.  She said, you know, he's a good father.  You know,

21    he's -- and the period at the time that she was speaking

22    to the Probation officer, he was making changes in his

23    life, trying to do better than before.

24          Your Honor, he has 16 children.  I'm sure you

25    know -- 15 natural, one adopted, with most of them are in

SENTENCING

128

1  court today to provide the support I think is important to

2  let people know that he does have that kind of support

3  system.  They mean all to him.  That's why they know it

4  and that's why they're here.

5          Judge, if you'll forgive me, Mr. Andrews, he has

6  these children from five different relationships but you

7  know what, Judge?  He's maintained cordial relationships

8  with everybody.  That's speaks a lot.  Want to know -- I

9  don't mean this to be funny -- I don't know if I could do

10  that.  That's an amazing situation, and I'd just ask the

11  Court to note that.

12          THE COURT:  He had some good letters on that,

13  too.  I read those.

14          MR. LARUSSO:  You know, Judge, I was just going

15  to say, the one that I sent to you recently was

16  substantial from my point of view.  His name was Marcus

17  Damas, D-A-M-A-S.  He's always doing this.  He's corrected

18  me.  It's Damas.

19          Thank you.

20          And Mr. Damas is here.  I apologize.

21          And what he did, Judge, is he gave me at least

22  an opportunity to tell you that he's committed to his

23  family -- that's his words -- and more importantly, he's a

24  decent man.  When you talk about this testimony and the

25  charges, you don't get that, but he is.  And given a

SENTENCING

1    chance, you know, Carl can make a difference in the lives

2    of his children.  I mean, not only has he tried, every

3    effort has been made.  He noted that as a father -- he's a

4    father himself -- how important it is to be present each

5    day.

6          So how did Mr. Andrews feel being in custody for

7    five years on these charges?  It's got to be -- got to be

8    very hard because he is a father, and he is involved --

9    was involved -- and he is so deeply concerned.

10         He also indicated which is important to me,

11   Judge, that he is a very successful businessman.  He's had

12   a couple of businesses.  And he thinks so highly of the

13   individual who's before you here today, he offered a job

14   for him as his personal driver.  I've had a lot of

15   character letters, but not one that is glowing like this.

16         THE COURT:  I haven't seen many job offers in

17   this context.  That's unusual, yes.

18         MR. LARUSSO:  I'm ready for one, Judge.  So I

19   thank Mr. Damas for providing that.

20         The other most important letter, Judge, is

21   Denise Lewis, the mother of his three children.  Again, I

22   won't read the letter because it would take too long, but

23   highlights, Judge, it was amazing.  Devoted to his

24   children, considerate of others, helping family and

25   friends in difficult times in their lives, providing food

A - 140

SENTENCING

130

1    and shelter to someone in need, and that struck a bell for

2    me.

3              The letter describes how Carl was involved in

4    his children's lives.  I won't go into it.  The Court read

5    it.  Describes Carl -- this is always the hardest when

6    you're looking at these letters, but she gave me the

7    words, not mine:  Kind, loving, funny, supportive,

8    thoughtful, honest, dependable.

9              You know, there is a person here outside of

10   these charges that I'm really trying to hard to convey to

11   the Court.  She would be lost without him.  I got a call

12   from his mother the other day.  His children have some

13   trouble, and the one solid rock is not there.  Boy, did

14   that hurt him when I talked to him about it.  It's got to.

15   There is no way to describe it.

16             His closest friend, Elton George, also wrote

17   about Carl, his willingness to help and assist others,

18   dedicated to children.  And even his mother talked about

19   his volunteer service.

20             I'm at a loss, Judge, in terms of recommending a

21   sentence that the Probation Department and the government

22   is asking.  I think it's unfair.  He's already served 51

23   months in custody.  And there are some really significant

24   things I'd like the Court to consider -- and again, I

25   won't read the pages, but just highlight them because

SENTENCING

131

1      these people have a right to know both sides of it.

2              He has an exemplary prison record, Judge, 51

3      months.  And I know the Court is familiar with the cases

4      that talk about that being a significant sign of

5      rehabilitation.  Yeah, he had a violation for possessing a

6      contraband cellphone and he was punished for that some

7      many, many months ago.

8              Even though government has claimed he doesn't do

9      barber, he barbered almost ever single day when he was in

10     the prison, and he did it for nothing, to help the inmates

11     out.

12             And this is one I -- you know, Judge, in all my

13     years of practice, both sides of the bench, I have had

14     maybe three people that fit this category and now I

15     understand why.

16             Mr. Andrews applied for and was accepted as a

17     trusted inmate in the Suicide Prevention Program at the

18     MCC.  What is that?  That's a monitoring program of risk

19     prisoners who make may commit suicide.  I don't see many

20     of these.

21             And more importantly, he received certificates,

22     Judge, for being in that program and attending classes to

23     be able to better perform his job of monitoring,

24     counseling and helping.  And that letter from the

25     supervisor, Judge, says it all.  I won't read it because I

A - 142

SENTENCING

132

1  know the Court read it.

2          THE COURT:  Uh-hum (affirmative response).

3          MR. LARUSSO:  He commended him for that --

4          THE COURT:  Yes.

5          MR. LARUSSO:  -- and the hard work that he did.

6  I mean, there's a man in here, Judge, a lot more than I've

7  seen in many, many, and that evaluation, I was very, very

8  happy for.

9          And Judge, he uses words like dependable,

10  reliable, trustworthy.  But that he goes farther.  He took

11  classes when he was able to, to improve himself.  He never

12  received a ticket or infraction while he was at MDC or

13  Yaphank.  He volunteered to be a dormitory representative

14  for his unit, to make sure that the sanitary conditions

15  were complied with.

16          And I couldn't find the case, Judge, but I know

17  there's a case that says the courts can consider a

18  person's record in prison in terms of determining an

19  appropriate sentence.  And I know the Court will forgive

20  me for not having the quote.

21          THE COURT:  Don't worry, Mr. LaRusso.  Even

22  without a case, I would consider that.

23          So go ahead.

24          MR. LARUSSO:  And Judge, the Court would

25  probably know.  I'm winding down because Mr. Andrews

SENTENCING

133

1    really would like to talk to you and I probably took some

2    of his time.

3            But the last thing I want to be able to say to

4    the Court in terms of what really is appropriate for him,

5    the conditions at the MDC are or have been atrocious.  I

6    can spend 20 minutes to an hour talking about what he

7    endured in terms of the lockdowns, and the 23 hours or 24

8    hours in a cell without telephones and internet service,

9    showers limited, all of that.

10           But you know, Judge, with your permission, I'm

11   going to end with just his own words to a government

12   official that I think more than any lawyer I've seen

13   describes what he had to endure not just during the time

14   he was talking about, but throughout all of the time at

15   the MCC.

16           And if I could, Judge, I will end with this.  It

17   was a handwritten letter.  I actually was able to

18   understand this.

19           He says, on the 21st of March, I was placed in

20   SHU for quarantine because I was exposed on the 16th at

21   court.

22           While placed in SHU, it was a nightmare.  The

23   building is infested with rodents and roaches.  The first

24   nine days in SHU, I was denied a shower and change of

25   clothes, soap, toothpaste, towel, washcloth.  I haven't

SENTENCING

134

1  received my psych meds since they brought me to MCC and

2  told psych a number of times.

3          I was allowed one phone call, actually two

4  because my lawyer called me one time and the other, I

5  called my wife and kids in 18 days.

6          On April 7th, I was placed back in population, 7

7  South, Cell G 10774, a cell with no sink.  Now, mind you,

8  still quarantined.  How do I wash my hands and keep clean

9  with no sink?  Me and my cellmate complains every day and

10  nothing gets done.

11          It seems like hell.  I have to block the door at

12  the bottom to keep the mice from coming in their holes

13  they come through in the walls.  The toilet leaks.  It

14  smells horrible.  My skin is infected from all this filth.

15  There's flies flying around the cells.  Disgusting.  It's

16  unhealthy and unsanitary for living.  Air vents are dirty.

17  We're breathing in dirty air.

18          I've been allowed one shower since the 7th.

19  Today is the 13th.  Mind you, no sink in my cell.  A whole

20  25 days, I had three showers and don't know when my next

21  one will be.  I ate cold food for two weeks in SHU.  And

22  that continued, lockdown, after lockdown, after lockdown.

23          Judge, I appreciate your patience.  I took more

24  time than I anticipated.

25          THE COURT:  That's fine.  You did a great job.

A - 145
SENTENCING

135

1          MR. LARUSSO:  But I appreciate it.

2          And with your permission --

3          THE COURT:  Let me just say, Mr. Andrews, you

4     and I have had this conversation before.  You don't have

5     to say anything.  But if you have anything to say, I'm

6     happy to hear it.

7          THE DEFENDANT:  So much, I don't know where to

8     start.

9          THE COURT:  Well, just get close to the mic, so

10    we don't miss it.  Take your time.

11         THE DEFENDANT:  First, I would like to speak

12    about the charges that I was accused of.  They're

13    disgusting.  It's evil.  They put my name in the paper,

14    newspaper, slandering my name, accusing me of doing things

15    to a person that I would never ever think about doing.

16         I was child abused when I was a kid, beat with

17    extension cords, stripped naked, going to school with open

18    blisters.  I never beat my kids, never wanted to, never

19    thought to beat any one of my kids.  I don't even like

20    when they mother's yell at them.

21         To be accused of something so cruel -- I didn't

22    know when I was getting sentenced.  I didn't know what day

23    I was getting sentenced.  My lawyer asked me, did I need

24    time to prepare -- or no.  He asked me, did I have

25    everything written out?  And I told him, there's nothing

SENTENCING

136

1  to write out because I know the truth.  I don't have to

2  prepare for the truth, how the government has to prepare

3  for false testimony, lies and just cruel actions.

4          I testified today because I'm not guilty of

5  these charges that I was charged with.  I'm not guilty of

6  the charge that I was convicted of.

7          Yeah, I sold drugs in my life.  I participated

8  in prostitution, promoted prostitution.  I participated.

9  Someone asked me to do -- yeah, I needed money.  I have

10  kids.  It's hard for me get to a regular job and support

11  all of them, especially at the same time.

12          I have a work history in my life.  I worked for

13  FedEx, mostly all moving companies and warehouses, all

14  temp agencies, all of that.  I had a life of that.

15          The streets, I have been shot, stabbed up

16  numerous times.  Mental issues that prevented me from

17  work.  I was diagnosed with mental health issues.  They

18  said that I was exempt from working.

19          So yeah, I did a little bit of hustling, and it

20  was a little bit because if I was making this kind of a

21  money from this person that they called a victim -- and

22  she is a victim, but not from me.  She's a victim of the

23  government.  They the ones who really don't care about who

24  they put in these positions, and force and coerce them.

25  They do the force and coerce.  They don't realize the

1    positions they put them in.

2         I'm also a victim of them.  Evidence withheld

3    from me all through the whole time I have been locked up.

4    They turn over what they want to turn over.  They destroy

5    what they want to destroy.  I don't get a fair trial.

6    They delay when they want to delay for their benefit.

7    It's no justice.

8         They charged me with sex trafficking in the

9    Southern District.  They made numerous offers to me that I

10   wasn't even charged with to throw out the sex trafficking.

11   I denied every one because I felt if you charged me with

12   sex trafficking, we're going to trial on the sex

13   trafficking because I didn't commit no sex trafficking.

14        The last offer they offered was a (b)(1)(B) drug

15   charge.  I refused it immediately as soon as my lawyers

16   addressed it to me.

17        Now they said if I didn't take it, I would be

18   charged with a gun charge in the Eastern District -- I

19   will be indicted in the Eastern District with a (b)(1)(A)

20   drug charge, a gun charge, fraud and sex trafficking.  And

21   I said, I'm not taking it.

22        I've been to prison.  I'm not scared.  I've been

23   incarcerated for things I've done, and I took full

24   responsibility for it and paid for it, and paid for my

25   actions.

SENTENCING

1      Now, when they threatened me, saying, you're

2  looking at 22 years -- you'll be looking at 22 years in

3  the Eastern District.  I still refused that offer where

4  they also said that if I take the offer, I -- it was I

5  think it was Monday or Tuesday -- they said, by Friday,

6  you'll be released, and awaiting sentencing at home.

7      Everybody -- everybody that I spoke to on the

8  outside and the inside, oh, you're stupid.  Why don't you

9  take this?  You know why I didn't take it?  Because I knew

10  that if I copped out to that, it would be in

11  furtherance -- I wouldn't be exonerated for the sex

12  trafficking.

13      So that's why I didn't take it because I want to

14  be clear.  I fought to get a trial.  They delayed.  They

15  lied about the witnesses.  Your key witness -- your key

16  witness that's supposed to be a victim stated in the trial

17  that this was her idea.  She stated in the trial nothing

18  was done violent to her.

19      Among the lies and everything that I thought in

20  a trial, the witness testimony was the main thing you are

21  supposed to listen to.  And these witnesses, including the

22  officers, were lying on the stand under oath, committing

23  perjury, false testimony, fabricated.

24      I'm not a lawyer.  And it's a lot that I don't

25  understand about this stuff, but I did a lot of research

SENTENCING

1    in this stuff, and I really know some things, and the

2    statute for sex trafficking, 1591, the charge that I was

3    charged with, it says -- I don't remember -- I don't

4    recall it fully, but it's knowing and intentionally some

5    trafficking of a child, and things to that nature, false

6    coercion, all of that.

7           The government theory was coercion, saying when

8    I withheld -- not I, but me and Geraldine Faustin withheld

9    drugs from Jillian Greener.  Jillian Greener testified

10    that she always got drugs, testified that I gave her drugs

11    to give -- to sell to clients, which was not true.  She

12    testified that I gave her numerous of grams a day.  I

13    don't understand.  Where's the withhelding at?

14           If that's the case, coercion and sex trafficking

15    case for 1591 that I'm charged with, the coercion is if

16    you don't do what I ask of you to do, you will be

17    physically harmed.  It's many different definitions for

18    coercion --  coercion.

19           And that statute, 1591, that I was charged with,

20    it says force and coercion of a child, all of this.  Judge

21    Engelmayer asked, was there any children involved in this

22    case?  No, the government responds.  The task force is

23    child exploitation, task force that supposedly has brought

24    this about, whatever also.

25           In the affidavit and the arrest warrant -- in

A - 150

SENTENCING

140

1   support of the arrest warrant for my arrest and Geraldine

2   Faustin's arrest were we -- that Jillian Greener was

3   scared of us, and we forced and coerced her to commit

4   commercial sex acts on our behalf.  That's in the

5   affidavit for my arrest warrant.  This is the reason they

6   come for me and her.  But you have the victim in court, in

7   trial, and grand jury testimony saying the total opposite.

8           I knew Jillian Greener.  She was cool.  We was

9   friends for a short period of time.

10          I'm no big time drug dealer, have no money.  I'm

11  living by the day to feed me and my family and others I'm

12  helping out.  I didn't force or coerce no one to do that

13  ever in my life.

14          Jillian, if the evidence was turned over to me

15  and phone records and stuff like that that wasn't damaged,

16  I mean destroyed or whatever they claim it was, I would

17  have been able to prove a lot of that.

18          *Brady* material withheld.  New evidence in this

19  trial that was presented to me the day of trial, going to

20  trial with a lawyer that never spent no time with me, no

21  evidence -- went over evidence with me or nothing.  You

22  know, we had -- nothing was fair to me to prove my

23  innocence, my due process rights or my civil rights

24  violated over and over again.

25          I asked for a bench trial.  They stopped my

SENTENCING

141

1    trial in Southern District.  They claim that it was

2    because of the pandemic, while the chief judge said --

3    ordered that all ongoing trials can continue in the

4    Southern District.  Two other trials was going on as well

5    in the Southern District.  Those trials kept going,

6    continued to go on.  And the city news press put it in

7    their paper, they don't know why they stopped Mr. Andrews'

8    trial, when other trials was going on.

9          They did not allow the court officer in the

10   courtroom the first day of Jillian Greener's testimony,

11   nor did they put on it on PACER after they told the

12   reporter that they will.  He also put that issue in the

13   paper.

14         Now, this is March, the beginning of -- middle

15   of March.  I started trial on March 9th, the beginning of

16   the pandemic.  You said you stopped my trial because of

17   jurors, for the safety of the jurors.  I asked for a bench

18   trial.  It was denied.

19         Now, we get down to me not agreeing to no

20   postponements and all of that, pushing for a trial, put

21   speedy trial motions in.  We get down to venue.  I put a

22   motion in to dismiss for improper venue because these

23   charges allegedly was brought up and said they was in

24   Suffolk County.  The judge told them, make sure you guys

25   have jurisdiction and venue, all of that, in conferences.

SENTENCING

142

1           I put in a motion to dismiss for improper venue.

2     The judge gives them a time frame to answer, which I think

3     is two weeks.  They asked for a postponement, adjournment.

4     He granted it.  Asked for another one that same month.  He

5     granted it.  Next month comes, they asked for another one.

6     He granted it.  That day comes.  Asked for another one.

7     Granted.  Over five, six times, he granted it.

8           Venue is supposed to be in an indictment, right,

9     where the crime was allegedly committed?  You should be

10    able to answer that in one -- in two minutes.  Here, you

11    don't answer it at all and you just drop -- you just drop

12    the case.

13          THE COURT:  Mr. Andrews, if it saves you any

14    time, I just remind you, I written an order raising all of

15    these issues, just so you know.  All right?  Yes?

16          THE DEFENDANT:  Okay.

17          But I just want to say you dropped the motion --

18    I meant you the dropped the charges they charged me in the

19    Eastern District.  After two years and-a-half, trying to

20    fight and prove my innocence, two and-a-half years away

21    from my family, away from my loved ones.

22          I write you a letter, tell you how I come over

23    here.  It should have been dismissed with prejudice, but

24    of course, no justice.

25          Now we at the end of the pandemic.  I'm at the

SENTENCING

1    worsening of the pandemic, which is December 20th,

2    December 2020, the worsening of the pandemic, when bodies

3    are dropping.

4           You get a jury panel when the courts are closed.

5    No juries are allowed.  You come up with an indictment in

6    the Eastern District at the worsening of the pandemic, but

7    you cannot come up with juries or give me a bench trial in

8    the beginning of the pandemic when the chief judge ordered

9    ongoing trials to continue.  No jury to prove my

10   innocence, but we get a jury to give you some more

11   charges.

12          They indict me in the Eastern District, sex

13   trafficking and add on a charge.  From my research and my

14   recollection, it's vindictive prosecution if you add on

15   another charge when someone exercising their right and try

16   to prove their innocence through a trial, and put motion

17   to dismiss in is vindictive prosecution for you to add on

18   another charge.

19          We get here in this district now, Eastern

20   District, fighting, fighting, fighting to go to trial even

21   though, you know, postponements, postponements,

22   postponements.  You made a order that this -- I think May

23   7th, we're not having no more nothing.  We're going to go

24   to trial.  That didn't happen.

25          The government, you know, in July, as a matter

144

1  of fact, when we were supposed to go to trial and we was

2  picking the jurors, the reason for the delay was not on my

3  behalf.

4          Actually, it was more lies.  The reason that the

5  delay was because it was a officer -- supposedly, it was a

6  officer, a ex-cop that was a juror seen a officer in

7  the -- no.  I mean, back up.

8          The reason for the delay was there was a ex-cop

9  and he heard the judge say, bring the defendant up.  They

10  said that that -- the lawyer and -- well, the lawyer, he

11  led me to believe that the cop thought that, the ex-cop

12  knew that, so we should assume -- this is what he said to

13  me -- we should assume that all the jurors knew --

14  believed that.  So I'm like, okay.  We picked the jurors.

15  I'd rather pick them again anyway because it wasn't no

16  jurors of my peers or anything, which is unconstitutional,

17  of course.

18          The next month, they ordered -- August -- to go

19  to trial.  The judge said when we came back, yeah, the

20  reason for us delaying the trial, the date last time, it

21  was something with the jurors.  It was a juror that knew

22  the officer that was sitting in the court, which is James

23  Johnson.

24          I'm not like, no, that is not why.  That wasn't

25  the reason why.  You read the transcripts.  That's

145

1  what was done.  So it was all lies and a reason to delay

2  for the purposes of their benefit, to coach witnesses, I

3  guess.

4          But anyway, I asked for a bench trial.  You

5  even -- you asked, see if he'd like -- see if he would

6  take a bench trial.  I don't know why y'all denied him in

7  the Southern District.

8          You told them, don't go nowhere.  Keep your

9  witnesses because we're possibly going to be going to

10  trial, starting trial.  For some reason I don't know, like

11  the other reason, it was denied.

12          All of these years, all this time, delay.  My

13  sentencing, I was convicted in 2021.  I'm supposed to be

14  sentenced with no unnecessary delays.  I'm getting lawyer

15  after lawyer that -- telling me that they are sick and

16  they are not able to come see me and go over things with

17  me.  They apologizing, everything, while I'm sitting in

18  jail, trying to prove my innocence.

19          Two years went by.  I'm deprived of early

20  release programs, in a facility with mold and no law

21  library.  We had no law library for God knows when because

22  of the thing with the computers, the ransom, you know,

23  ransomware.

24          THE COURT:  Mr. Andrews, let me just ask you.  I

25  want you to say whatever you want to say, but I'd like

SENTENCING

1   you, if you can, focus on what you think happens now.  In

2   other words, this is about sentencing, right?  We've got

3   to get there.

4            THE DEFENDANT:  My reason for saying that is

5   just it's unfair.  And the whole time, I have had no

6   justice.  This has been injustice, unfair, couldn't prove

7   my innocence.  Away from my family every day.  You know

8   what it's like to raise your kids on the phone for four

9   and-a-half years?

10           Lucky that I have the relationship with them

11  that I have.  You know what it's like for them to ask you

12  when you're coming home or you need to come home?  And

13  you're telling them the same thing, daddy be home soon.

14  It's not fair to them.  It's not fair to me.

15           It's not fair to none of these witnesses because

16  if -- they only was witnesses because of what the

17  government did to them, if it wasn't for this case brought

18  about.  You don't care about their safety, nothing.  You

19  don't care about our families.

20           God knows, everyone in this courtroom knows I

21  didn't commit no sex trafficking.  Okay?  Charge.  Crime.

22  Everyone knows for damn sure, I ain't sell all these damn

23  drugs.  And -- excuse my language.

24           THE COURT:  That's fine.  I've heard worse.

25  Don't worry.

SENTENCING

147

1      Go ahead.

2      THE DEFENDANT:  Because 2.3 -- no 2.8 grams.

3   You add up over 200 grams.  You put pictures up that was

4   never shown to me, that you used from my phone that said I

5   cooked drugs.

6      I don't know if it hurt me or not, but you said

7   that picture of that block of drugs was crack that was

8   cooked up, and it wasn't.  When you buy cocaine, what does

9   it come in?  Bricks, blocks, right?  Stuff like that.

10      So, mind you, the date on that picture, no one's

11   around for that to be cooked up, any witnesses that said

12   they seen me cook.  Geraldine said she never seen -- meant

13   that I didn't know how to cook and I got somebody to do it

14   for me.  Jillian said I cooked it up in front of her.

15      The witnesses' testimony was lies, over lies,

16   over lies, and they said the main thing you pay attention

17   to is the witness testimony.  You said, so I gave the

18   drugs five to ten times, twenty to 30 times, 50 to 70

19   times.  You telling me you could take the low end or you

20   could choose what -- never mind the lies.  Never mind how

21   is it credible?

22      What's credible is me sitting here to fight for

23   my life, trying to go to trial.  Sitting here, not -- I

24   don't need to prepare for that, the truth.  You have to

25   prepare for lies.  You have to coach witnesses.  All of

SENTENCING

148

1    that, all for them plea agreements, money, all of that to

2    get out of the -- to get them off of there, to let, you

3    know.

4          I want to apologize for all the time I took, but

5    this is my life, and this is my family. I was fighting

6    for that. And that means everything to me.

7          There should have been perjury charges brought,

8    all of this. The officer said to me -- I meant in the

9    trial that they said the pole camera was put up in June,

10   right, from the Drug Task Force, Narcotics Task Force.

11         How is that when July 16th, they didn't hear

12   from me until July 16th in my trial in Southern District?

13   My lawyer asked me them, both officers, when did you hear

14   of Andrews, Mr. Andrews? July 16th. How long you been on

15   the task force? I don't recall. But it was a lot of

16   years that they said they been on the task force. Did you

17   ever hear of Mr. Andrews? No.

18         So how can a drug -- the Suffolk County

19   Narcotics put that pole camera up if they never heard of

20   me? How was they investigating me if they never heard of

21   me until July 16th? That is June 30th of 2018 and July

22   16th of 2018.

23         Phone records from the detective, lead detective

24   of the case, phone records, I asked for. I'm entitled to.

25   Phone records from Jillian, I'm entitled to. Phone

SENTENCING

149

1   records from Geraldine, I'm entitled to.  Never got them.

2          Motion to compel, put in for it.  The cop said

3   he dropped the phone so hard, he couldn't -- the detective

4   said he dropped the phone so hard, he couldn't get the

5   data out of it, in front of the precinct.  There's cameras

6   in front of the precinct.  And I don't think you need the

7   phone to get to data out of it anyway.

8          Okay.  If that phone was destroyed, then let me

9   get the phone records from Greener's phone, from your

10  phone to her phone in that time frame of March 2018 -- or

11  I asked for April of 2018 to whenever.

12          THE COURT:  I'm going to have to ask you to wrap

13  it up, please.  Yes?

14          THE DEFENDANT:  All right.

15          All lives matter, man, and I just hope one day

16  this system changes.  Thank you for your time and

17  consideration.

18          THE COURT:  Thank you, Mr. Andrews.  I

19  appreciate that.

20          All right.  Counsel, don't feel obligated to

21  respond to everything because there was a lot, but if

22  there is anything that you would like to respond to, I'll

23  hear from you.

24          MS. BHASKARAN:  Thank you, Your Honor.

25          There were many allegations that were just made

SENTENCING

150

1    regarding discovery, the procedural history of this case,

2    plea offers, witness tampering and the like.  I'm not

3    going to address that.  I think there is plenty in the

4    record in written submissions and other arguments before

5    the Court.  I don't want to suggest that my lack of

6    comment on those issues suggests that we concede them in

7    any way.

8              THE COURT:  You have conceded nothing.

9              Go ahead.

10             MS. BHASKARAN:  Thank you, Your Honor.

11             So I want to focus my time on sentencing now, on

12   the 3553(a) factors, which is where the Court must

13   consider all of this massive record before it, the history

14   and characteristics of the defendant, and fashion an

15   appropriate sentence.

16             I think we can all be in agreement that the

17   facts that were adduced at that March trial in the

18   Southern District of New York can be considered by this

19   Court.

20             And I also think it's important to recognize

21   that the Court's task right now is not to determine

22   whether or not that conduct is technically a violation of

23   Section 1591 or 1594, and we submit that it is, but that

24   is not the task before the Court.  The task before the

25   Court is to look at conduct and determine what it means in

SENTENCING

151

1    terms of the application of the Section 3553(a) factors.

2            What does it mean about the nature and

3    seriousness of the offense?  What does it mean about the

4    history and characteristics of this defendant?  And what

5    does it mean for just punishment?  And I think that is

6    appropriately the task for the Court in sentencing this

7    defendant.

8            And to begin now, Your Honor, on the conduct

9    that was described and discussed at that March trial, I

10   wanted to start with a few notes about the victim.  The

11   Court heard her testify credibly at this trial, and she

12   testified for approximately two days at that March trial.

13   Much of the relevant testimony was excerpted in the

14   government's sentencing submission in this case.

15           The victim in this case is someone who has

16   survived tremendous abuse, and she has come a long way.

17   When the defendant first met her, she had hit absolute

18   rock bottom.  Her belongings were confined to two

19   suitcases.  She had failed drug rehab because she couldn't

20   make it through it.  She had no money.  She was estranged

21   from her family members, and she was desperate to get

22   drugs.

23           And I think everyone in this courthouse knows

24   that an addiction to drugs, it's a disease.  You can't

25   just shut it off.  It is a real and serious disease, and

SENTENCING

152

1  that is who the victim was when she first encountered the

2  defendant.

3          She had no home to go to.  She had no money.  As

4  you saw from the trial, she didn't even have a working

5  phone.  She had to go to McDonald's to get onto free WiFi

6  in order to connect to a WiFi phone account.  She was

7  isolated, and she was so desperate for drugs that the

8  thing that she thought she could do was sell her body for

9  sex.

10         And for that reason, she wanted to find a pimp.

11 In her mind, a pimp was someone who was going to protect

12 her, help her set up dates, take her to and from dates.

13 In her case, she wanted someone who could give her drugs.

14         And so after she left drug rehab, she met

15 someone who was a crack customer of the defendant, and

16 when she asked that crack customer, do you know someone

17 who could help me in this way?  His suggestion was the

18 defendant.  And so the crack customer sends pictures of

19 the victim to the defendant, and the defendant's response

20 was, I want her.

21         And the other thing that he asked the crack

22 customer was, is she homeless?  What's apparent here is

23 that he's questioning like the depths of her desperation.

24 Here is a drug addict who is homeless, who wants to engage

25 in prostitution in order to buy crack.

153

1          Someone who's a crack dealer knows just how
2    addictive and destructive crack is.  It is a drug that
3    gives an incredibly short high and an incredibly
4    destructive withdrawal from those drugs.
5          And during her testimony at the first trial, the
6    victim described the psychological and emotional effects
7    that she would go through when she was withdrawing from
8    crack cocaine.  She described it as torture.  She
9    described how it brought her to the point of near -- a
10   point of suicide.
11         And Judge, I remind you that this was a victim
12   who was also grappling with a heroin addiction, which had
13   this like really awful dynamic with her crack addiction
14   because the crack would bring her up and the heroin would
15   bring her down, and she was in this really vicious
16   addictive cycle between these two narcotics, but was
17   primarily relying on crack at the time that she was with
18   the defendant.  And that is the person that this victim
19   was when she encountered the defendant.  She was
20   incredibly vulnerable.
21         And what the testimony and the evidence at this
22   trial showed was that the defendant took full advantage of
23   these vulnerabilities.  He didn't look at the victim and
24   say, this is awful.  Here is a woman who's suffering, who
25   needs help.  Instead, what he did was, he saw an

SENTENCING

154

1  opportunity to make money, and he made lots of money by

2  prostituting this woman and having her sell her body for

3  sex.

4          And he got her to commit more sex acts than she

5  ever wanted to make by conditioning the crack cocaine that

6  her body was addicted to to her meeting his financial

7  goals.  And at first, those financial goals were sometimes

8  a thousand dollars a day.  Later, it became $2,000 a day.

9  That would mean sex with as many as five, six, 10, 15

10  different men in a single day in order to meet the

11  financial goals that the defendant set.

12          And when she didn't meet those goals, he

13  withheld crack cocaine from her.  And what happened when

14  he did that?  That's when the victim started fearing

15  withdrawal, going through those suicidal thoughts, feeling

16  like she was being tortured.  And so what did she do?  She

17  would do those additional commercial sex acts in order to

18  meet those goals, and get whatever amount of crack that

19  the defendant give her.

20          The defendant's treatment of the victim, it

21  didn't just include the withholding of crack and the use

22  of crack to get her to perform these additional sex acts.

23  As you saw from the text messages and as she testified, he

24  withhold her food.

25          She was sick one day, and she was trying to

A - 165

SENTENCING

155

1   sleep and he woke her up because she wasn't responding to

2   the texts about commercial sex dates.  This is truly

3   abhorrent and shameful behavior that reflects like an

4   utter disregard for the well being of another human being.

5           We have excerpted some of this stuff, some of

6   these remarks in our sentencing submission, and I won't

7   read all of it, but I think --

8           THE COURT:  I actually have Judge Engelmayer's

9   findings on that.

10          MS. BHASKARAN:  Yes.

11          THE COURT:  So I don't know if that saves you

12  some time.

13          MS. BHASKARAN:  It will, Judge.  And just for

14  purposes of my oral remarks, I just wanted to refer the

15  Court to our sentencing submission at page 35 or 36, where

16  he described the nature of this conduct and just how

17  shameful, immoral and sadistic it was.  And I'll just --

18  and at one point, he called it in its own way a terrible

19  sadistic assault.

20          And so reflecting back again, this is not about

21  Section 1591 or 1594 or the Travel Act.  This is about

22  just punishment, the nature and seriousness of the

23  offense, and it's about the history and characterizes of

24  this defendant.  And this conduct, this shameful,

25  antisocial degrading treatment of a victim speaks volumes

SENTENCING

156

1    for that, and it counsels for a substantially

2    above-Guidelines sentence in this case.

3            There's a few other factors that I want to

4    mention here that I think bear on sentencing.

5            General deterrence here is also very important

6    in the Court's consideration of the appropriate sentence

7    here.  Obviously, distributing highly-addictive drugs for

8    well over a year is a very serious offense that should be

9    met with a significant sentence to deter other traffic

10   traffickers from selling these dangerous drugs throughout

11   the counties.  But it's also important in terms of the way

12   people treat vulnerable victims like the victims in this

13   case.

14           I think we all know that there's a reason that

15   vulnerable individuals are targeted for this type of

16   abuse.  It's because people think that they won't be

17   believed later on, that they won't show up in court and

18   testify, that they'll be all sorts of things that get in

19   the way of a prosecution because this victim, well, she's

20   homeless, she's a heroin addict, she's a crack addict.

21   She engaged in prostitution.  Who will ever believe her?

22           And our sense is that many sex traffickers, many

23   people who engage in this type of activity think, you know

24   what?  Like the people we're victimizing here, no one's

25   ever going to believe them.

1          It's important for this Court's sentence to send

2     a strong message that when victims like the victim in this

3     case testify, and when they are subject to

4     cross-examination, when the government puts forth evidence

5     of this case, this will be met with a significant

6     sentence.

7          And then finally, Your Honor, I want to make a

8     few remarks on specific deterrence here, and I'll be

9     brief.  This is well-documented in the PSR.  It's in our

10    sentencing submission.  There are numerous convictions in

11    the defendant's criminal history that are not accounted

12    for in his criminal history score, and they were met with

13    lenient punishment.

14          The defendant began what I think is his most

15    significant criminal offense when he was in his forties,

16    and to this day, he's engaging in behavior that is against

17    the law, including by obstructing these very proceedings

18    to this day.  This Court has to send not just a strong

19    message to the public that offenses like this will be met

20    with significant punishment, but that this defendant in

21    particular needs the lesson.

22          And so with that, Your Honor, unless the Court

23    has further questions for the government, we'll rest on

24    that.

25          THE COURT:  Nope.  I'm good.  Thank you.

## SENTENCING

158

1      All right.  I will now describe the sentence I

2  intend to impose.

3      I have considered the factors set out in Title

4  18, United States Code, 3553(a).  As everyone knows, those

5  factors include the nature and circumstances of the

6  offense, and the history and characteristics of the

7  defendant.

8      Against that backdrop, the Court is required to

9  craft a sentence that reflects the seriousness of the

10  offense, that promotes respect for the law, that provides

11  just punishment for the offense, to afford adequate

12  specific and general deterrence to criminal conduct, and

13  to protect the public from further crimes by the

14  defendant.

15      I have quite carefully considered the Advisory

16  Sentencing Guideline ranges as we have discussed them,

17  issued by the Sentencing Commission, and the applicable

18  range in this case -- which again, is the powdered coke

19  guideline, which is substantially lower that could apply,

20  as well as the applicable policy statements issued by the

21  Sentencing Commission.

22      Another factor I must consider under 3553(a)is

23  the need to avoid unwarranted sentencing disparities among

24  similarly-situated defendants -- a factor that plays in a

25  little bit here -- and the need to provide restitution to

159

1    the victims.

2            I don't think we really have that as an issue

3    here.  Am I right about that?

4            MS. BHASKARAN:  We're not seeking restitution

5    here.

6            THE COURT:  Right, given the nature of the

7    crime.  Okay.

8            So I will say that I have extensively considered

9    the appropriate sentence to be imposed here, and I can

10   honestly say I have spent more time on this sentencing

11   than any other sentencing I've been involved in, and that

12   includes many different kinds of crimes, but this is a

13   complicated matter.

14           So let's start with the defendant's personal

15   characteristics.  He has offered some evidence of

16   community support.  I have considered the letters received

17   by the Court, considered them very carefully, including as

18   we mentioned a job offer, which was quite extraordinary,

19   and he has a great number of supporters in the courtroom

20   today, and that's very important.  I'm glad folks came to

21   show their support.

22           I'll also note that this defendant has been

23   incarcerated under the harshest prison conditions

24   imaginable during the COVID pandemic, something I've

25   thought about in terms of a sentence.

A - 170

SENTENCING

160

1    He had a terrible childhood.

2    Something else I'll talk about a little more.

3 He did not accept responsibility for his acts and has

4 shown no remorse during these proceedings.

5    He has a lengthy criminal record, having

6 sustained approximately 17 convictions in his adult life.

7 And there was, as I mentioned, there was an offer of

8 employment contained in one letter that was submitted to

9 the Court.  There is no evidence that he held any

10 legitimate employment over the past decade.

11    In terms of the other 3553(a) factors, the

12 offense conduct here is quite serious.  He organized

13 rampant distribution of crack and cocaine.  Equally

14 troubling or also troubling was the intertwined conduct of

15 prostitution activities by the defendant.  We'll talk a

16 little bit more about that.

17    And while that's not the offense of conviction,

18 the evidence is clear.  The defendant used his access to

19 crack to essentially procure the services of a

20 drug-addicted woman to offer sexual services for money

21 that in some cases, the defendant benefited from.

22    Indeed, the sex trafficking and narcotics

23 distribution in some senses are inseparable, as that

24 woman, referred to in the filings as Victim 1, but we've

25 used her name here, Ms. Greener -- became involved in the

SENTENCING

1    drug distribution operation, selling crack for the

2    defendant or crack or coke to the defendant for her sex

3    customers and to others, to further enhance the

4    defendant's profits.

5            In this highly unusual case, the questions of

6    promotion of respect for the law, just punishment and

7    specific and general deterrence are not satisfied by a

8    sentence within the applicable Guidelines range that I've

9    set forth for several reasons, and an upward variance is

10   warranted.  I will briefly discuss those reasons now.

11           So the grounds for an upward variance in this

12   case, there are four principal factors in this case that

13   warrant an upward variance from the 78 to 97 month range

14   that was discussed earlier.

15           Number one is the use of the powdered cocaine

16   guidelines.  Now, for avoidance of doubt, crack cocaine

17   guidelines remain the law; however, to avoid any issue

18   should Congress adopt the changes being noticed upon it,

19   the Court has opted to accept the parties' request to use

20   the powdered cocaine Guidelines.  Probation calculated his

21   exposure using the crack guidelines, which would yield a

22   range of 185 months or above?  Yes?

23           MS. LANGONE:  188 and above.

24           THE COURT:  I'm sorry, 188 and above.

25           That does raise a small question in my mind

A - 172

SENTENCING

162

1  about sentence disparities between similarly-situated

2  defendants, a fact that the Court can consider, but I

3  haven't put a lot of weight on that particular factor.

4        The fact that this was crack though does play

5  into this case in a unique way because defendant's

6  distribution of crack rather than just powdered cocaine

7  played an important role in this situation.

8        Ms. Greener was a crack addict, among other

9  things, and it was specifically his access to crack that

10 enabled the additional criminal conduct in this case.

11 Thus, the use of the powdered cocaine guidelines in this

12 particular set of circumstances fails to capture the full

13 nature of the conduct and therefore will be one basis upon

14 which the Court would consider an upward variance.

15       The second is the defendant's criminal history.

16 The defendant has, as I mentioned, sustained 17 adult

17 criminal convictions excluding juvenile convictions and

18 the conviction in this case.

19       Now, some of these are, as Mr. LaRusso correctly

20 pointed out, minor matters, matters that wouldn't affect

21 today's calculation in any way, but others are somewhat

22 more serious.

23       He has several assault convictions, including

24 one in which involved several other individuals, and it

25 was the use of a tire iron and a club antitheft bar on two

1    men, which is a pretty significant violent crime.  There

2    were resisting arrests and other narcotics charges.

3          Many of these -- virtually all of these dropped

4    out of the calculation because of the age of the

5    convictions or were the result of various plea bargains,

6    but nevertheless indicate a pattern of recidivism and were

7    incurred when the defendant was well past the age of

8    maturity, an observation that I believe Judge Engelmayer

9    also made about this defendant.

10          Overall, I find that the defendant's criminal

11   history score understates the nature and severity of his

12   criminal record, which is another ground to support an

13   upward variance.

14          Then there is lack of remorse.  Mr. Andrews

15   vehemently contests the factual or legal accuracy of the

16   sex trafficking charge per se, but based on his testimony,

17   he does not, indeed cannot contest that he was a narcotics

18   dealer.  Despite this acknowledgement, the defendant has

19   not expressed a morsel of remorse or regret.

20          He took the stand today with many of his family

21   members present and unabashedly described his narcotics

22   dealing activities.  These facts bear on the questions

23   including things like individual deterrence.

24          And then there is the last potential upward

25   departure ground which I am also relying on, which is the

164

1   sex trafficking activity.

2          The fourth and most perhaps the most important

3   ground for upward departure concerns the defendant's

4   involvement in prostitution activities, which was the

5   subject of a trial in the Southern District of New York

6   that neared completion before being shut down by the

7   pandemic.  As such, there's a substantial evidentiary

8   record to support these charges.

9          The parties have argued whether the individual,

10  Ms. Greener, Victim 1, whether she worked, had other

11  experience as a prostitute before or after her involvement

12  with Andrews, as well as what level of compulsion was used

13  to get her to cooperate or get her to generate monies from

14  sexual activities.

15         The reasons that counsel has spilled a lot of

16  ink on these arguments is simple.  There is the issue of

17  whether the relationship between Andrews and Ms. Greener

18  involved coercion as defined in 18 United States Code,

19  1591(e)(2).

20         To be clear, it's a close call, and I'm not here

21  today to make that determination.  We're not sentencing

22  Mr. Andrews on the sex trafficking offense, although I am

23  considering his involvement, his profiteering from

24  prostitution as grounds for an upward departure as a

25  narcotics offense.

A - 175

SENTENCING

165

1        To be clear, there is case law, including the

2   Eighth Circuit's decision *United States v. Bell* that holds

3   that prior prostitution history does not foreclose a

4   charge under 1591.

5        More importantly, the evidence in this case,

6   some of which was made available in the Southern District

7   of New York trial and as well as the trial before this

8   Court which was limited to narcotics charges reveals that

9   the relationship between Andrews and Ms. Greener was such

10  that he exercised coercive control over her actions by

11  giving her access to narcotics.

12       There is case law such as the decisions in

13  *United States v. Mack* and *United States v. Fields*, as well

14  as common sense that dictate that exploiting narcotics

15  addiction to incentivize sex work plainly falls within the

16  ambit of coercion.

17       Moreover, Ms. Greener testified -- something you

18  didn't discuss today, but has been discussed in papers --

19  to two instances in which the defendant at a minimum at

20  least threatened her with violence, which would also

21  satisfy the statute.  And I'm talking about the March

22  transcript, 150 to 151.

23       Importantly, that's not the determination this

24  Court needs to make today in order to decide whether or

25  not he formally qualifies for the penalty under the 1591

SENTENCING

166

1    statute, but I do think whether or not an upward departure

2    is warranted -- sorry. Scratch that. An upward variance

3    is warranted based on the prostitution activities is

4    really important.

5            I would say that to the extent I've found that

6    there was some element of coercion used, I'm not alone in

7    reaching that conclusion. Based on the testimony

8    presented in the sex trafficking trial in the Southern

9    District, Judge Engelmayer made the following findings

10   concerning the methods used by Mr. Andrews to coerce Ms.

11   Greener.

12           And Judge Engelmayer said the following: I sat

13   through the trial of victim -- he called her Victim 4 --

14   that's Ms. Greener -- at the Carl Andrews trial. It was

15   riveting, it was altogether credible, and it was deeply

16   affecting. I heard her account of how Carl Andrews

17   trafficked her. And you can find that at DE 119-559.

18           Now, addressing the co-conspirator who

19   participated in these acts, Judge Engelmayer held -- and

20   then I'm going to quote this -- suffice it to say, you

21   would bring Victim 1, Ms. Greener, crack and cigarettes

22   and drive her to the residence of prostitution clients or

23   hotels. You brought her food at these hotels. You also,

24   in concert with Andrews, shamefully regulated her food

25   intake, and you did nothing to stop Andrews when you would

167

1  literally deny her food to maintain control over her, as

2  he was denying her or giving her addictive drugs to cement

3  that control.

4         She was totally dependent on Carl Andrews and on

5  you.  He and you regulated her sleep.  Her sleep was

6  denied at times to get her to want more.

7         You also helped Ms. Greener pay for renewal of

8  advertisements for commercial sex acts when at the depths

9  of her despair, she reached out to you for food or to

10  avoid eviction from a hotel.  According to the testimony,

11  you and Andrews ignored her to further cement her control.

12         Along with Andrews, you abused a fellow human

13  being.  You exploited her addiction and poverty and

14  emotional fragility to induce her to sell her body for

15  profits.  And that's DE 119 at 59 to 60.

16         Having seen the testimony here, reviewed the

17  portions of the March trial transcript, I recognize Judge

18  Engelmayer's findings as part of this Court's

19  determination that Mr. Andrews used his access to crack

20  cocaine to exploit Ms. Greener's addiction to further

21  profiteer from prostitution activities.

22         Whether her sex work was a result of coercion,

23  threats of violence on the part of the defendant, to

24  determine the appropriate penalty under 1591, as

25  Subsection (d)(1) of that statute provides for a mandatory

A - 178

SENTENCING

168

1    minimum of 15 years, the same penalty that the government

2    is urging on the Court.

3            On balance, the Court is persuaded by a

4    preponderance of the evidence that the defendant engaged

5    in prostitution activities with Greener, and that that

6    course of conduct involved coercion.

7            Of course, this Court is not sentencing the

8    defendant for a charge to a violation of that section.

9    Rather, the penalty is only instructive in terms of

10   crafting a sentence under the rubric of 3553(a), and thus,

11   is as I've indicated, supportive of an upward variance,

12   but it's not a precise measurement.

13           It could be that the government might not

14   satisfy the burden to sustain that charge at trial, but no

15   matter how one considers the involvement in the

16   prostitution activities, the nature -- it certainly

17   enhances the nature of the criminal activity that is

18   before the Court, that is, the narcotics dealing.

19           The defendant's sex trafficking activities were

20   closely and separately intertwined with the narcotics

21   activities for which he was convicted, and thus, further

22   supports an upward variance to the Guidelines.

23           But to be clear, if we get there, any sentence

24   that could be imposed on the pending sex trafficking

25   charges will run concurrent with the sentence I'm imposing

SENTENCING

169

1    today.

2         I will note that Mr. Andrews has several points,

3    several valid points.  He's served harder time because of

4    COVID, and I have reduced the sentence I intend to impose

5    to reflect that.  I have further reduced the sentence to

6    reflect the arguments raised by Mr. LaRusso, with whom --

7    who did actually an excellent job on this case.

8         So right now, the Guidelines or the guidance is

9    clear.  I think an upward departure is warranted, but the

10   question is how far?  Again, the Guideline we're looking

11   at is 78 to 87 months.  Probation calculated 188 to 235

12   month sentencing range.  The government is urging the sex

13   trafficking penalty of 180 months.  I think that's too

14   much.

15        Based on all of these factors the Court has

16   outlined, including the factor specific to this defendant,

17   his age, his mental status and personal characteristics, I

18   hereby sentence you to a period of incarceration of 115

19   months.

20        Four years of supervised release will have to

21   follow that.  There is a $100 Special Assessment that I

22   must impose.  And I impose no fine, as I find you have the

23   inability to pay a fine.  And no restitution is being

24   sought, so you don't have to deal with that.

25        I find that that sentence is sufficient but not

SENTENCING

170

1   greater than necessary to comply with the purposes of the

2   Guidelines and the statutory scheme, and that the sentence

3   reflects the seriousness of the crime.

4        Now, Mr. Andrews, to the extent you haven't

5   waived it, you have the right to appeal, and you have a

6   right to appeal your conviction and sentence.  If you are

7   unable to pay the cost of an appeal, you can apply for

8   leave to appeal *in forma pauperis*, which means all the

9   fees will be paid.  If you can't afford counsel, counsel

10   will be provided.

11        The Notice of Appeal must be filed 14 days of

12   the Judgment of Conviction.  Now, I normally say that

13   that's today, but we have another matter to resolve, so

14   put that on hold for a moment.

15        So that's the sentence of the Court as to the

16   conviction.

17        Now, I had indicated --

18        MS. BHASKARAN:  Your Honor?

19        THE COURT:  Yes?

20        MS. BHASKARAN:  I apologize.  I apologize for

21   interrupting.

22        I don't -- I wasn't sure if you mentioned any

23   special conditions of supervised release.

24        THE COURT:  Supervised release would include all

25   the special conditions in the Probation report.

SENTENCING

171

1          Any objection to any of those specifically?

2          MR. LARUSSO:  No, Your Honor.  I've read that.

3          THE COURT:  So you've read those.  Thank you for

4    reminding me of that.

5          Let me just check with Probation.  Anything else

6    that needs to be covered for your purposes?

7          MS. LANGONE:  No, Your Honor.

8          THE COURT:  Okay.  Good.

9          All right.  So that's the sentence of the Court.

10         We obviously are not done, but Mr. Andrews is

11   still facing the sex trafficking charge, which would carry

12   the 15-year mandatory minimum.

13         Now, has the government decided what it's going

14   to do about that?

15         MS. BHASKARAN:  Yes, Your Honor, and we'll

16   respond with an application to dismiss the open counts

17   against the defendant.

18         THE COURT:  You're prepared to dismiss those

19   charges?

20         MS. BHASKARAN:  Yes.

21         THE COURT:  All right.  Mr. LaRusso, I assume

22   there is no objection to that?

23         MR. LARUSSO:  No objection, Your Honor.

24         THE COURT:  Okay.  I think that was very wise.

25         All right.  So those open counts are dismissed,

SENTENCING

172

1    which means we're concluded.  That means we will impose

2    the judgment.  We will sign the judgment shortly.

3              Mr. Andrews, just understand, you have 14 days

4    to appeal.  Just talk to Mr. LaRusso about that as soon as

5    you can.  Okay?  I just need to know whether you

6    understand.  You understand?

7              THE DEFENDANT:  Yes.

8              THE COURT:  All right.

9              Anything further from the government?

10             MS. BHASKARAN:  No, Your Honor.

11             THE COURT:  Anything further, Mr. LaRusso?

12             MR. LARUSSO:  No, Your Honor.

13             THE COURT:  All right.  We're adjourned.  Thank

14   you.

15             (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

AO 245B (Rev. 10/13/2021)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| Carl Andrews | ) | Case Number:  2:20CR00546-001(GRB) |
| | ) | USM Number:  91454-053 |
| | ) | Robert LaRusso |
| | ) | Defendant's Attorney |

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 22 2023 ★

LONG ISLAND OFFICE

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   5 of a five-count Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(B) | Conspiracy to Distribute and Possess with Intent to Distribute 28 Grams or More of Cocaine Base (Class B Felony) | 2/27/2019 | FIVE (5) |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   pending   ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/22/2023
Date of Imposition of Judgment

/s/Gary R. Brown

Signature of Judge

Gary R. Brown, United States District Judge
Name and Title of Judge

6/22/2023
Date

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___7___

DEFENDANT:  Carl Andrews
CASE NUMBER:  2:20CR00546-001(GRB)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
ONE HUNDRED FIFTEEN (115) MONTHS

☑ The court makes the following recommendations to the Bureau of Prisons:
    A designation to a facility near the New York metropolitan area.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                  Sheet 3 — Supervised Release

Judgment—Page   3   of    7  

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

      THREE (4) YEARS

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you
           pose a low risk of future substance abuse. *(check if applicable)*
4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |

DEFENDANT:  Carl Andrews
CASE NUMBER:  2:20CR00546-001(GRB)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk..
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
            Sheet 3D — Supervised Release

Judgment—Page   5   of   7

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

- The defendant shall not have contact with Jane Doe. This means that he shall not attempt to meet in person, or communicate by letter, telephone, email, the Internet, or through a third party, without the knowledge and permission of the U.S. Probation Department.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                   Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 6 | of | 7 |

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☐   Lump sum payment of $ _____ due immediately, balance due

    ☐   not later than _____ , or
    ☐   in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ☑   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Case Number
    Defendant and Co-Defendant Names                             Joint and Several          Corresponding Payee,
    (including defendant number)        Total Amount          Amount            if appropriate

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245C (Rev. 10-15-21)   Amended Judgment in a Criminal Case   (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT
Eastern District of New York

| UNITED STATES OF AMERICA | ) | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| Carl Andrews | ) | Case Number:  2:20CR00546-001(GRB) |
| | ) | USM Number: 91454-053 |
| **Date of Original Judgment:**  6/22/2023 | ) | Robert LaRusso |
| *(Or Date of Last Amended Judgment)* | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   5 of a five-count Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(B) | Conspiracy to Distribute and Possess with Intent to Distribute 28 Grams or More of Cocaine Base (Class B Felony) | 2/27/2019 | FIVE (5) |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   pending   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/22/2023
Date of Imposition of Judgment

/s/Gary R. Brown

Signature of Judge

Gary R. Brown, U.S.D.J.
Name and Title of Judge

7/5/2023
Date

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 0 5 2023 ★
LONG ISLAND OFFICE

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __7__

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
ONE HUNDRED FIFTEEN (115) MONTHS

☑ The court makes the following recommendations to the Bureau of Prisons:
A designation to a facility near the New York metropolitan area.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# A - 192

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___7___

DEFENDANT:  Carl Andrews
CASE NUMBER:  2:20CR00546-001(GRB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

FOUR (4) YEARS *

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    4    of    7

DEFENDANT:  Carl Andrews
CASE NUMBER:  2:20CR00546-001(GRB)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk..
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

**A - 194**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___5___ of ___7___

DEFENDANT:   Carl Andrews
CASE NUMBER:   2:20CR00546-001(GRB)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

The defendant shall not have contact with Jane Doe. This means that he shall not attempt to meet in person, or communicate by letter, telephone, email, the Internet, or through a third party, without the knowledge and permission of the U.S. Probation Department.

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___6___ of ___7___

DEFENDANT: Carl Andrews
CASE NUMBER: 2:20CR00546-001(GRB)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | | |
|---|---|---|---|---|
| **TOTALS** | $ | 0.00 | $ | 0.00 |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐ the interest requirement is waived for    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
      Sheet 6 — Schedule of Payments                                                     (NOTE: Identify Changes with Asterisks (*))

                                                            Judgment — Page   7   of    7  

DEFENDANT:  Carl Andrews
CASE NUMBER:  2:20CR00546-001(GRB)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☑  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
        imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Case Number
    Defendant and Co-Defendant Names                                      Joint and Several              Corresponding Payee,
    *(including defendant number)*              Total Amount                     Amount                   if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

_Eastern_   District of _New York_

Caption:

_United States_   v.

_Carl Andrews_

Docket No.: 20-CR-546

Hon. Gary R. Brow
(District Court Judge)

Notice is hereby given that _Carl Andrews_ appeals to the United States Court of Appeals for the Second Circuit from the judgment ✓, other _____, in a criminal case (specify)

entered in this action on _6/30/2023_ (date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |✓| Other |___|

Defendant found guilty by plea | | trial |✓| N/A | .

Offense occurred after November 1, 1987? Yes |✓| No | | N/A |

Date of sentence: June 22, 2023 N/A |___|

Bail/Jail Disposition: Committed |✓| Not committed | | N/A |

Appellant is represented by counsel? Yes ✓ | No | | If yes, provide the following information:

| | |
|---|---|
| Defendant's Counsel: | Robert P. LaRusso |
| Counsel's Address: | 666 Old Country Road |
| | Garden City, New York 11530 |
| Counsel's Phone: | 516-248-3520 |
| Assistant U.S. Attorney: | AUSA Rushmi Bhaskaran |
| AUSA's Address: | One Saint Andrew's Plaza |
| | New York, NY 10007 |
| AUSA's Phone: | 212-637-2439 |

_____
Signature